# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES<br>1201 15th St NW, Suite 400<br>Washington, DC 20005<br><br>RESTAURANT LAW CENTER<br>2055 L St NW, Suite 700<br>Washington, DC 20036<br><br>NATIONAL APARTMENT ASSOCIATION<br>4300 Wilson Blvd, Suite 800<br>Arlington, VA 22203<br><br>MARYLAND BUILDING INDUSTRY ASSOCIATION<br>11825 West Market Place<br>Fulton, MD 20759<br><br>WASHINGTON GAS LIGHT COMPANY<br>1000 Maine Ave, SW<br>Washington, DC 20024<br><br>PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL<br>665 N. Broad Street<br>Philadelphia, PA 19123<br><br>TEAMSTERS LOCAL 96<br>5627 Allentown Rd, Suite 202<br>Camp Springs, MD 20746<br><br><div align="right">*Plaintiffs,*</div><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br><div align="right">*Defendant.*</div> | CASE NO. 24-2492<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiffs National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 seek declaratory and injunctive relief under federal law against enforcement of the Clean Energy DC Building Code Amendment Act of 2022 ("D.C. Appliance Ban"), codified at D.C. Code § 6-1453.01. The D.C. Appliance Ban prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings, including buildings used as residences over three stories (such as apartment buildings), in the District of Columbia after December 31, 2026, at latest. D.C. Code § 6-1453.01(b)(1). But the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, already regulates the energy use of such appliances and expressly and broadly preempts state and local laws on that subject. The D.C. Appliance Ban falls within the heartland of EPCA's express preemption provision because it too purports to regulate the energy use of gas appliances—by preventing such use entirely. As such, the D.C. Appliance Ban is preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets

energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4.   The Ninth Circuit's invalidation of the City of Berkeley's prohibition on gas piping in new buildings just last year is particularly noteworthy since it struck down this same kind of attack on gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. Because the D.C. Appliance Ban does exactly that, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and abandoned their efforts to enact similar bans. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887. Because the District did not do so on its own, the Court must order it to do the same.

5.   The D.C. Appliance Ban inflicts serious and irreparable harm. Banning the use of gas appliances in new construction and renovations is at odds with the needs of District residents, workers, and businesses for affordable, resilient, and reliable energy. Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest and consumer choice, exacerbates the District's housing crisis, and aims to shift the District's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply. Due to the D.C. Appliance Ban artificially limiting the pool of gas customers, homes, apartments, restaurants, and other businesses that rely upon gas services will be forced to pay higher gas prices than they would

otherwise have to pay. Thus, the D.C. Appliance Ban will negatively impact existing buildings as well, even those that do not undergo substantial improvements.

6.   Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems for their livelihoods—stand to lose much if the D.C. Appliance Ban is not enjoined. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, apartment owners, retail, and delivery related to gas and gas infrastructure. Even though the D.C. Appliance Ban does not go into effect until the end of 2026 at latest, its chilling effect is already undermining their livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs and hiring and training programs, and hampering the ongoing maintenance of existing and development of new desperately needed multifamily homes. Ultimately, the D.C. Appliance Ban will compel Plaintiffs to exit some or all of their businesses and trades and substantially increase the cost in the District for apartment homes, lodging, energy, and food service—all despite federal law's express preemption of it.

7.   In sum, the D.C. Appliance Ban is plainly preempted by EPCA, is already inflicting substantial irreparable harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the D.C. Appliance Ban is preempted by EPCA and an injunction preventing its enforcement.

## JURISDICTION AND VENUE

8.   Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have express jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. 42 U.S.C. § 6202(4) defines the term "State" to encompass the District of Columbia under EPCA, and as such, references to states throughout this Complaint should be read to encompass the District of Columbia as well. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

9.   This Court has personal jurisdiction over the District of Columbia and authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injury in the District of Columbia, where Plaintiffs or their members either reside and/or do business, and (ii) the law at issue will be enforced here.

## PARTIES

11. Plaintiff National Association of Home Builders of the United States ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C. It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states. The National Association of Home Builders' mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members. Among NAHB's members are land developers, builders, vendors, trades, building owners, and product manufacturers. The National Association of Homebuilders has one or more members that do business in the District of Columbia and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. For example, one of NAHB's members is an appliance manufacturer that sells gas appliances, "including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers," in the District of Columbia. Ex. 1, Perry McGuire Decl., ¶ 2. The D.C. Appliance Ban will harm this member, as the company "will face significant sales losses if new commercial buildings and substantially modified commercial buildings in the District of Columbia can no longer use the gas appliances we manufacture and sell due to the D.C. Appliance Ban." *Id.* at ¶ 5.

12. The Restaurant Law Center ("RLC") was officially established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States. While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 14.7 million employees, or approximately 10% of the workforce in the United States. RLC's members include more than 500,000 restaurant businesses located across the United States, including businesses in the District of Columbia. RLC's members will be harmed by D.C. Law 24-177 by restricting energy choice, by losing the ability to cook with gas, which is necessary for many of their restaurants' menus, and by increasing the costs of building and maintaining their restaurants. Ex. 2, Angelo Amador Decl., ¶ 7. Furthermore, many RLC members run on thin margins, making any increase in business operations significant. *Id.* at ¶ 8. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are RLC members to pay higher rates for gas service than they otherwise would pay. *Id.* Notably, many RLC members in the District of Columbia are already struggling due to a variety of unfavorable economic conditions. *Id.* at ¶ 9. D.C. restaurant owners still have not fully recovered from the pandemic,[1] and many have already gone out of business. *Id.* The D.C. Appliance Ban will further exacerbate these unfavorable economic conditions. *Id.*

13. The National Apartment Association ("NAA") is the leading voice and preeminent resource for the rental housing industry across the country. As a federation of 141 affiliated apartment associations, NAA encompasses over 97,000 members, representing more than 12 million apartment

---

[1] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in the District of Columbia).

homes globally. NAA emphasizes integrity, accountability, collaboration, inclusivity, and innovation, and believes that rental housing is a valuable partner in every community. In addition to providing professional development, education, and credentialing, NAA and its network of affiliated apartment associations work to ensure that public policy does not impede but promotes the businesses of apartment owners and operators to run their businesses and provide housing to more than 30 million American households. D.C. Law 24-177 harms NAA's members by restricting energy choice and increasing the costs of building and maintaining apartment buildings. Ex. 3, Nicole Upano Decl., ¶ 6. Having access to affordable gas services is important to NAA members. *Id.* at ¶ 7. Many NAA members run on thin margins, making any increase in business operations significant. *Id.* For example, based on data from the operating statements of federally mortgaged properties, each dollar of rent results in a profit of only seven cents to the owners, a slim margin that underscores the challenging financial pressures that the rental housing industry faces.[2] *Id.* The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are NAA members to pay higher rates for gas service than they otherwise would pay. *Id.* Furthermore, research has shown that more than 40% of multifamily development costs derive from regulations imposed by all levels of government.[3] *Id.* at ¶ 8. The D.C. Appliance Ban is another regulation which will further drive up the costs of multifamily rental housing in the District of Columbia. *Id.*

14. Plaintiff Maryland Building Industry Association ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience; the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-

---

[2] National Apartment Association, *Breaking Down One Dollar of Rent: 2023*, https://www.naahq.org/breaking-down-one-dollar-rent-2023 (last visited Oct. 3, 2024).

[3] National Association of Home Builders and National Multifamily Housing Council, *Regulation: 40.6 Percent fo the Cost of Multifamily Development*, (2022), https://www.nmhc.org/globalassets/research--insight/research-reports/cost-of-regulations/2022-nahb-nmhc-cost-of-regulations-report.pdf.

Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the NAHB. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's and St. Mary's, as well as Baltimore City, the Eastern Shore, the District of Columbia. MBIA has members that do business in the District of Columbia and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. Ex. 4, Lori Graf Decl., at ¶¶ 6–8. The D.C. Appliance Ban will restrict MBIA members from using gas in new commercial buildings, and they will be forced to conduct expensive electric retrofits in existing commercial buildings they make substantial modifications to that currently have gas service. *Id.* at ¶ 6. Additionally, the D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are MBIA members to pay higher rates for gas service than they otherwise would pay. *Id.* at ¶ 7. By contributing to rising construction and energy costs, the D.C. Appliance Ban will also further exacerbate the affordable housing crisis in the District.[4] *Id.* at ¶ 8.

15. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 160,000 customers in the District of Columbia, which make up nearly 13% of WGL's customers overall. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. "The D.C. Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers

---

[4] *See, e.g.,* Aaron Wiener, *A 'perfect storm' of problems pushes D.C. toward full-blown housing crisis*, WASHINGTON POST (Sept. 25, 2024), https://www.washingtonpost.com/dc-md-va/2024/09/25/dc-affordable-housing-crisis/.

and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had." Ex. 5, Donald "Blue" Jenkins Decl., ¶ 6. Additionally, "[b]y capping a portion of WGL's customer growth, the D.C. Appliance Ban impedes [the company's] ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system." *Id.* at ¶ 8. The result will be financial harm to and lower profits for WGL. Furthermore, the D.C. Public Service Commission has already relied on the D.C. Appliance Ban to deny WGL's requests regarding pipeline replacement. *Id.* at ¶ 10.

16. Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council ("District Council") is an affiliate of the Laborers International Union of North America ("LIUNA"), AFL-CIO, a 120-year-old labor organization with over 500,00 members throughout the United States and Canada. Ex. 6, Ryan Boyer Decl., ¶ 2. The District Council has approximately 13,000 members, and nationally, one-third of construction work performed by LIUNA members is in the energy sector. *Id.* Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by WGL, such as Miller Pipeline, Infrasource, Skoda Contracting Company, and Vector Services, 70 of whom regularly work in the District. *Id.* at ¶ 3. Notably, District Council members who work on gas distribution lines are required to hold an operator qualification under Subpart G in 49 C.F.R. Part 195. *Id.* at ¶ 4. This valuable employment credential is applicable only to work on gas lines. *Id.* The D.C. Appliance Ban will reduce the work performed by District Council members, leading to layoffs and the permanent loss of employment. *Id.* at ¶ 6. Furthermore, it will cause the gas industry in the local area to shrink, restricting District Council members' ability to find employment in the industry for which they have non-transferrable training and credentials. *Id.*

Loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans. *Id.* Many District Council local members are also WGL customers. *Id.* at ¶ 7. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers like these local members to pay higher rates for gas service than they otherwise would pay. *Id.*

17. Plaintiff Teamsters Local 96 ("Local 96") is a union. Local 96 has approximately 600 members, all of whom are employed by Plaintiff WGL. Ex. 7, Wilder Reed Decl., ¶ 3. As WGL employees, Local 96 members service the more than 160,000 WGL customers in the District of Columbia. *Id.* Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses. *Id.* at ¶ 4. The D.C. Appliance Ban will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. *Id.* at ¶ 6. The D.C. Appliance Ban will therefore harm Local 96's members. *Id.* Additionally, the D.C. Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade. *Id.*

18. Defendant District of Columbia is a municipal corporation that adopted D.C. Law 24-177.

19. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of D.C. Law 24-177. Plaintiffs contend that the D.C. Appliance Ban is preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and assert that the appliance ban is lawful and enforceable. Enforcement of the appliance ban will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

20. The claims asserted herein are ripe for review because Plaintiffs challenge the facial validity of D.C. Law 24-177, thereby raising a legal question. When a question is "predominantly legal,"

there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which D.C. Law 24-177 would be valid under federal law.

## ALLEGATIONS

**D.C. Law 24-177's Ban on Federally Regulated Appliances**

21. D.C. Law 24-177 bans the use of gas appliances in newly constructed or substantially improved existing commercial buildings (which encompasses residences over three stories), including mixed-use buildings with restaurants, apartment buildings, hotels, condos, or houses, located in the District of Columbia.

22. D.C. Law 24-177 applies to "covered buildings," which means "all buildings that are subject to the District of Columbia Energy Conservation Code – Commercial Provisions." D.C. Code § 6-1453.01(a)(2). The District of Columbia Energy Conservation Code defines commercial buildings to encompass "all buildings that are not included in the definition of 'Residential building.'" D.C. Energy Conservation Code, R202 (2017) The Code defines residential buildings to include "detached one- and two-family dwellings and multiple single-family dwellings (townhouses) as well as Group R-2, R-3 and R-4 buildings three stories or less in height above grade plane." *Id.* Accordingly, the D.C. Appliance Ban applies to all such buildings that are more that than three stories.

23. For covered buildings, D.C. Law 24-177 requires the Mayor of the District of Columbia to issue, by December 31, 2026, at latest, "final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard." D.C. Code § 6-1453.01(b)(1).

24. "New construction" includes "new buildings and additions or enlargements of existing buildings, exclusive of any alterations or repairs to any existing portion of a building." *Id.* § 6-1451.01(33); *id.* § 6-1453.01(a)(4).

25. "Substantial improvement" means "any repair, alteration, addition, or improvement of a building or structure, the cost of which equals or exceeds 50% of the market value of the structure before the improvement or repair is started." *Id.* § 6-1451.01(40); *Id.* § 6-1453.01(a)(5).

26. The definition of "net-zero-energy standard" states that "[o]n-site fuel combustion shall not be permitted for the provision of thermal energy to the building." *Id.* § 6-1453.01(a)(3)(B)(iii). This prohibits the use of gas appliances, which necessarily rely upon fuel combustion in their energy use.

27. If the Mayor does not adopt the aforementioned net-zero-energy standard regulations by December 31, 2026, "no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z [of the District of Columbia Energy Conservation Code – Commercial Provisions] . . . ." *Id.* § 6-1453.01.

28. Under Appendix Z, "[o]n-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building . . . ." D.C. Energy Conservation Code, Appendix Z, Section Z3.1 (2017). This prohibits the use of gas appliances, which necessarily rely upon fossil fuel combustion in their energy use.

29. As a result, use of federally regulated gas appliances will be banned in covered buildings in the District after December 31, 2026, at latest, regardless of whether the Mayor promulgates net-zero-energy standard regulations.

30. The Council of the District of Columbia adopted Bill 24-420, which eventually became D.C. Law 24-177, on First Reading and Final Reading, on June 28, 2022, and July 12, 2022, respectively.

31. Following execution by the Mayor on July 27, 2022, the bill became Act 24-528 and was published in the August 5, 2022 edition of the D.C. Register (Vol. 69, page 009924).

32. Act 24-528 was then transmitted to the U.S. Congress on August 9, 2022 for a 30-day review period. The 30-day review period ended on September 21, 2022, at which point Act 24-528 became D.C. Law 24-177 and took effect the same day.

33. On October 7, 2022, D.C. Law 24-177 was published in the D.C. Register (Vol. 69, page 011947).

**EPCA Establishes National Binding Appliance Energy Regulations**

34.  D.C. Law 24-177 impermissibly regulates the energy use of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. § 6201 *et seq.*

35.  EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

36.  The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

37.  Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

38.  In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

39.  Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

40.  In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

41.  One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations

that were more stringent than federal regulations *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

42. Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from State requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

43. In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

44. As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

45. Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

46. After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states can seek permission to establish their own standards, "achieving the

waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

47. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

48. In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state

building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

49.  Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts State Regulation of Consumer and Industrial Appliances**

50.  EPCA expressly preempts state regulation of appliance energy use and efficiency, with only narrow exemptions. The statute sets out specific requirements that must be met to qualify for one of these narrow exemptions. In other words, Congress meant to preempt the entire field of energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state  regulations must meet to avoid preemption.

51.  EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters,"  "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

52. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the

products are used in a commercial building or a residential building. Some of the appliances regulated under D.C. Law 24-177 are considered "consumer products."

53. The express preemption in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

54. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

55. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters and furnaces and gas stoves) which are regularly sold to individuals.

56. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-17.

57. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

58. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

59. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(2)(B). Those products are "industrial" rather than "consumer" if

18

they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

60.  Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning the energy use or energy efficiency of heating equipment, water heaters, furnaces, and gas stoves which are regularly sold for residential, industrial, or commercial use.

**EPCA Preempts the D.C. Appliance Ban**

61. EPCA preempts D.C. Law 24-177 because D.C. Law 24-177 expressly concerns the energy use of EPCA-covered gas appliances which are regularly sold for residential, commercial, or industrial use, as it bans the use of entire classes of such appliances in newly constructed and substantially improved existing buildings over three stories in the District of Columbia.

62. D.C. Law 24-177 concerns the quantity of natural gas consumed by appliances in the buildings it regulates because it prohibits the installation of EPCA-covered products. As a result, D.C. Law 24-177 requires that *no* natural gas is used by such products. Stated another way, these provisions effectively require that the quantity of natural gas used by EPCA-covered products is zero, when the national standards promulgated by DOE specify levels of energy efficiency that are based on different, non-zero levels of gas energy use by such covered products. As a result, EPCA preempts D. C. Law 24-177.

63. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation must meet *all seven* of these requirements to avoid preemption.

64. The EPCA provisions providing the possibility of an exemption from preemption for consumer appliances only apply to codes governing new construction. For the provisions of D.C. Law 24-177 that impose requirements concerning the energy use or energy efficiency of EPCA-

covered appliances in existing buildings that undergo substantial modifications, EPCA provides no exemption from preemption, and D.C. Law 24-177 is thus preempted.

65. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

66. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives in new construction, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

67. When it comes to new construction, D.C. Law 24-177 does not meet all seven requirements listed in Section 6297(f)(3), and is thereby preempted. For example, the first requirement to avoid preemption is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). D.C. Law 24-177 does not meet this requirement, because it does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective. Instead, the builder cannot select *any* EPCA-covered gas appliance, no matter the energy use or efficiency of the appliance.

68. The second requirement is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). D.C. Law 24-177 does not meet this requirement, because it prohibits the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

69. The third requirement is that "[t]he credit to the energy consumption or conservation

20

objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). D.C. Law 24-177 does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than the federal standards require. Instead, D.C. Law 24-177 bans the use of EPCA-covered consumer products.

70.  The fifth requirement is that "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [federal energy efficiency standards for consumer products], there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, ***except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard***." *Id.* § 6297(f)(3)(E) (emphasis added). Here, D.C. Law 24-177 does not allow for any combination where builders can install EPCA-covered gas appliances that meet applicable EPCA efficiency standards.

71. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B). To avoid preemption, a state building code regulation for new construction must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i).

72. D.C. Law 24-177 does not meet this requirement, because it bans EPCA-covered industrial appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

73. Like the EPCA preemption exemption for consumer appliances, the preemption exemption

for industrial appliances only applies to codes governing new construction. To the extent that D.C. Law 24-177 attempts to impose requirements concerning the energy use or energy efficiency of EPCA-covered appliances in the context of substantial modifications to existing buildings, EPCA provides no exemption from preemption, and D.C. Law 24-177 is thus preempted.

74. On information and belief, the District of Columbia has not applied for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required for an exemption under 42 U.S.C. § 6297(d). Even if the District of Columbia did make such an application, it could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

## CAUSES OF ACTION

### <u>COUNT ONE</u>: FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

75. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

76. D.C. Law 24-177 concerns the energy efficiency and energy use of EPCA-covered consumer and industrial appliances in newly constructed or substantially improved existing buildings—including but not limited to certain apartment buildings, condos, and homes—that are more than three stories tall.

77. On information and belief, the District of Columbia has not applied for a waiver from the U.S. Secretary of Energy to be exempt from EPCA preemption, and it could not lawfully obtain such a waiver even if it had applied for one.

78. D.C. Law 24-177's requirements for new construction do not meet EPCA's requirements to be exempt from preemption, including because, inter alia:

    a. It does not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather bans EPCA-covered gas appliances;

    b. It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as they ban the use of EPCA-covered gas appliances, no matter their efficiency; and

    c. It bans EPCA-covered gas appliances, even when they meet the federal efficiency standards.

79. D.C. Law 24-177's requirements for substantial modifications of existing construction are not eligible for an exemption from preemption, as any applicable exemptions only apply to new construction.

80. D.C. Law 24-177 is therefore preempted by the federal EPCA.

81. There is no set of circumstances under which D.C. Law 24-177 would be valid.

82. Plaintiffs accordingly request that the Court declare that D.C. Law 24-177 is preempted by EPCA and enjoin Defendant from enforcing D.C. Law 24-177.

**PRAYER FOR RELIEF**

83. WHEREFORE, Plaintiffs pray for relief as follows:

84. For a permanent injunction enjoining Defendant from enforcing or attempting to enforce D.C. Law 24-177;

85. For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that D.C. Law 24-177 is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

86. For costs of this suit, including reasonable attorney's fees; and

87. For such other and further relief as the Court may deem just and proper.


Respectfully submitted,

BAKER BOTTS L.L.P.

__/s/ Megan H. Berge_____
Megan H. Berge (Bar ID: 983714)
Scott Novak (DC Bar No. 1736274) (*admission pending*)
700 K St NW
Washington, DC
202-639-1308
megan.berge@bakerbotts.com
scott.novak@bakerbotts.com
*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*


RESTAURANT LAW CENTER

__/s/ Angelo Amador_____
Angelo Amador (Bar ID: 480031)
2055 L St NW
Washington, DC 20036
202-331-5913
AAmador@restaurant.org
*Counsel for Restaurant Law Center*


LIUNA, MID-ATLANTIC REGION

__/s/ Brian Petruska_____
Brian Petruska (Bar ID: 498321)
1875 Explorer Dr, Ste. 920
Reston, VA 20190
703-860-4194
bpetruska@mailliuna.org
*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

MOONEY, GREEN, SAINDON, MURPHY &
WELCH, P.C

  /s/ Lauren McDermott
Lauren McDermott (Bar ID: 1008301)
1920 L St NW
Washington, DC 20036
202-783-0010
lmcdermott@mooneygreen.com
*Counsel for Teamsters Local 96*