## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*, <br><br>     **Plaintiffs,** <br><br>     **v.** <br><br> **DISTRICT OF COLUMBIA,** <br><br>     **Defendant.** | **No. 1:24-cv-02942-ACR** |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION

Plaintiffs National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96, by and through undersigned counsel, move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56; a declaratory judgment under 28 U.S.C. § 2201(a) that the federal Energy Policy and Conservation Act preempts D.C. Law 24-177 (the "D.C. Gas Ban") and therefore renders it void and unenforceable; and a permanent injunction enjoining the District of Columbia from enforcing or attempting to enforce the D.C. Gas Ban. In support of this Motion, Plaintiffs rely on the accompanying Memorandum, Statement of Material Facts Not In Dispute, and the attached exhibits. Plaintiffs request an oral hearing on this Motion.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>    **Defendant.** | **No. 1:24-cv-02942-ACR** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

**Page**

Table of Contents ....................................................................................................................... ii

Table of Authorities ................................................................................................................. iii

Introduction ............................................................................................................................... 1

Background ................................................................................................................................ 1

    I.      The Energy Policy and Conservation Act ................................................................ 1

    II.     The D.C. Gas Ban ..................................................................................................... 6

    III.   Plaintiffs' Challenge .................................................................................................. 8

Legal Standards ......................................................................................................................... 9

Argument ................................................................................................................................. 10

    I.      EPCA's plain text expressly preempts the D.C. Gas Ban because it is a
regulation "concerning" the "energy use" or "energy efficiency" of EPCA-
covered appliances. ............................................................................................... 10

         A.   EPCA preempts the D.C. Gas Ban as a regulation "concerning the . . .
energy use" of EPCA-covered appliances. .................................................... 10

         B.   Even without its outright prohibition on gas combustion, the D.C. Gas
Ban still would be preempted as a regulation "concerning" the "energy
use" or "energy efficiency" of EPCA-covered appliances. .......................... 17

    II.     EPCA's history and purpose further confirm its preemption of the D.C. Gas
Ban. ........................................................................................................................ 18

    III.   No exception or waiver applies to save the D.C. Gas Ban from
preemption. ............................................................................................................ 21

    IV.   Plaintiffs are entitled to declaratory and injunctive relief. ..................................... 24

         A.   The Court should enter a declaratory judgment that EPCA preempts the D.C.
Gas Ban. ........................................................................................................ 24

         B.   The Court should enjoin the District from enforcing the D.C. Gas
Ban. ............................................................................................................... 26

Conclusion .............................................................................................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
  64 F.4th 1354 (D.C. Cir. 2023) ............................................................................................9, 27

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) .............................................................................................................9, 26

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*,
  No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ...................................15

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
  710 F.3d 99 (3d Cir. 2013) .......................................................................................................27

*C.F. Folks, Ltd. v. DC Jefferson Building, LLC*,
  308 F.Supp.3d 145 (D.D.C. 2018) ............................................................................................25

*California Restaurant Association v. City of Berkeley*,
  89 F.4th 1094 (9th Cir. 2024) ...............................................................1, 11, 12, 13, 14, 15, 20

*Champion v. Ames*,
  188 U.S. 321 (1903) ..................................................................................................................14

*eBay Inc. v. MercExchange*,
  L.L.C., 547 U.S. 388 (2006) .....................................................................................................26

*Friedman v. Sebelius*,
  686 F.3d 813 (D.C. Cir. 2012) ..................................................................................................11

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ..................................................................................................27

*Hanes Corp. v. Millard*,
  531 F.2d 585 (D.C. Cir. 1976) ..................................................................................................25

*Hemp. Indus. Ass'n v. DEA*,
  36 F.4th 278 (D.C. Cir. 2022) ...................................................................................................24

*Kiakombua v. Wolf*,
  498 F.Supp.3d 1 (D.D.C. 2020) ................................................................................................27

*Lamar, Archer & Cofrin, Llp v. Appling*,
  584 U.S. 709 (2018) ..................................................................................................................11

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
    469 U.S. 256 (1985)..................................................................................................9

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).....................................................................................27

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)................................................................................................25

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)................................................................................................18

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992).........................................................................................11, 14

*Nat. Res. Def. Council, Inc. v. Herrington*,
    768 F.2d 1355 (D.C. Cir. 1985)..............................................................................18

*Philip Morris USA Inc. v. Scott*,
    561 U.S. 1301 (2010)..............................................................................................26

*President v. Vance*,
    627 F.2d 353 (D.C. Cir. 1980).................................................................................25

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc*,
    344 U.S. 237 (1952)................................................................................................25

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
    579 U.S. 115 (2016)................................................................................................10

*Pulsifer v. United States*,
    601 U.S. 124 (2024)................................................................................................13

*Rieser v. District of Columbia*,
    563 F.2d 462 (D.C. Cir. 1977).................................................................................27

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)..................................................................................................26

*Sickle v. Torres Advanced Enter. Sols., LLC*,
    884 F.3d 338 (D.C. Cir. 2018)..................................................................................9

*Thompson v. District of Columbia*,
    832 F.3d 339 (D.C. Cir. 2016)..................................................................................9

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)................................................................................................27

*United States v. Burwell*,
 122 F.4th 984 (D.C. Cir. 2024)..............................................................................................19

*United States v. Slatten*,
 865 F.3d 767 (D.C. Cir. 2017)..............................................................................................11

*Whitman-Walker Clinic v. Dep't of Health & Hum. Servs.*,
 485 F.Supp.3d 1 (D.D.C. 2020)............................................................................................26

**Constitutional Provisions, Statutes, and Regulations**

U.S. Const. art. VI, cl. 2...............................................................................................................9

28 U.S.C. § 2201.........................................................................................................................24

42 U.S.C. § 6291..................................................................................................10, 14, 16, 17, 18

42 U.S.C. § 6292.........................................................................................................................16

42 U.S.C. § 6293.........................................................................................................................16

42 U.S.C. § 6295..........................................................................................................4, 16, 20, 23

42 U.S.C. § 6297...........................................................1, 4, 10, 11, 12, 13, 18, 20, 21, 22, 23, 24

42 U.S.C. § 6311..................................................................................................10, 14, 16, 17, 18

42 U.S.C. § 6314.........................................................................................................................16

42 U.S.C. § 6316.................................................................................1, 5, 6, 10, 11, 13, 18, 21, 24

Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871 (1975) .....................2, 19

National Energy Conservation and Policy Act, Pub. L. No. 95-619, 92 Stat. 3206
 (1978) ..............................................................................................................................2, 3, 19

National Appliance Energy Conservation Act, Pub. L. 100-12, 101 Stat. 103 (1987) .................3

10 C.F.R. § 430.32.........................................................................................................................6

D.C. Code § 6-1451.01 ..................................................................................................................7

D.C. Code § 6-1453.01 ............................................................................................1, 6, 7, 8, 17, 21, 22

D.C. Building Code........................................................................................................................7

D.C. Energy Conservation Code.................................................................................6, 7, 8, 17, 18

D.C. Mun. Regs. tit. 12A, § 101.10.5 ...........................................................................................6

**Legislative Materials**

H.R. Rep. No. 94-340 (1975).............................................................................................................2

S. Rep. No. 94-516 (1975).........................................................................................................1, 19

S. Rep. No. 100-6 (1987)............................................................................3, 4, 19, 20, 21, 23

H.R. Rep. No. 100-11 (1987)......................................................................4, 5, 19, 22, 23

**Other Authorities**

Cambridge English Dictionary Online (2025) .......................................................................10, 11

Julia Richardson & Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat.
   Res. & Env't 62 (1995) .............................................................................................................3

## INTRODUCTION

The core of this case is simple and straightforward. The federal Energy Policy and Conservation Act ("EPCA") expressly preempts State and local laws "concerning the energy efficiency [or] energy use" of gas appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). D.C. Law 24-177 (the "D.C. Gas Ban")[1] explicitly bans the use of gas appliances in a wide variety of commercial and residential buildings. By prohibiting gas appliances from using any energy whatsoever, the D.C. Gas Ban plainly qualifies as a State or local law "concerning the energy efficiency [or] energy use" of gas appliances. Therefore, EPCA expressly preempts the D.C. Gas Ban. EPCA's text, context, history, and purpose are all in accord on this point and confirm that EPCA preempts laws like the D.C. Gas Ban. The Ninth Circuit followed this clear chain of reasoning to that conclusion when it struck down the City of Berkeley's similar gas ban in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). This Court should do the same, hold that EPCA preempts the D.C. Gas Ban, and grant Plaintiffs declaratory and injunctive relief against it.

## BACKGROUND

### I.     The Energy Policy and Conservation Act

EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources. *See* S. Rep. No. 94-516, at 116-17 (1975). Since then, Congress has amended EPCA several times to emphasize the federal government's intent to regulate appliance energy use and efficiency and limit states' ability to act in those areas.

---

[1] Codified at D.C. Code § 6-1453.01. A copy of D.C. Law 24-177 is attached as Exhibit 1.

The original 1975 EPCA provisions regarding consumer appliances focused on appliance labeling, with the expectation that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Pub. L. No. 94-163, 89 Stat. 871 (1975). The statute accordingly required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should issue energy-efficiency standards if the labeling program proved ineffective. Pub. L. No. 94-163 § 324, 325, 89 Stat. 871, 920-24 (1975). Contemporaneous legislative materials make that vision clear: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

In addition to this consumer-empowering approach, the original EPCA also permitted significant state involvement in appliance regulation. Specifically, it allowed state regulations that differed from federal regulations, but only if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard. Pub. L. No. 94-163 § 327, 89 Stat. 871, 927 (1975). Thus, as originally enacted in 1975, EPCA's provisions regarding energy efficiency took a laissez faire approach and permitted state regulation, assuming there was a showing of local need.

Since 1975, however, Congress has amended EPCA several times, progressively moving away from this laissez faire approach and toward binding federal appliance standards. Each one of these amendments further strengthened the federal government's role in regulating appliance energy use and efficiency and restricted states' abilities to set their own standards.

First, in 1978, Congress passed a range of statutes that gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy to sustain economic growth. *See* Julia Richardson & Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal Department of Energy ("DOE") in 1977 to coordinate a federal response to the nation's energy problems.

One of those 1978 statutes was the National Energy Conservation and Policy Act ("NECPA"), Pub. L. No. 95-619, 92 Stat. 3206 (1978), which amended the 1975 EPCA. Rather than rely exclusively on labeling, as EPCA had done, NECPA required DOE to prescribe minimum energy-efficiency standards for certain products. Pub. L. No. 95-619, § 325, 92 Stat. 3206, 3259 (1978). NECPA also strengthened EPCA's preemption provisions, allowing state regulations that were more stringent than federal regulations, but only if the Secretary found that there was significant or local interest to justify the state's regulation and that the regulation would not unduly burden interstate commerce. Pub. L. No. 95-619, § 424, 92 Stat. 3206, 3264 (1978).

Despite NECPA's new requirements, DOE refused to adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption." S. Rep. No. 100-6, at 4 (1987). "As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." *Id.*

So, in 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"), Pub. L. 100-12, 101 Stat. 103 (1987). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance-manufacturing industry through the establishment of national energy conservation standards for major residential

appliances." S. Rep. No. 100-6, at 1 (1987). As the Senate at the time recognized, DOE's abdication of its standard-setting responsibility and its freewheeling waiver policy had created "the problem of a growing patchwork of differing regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, reports about NAECA in the House make clear that Congress sought to "end an era of confusion and uncertainty" for the appliance industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 23, 30 (1987).

NAECA thus contained "two basic provisions:" "The establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." To that end, EPCA's current preemption provision regarding consumer appliances reads:

> [E]ffective on the effective date of an energy conservation standard established or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use of **such covered product shall be effective with respect to such product** . . . .

42 U.S.C. § 6297(c) (emphases added).

After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to preemption. First, DOE can grant a waiver of preemption. *Id.* § 6297(d). But, while states can seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It requires demonstrating an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class." 42 U.S.C. § 6297(d)(4).

The second option to avoid preemption for consumer appliances applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). As the House Report regarding NAECA explains, this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. No. 100-11, at 26 (1987). Flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy-efficiency standards for industrial appliances as well as consumer appliances. EPCA's current preemption provision regarding industrial appliances reads:

> A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, **supersede any State or local regulation concerning the energy efficiency or energy use of a product** for which a standard is prescribed or established pursuant to such section.

42 U.S.C. § 6316(b)(2)(A) (emphasis added).  Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1."  42 U.S.C. § 6316(b)(2)(B)(i).

Thus, in its present form, EPCA covers both consumer and industrial appliances, sets federal standards for the energy use and efficiency of those products, and preempts State regulations concerning those matters.

Invoking its authority under EPCA, DOE has set energy conservation standards for all manner of consumer and industrial appliances.  DOE, *Standards and Test Procedures*, https://www.energy.gov/eere/buildings/standards-and-test-procedures (last visited Apr. 10, 2025).  To name a few, gas stoves, ovens, heaters, water heaters, and dryers are all subject to federal energy conservation standards DOE has promulgated under EPCA.  *Id.*; 10 C.F.R. § 430.32.

## II.    The D.C. Gas Ban

The D.C. Gas Ban bans the use of gas appliances in newly constructed covered buildings and substantial improvements to existing covered buildings located in the District of Columbia.  "'Covered buildings' means all buildings that are subject to the District of Columbia Energy Conservation Code - Commercial Provisions."  D.C. Code § 6-1453.01(a)(2).  Those provisions of the Code apply to "commercial buildings."  D.C. Mun. Regs. tit. 12A, § 101.10.5.  The Code defines "commercial building" to encompass "all buildings that are not included in the definition of 'Residential building.'"  D.C. Energy Conservation Code, § R202.[2]  The Code then defines

---

[2] The District of Columbia Energy Conservation Code is available at https://dob.dc.gov/sites/default/files/dc/sites/dob/publication/attachments/2017%20DC%20Energy%20Code.pdf.

"residential building[s]" as "detached one- and two-family dwellings and multiple single-family dwellings (townhouses) as well as Group R-2, R-3 and R-4 buildings three stories or less in height above grade plane."  *Id.*[3]  All other buildings are "commercial building[s]."  *Id.*  That includes residential buildings (such as condos and apartment complexes) more than three stories tall and businesses.  The D.C. Gas Ban applies to that broad swath of buildings.

The D.C. Gas Ban bans the use of gas appliances in those covered buildings through one of two pathways.  First, the D.C. Gas Ban directs the Mayor of the District of Columbia to issue, by December 31, 2026, at latest, "final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard."  D.C. Code § 6-1453.01(b)(1).  "New construction" includes "new buildings and additions or enlargements of existing buildings, exclusive of any alterations or repairs to any existing portion of a building."  *Id.* § 6-1451.01(33); *id.* § 6-1453.01(a)(4).  "Substantial improvement" means "any repair, alteration, addition, or improvement of a building or structure, . . . the cost of which equals or exceeds 50% of the market value of the structure before the improvement or repair is started."  *Id.* § 6-1451.01(40); *id.* § 6-1453.01(a)(5).  Critically, the definition of "net-zero-energy standard" states that "[o]n-site fuel combustion shall not be permitted for the provision of thermal energy to the building."  *Id.* § 6-1453.01(a)(3)(B)(iii).  That necessarily prohibits the use of gas appliances since they require fuel combustion to function.  In this way, the D.C. Gas Ban mandates that the Mayor promulgate regulations that ban the use of gas appliances in newly constructed covered buildings or substantial improvements to existing covered buildings by December 31, 2026.

---

[3] Group R-2, R-3, and R-4 buildings are generally used for residential purposes and include buildings such as dormitories, apartment houses, and assisted living facilities. *See* D.C. Building Code, Sections 310.4-310.6 (2020), https://dob.dc.gov/sites/default/files/dc/sites/dob/publication/attachments/2017%20District%20of%20Columbia%20Building%20Code_Part%201.pdf.

Second, the D.C. Gas Ban provides a backup pathway in the event the Mayor does not act by the December 31, 2026, deadline. In that event, "no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z [of the District of Columbia Energy Conservation Code - Commercial Provisions] . . . ." D.C. Code § 6-1453.01(b)(2). Appendix Z, in turn, provides that "[o]n-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building except as specified by the *code official*." D.C. Energy Conservation Code, Appendix Z, § Z3.1.[4] This second pathway thus results in a similar ban on the use of gas appliances in covered buildings. Therefore, even if the Mayor does not act by the deadline, the D.C. Gas Ban will still prohibit the use of federally-regulated gas appliances in newly constructed covered buildings or substantial improvements to existing covered buildings in the District after December 31, 2026.

### III.    Plaintiffs' Challenge

Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems for their livelihoods—challenge the D.C. Gas Ban as preempted under EPCA and seek declaratory and injunctive relief. Plaintiffs stand to lose much if the District is not enjoined from enforcing the D.C. Gas Ban. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, apartment owners, and delivery related to gas and gas infrastructure. *See* Ex. 2, Compl., at ¶¶ 11-17; Ex. 3, Perry McGuire Decl., at ¶ 2; Ex. 4, Angelo Amador Decl., at ¶ 2; Ex. 5, Nicole Upano Decl., at ¶¶ 3, 5; Ex. 6 Lori Graf Decl., at ¶¶ 3, 5; Ex. 7, Donald "Blue" Jenkins Decl., at ¶ 3; Ex. 8, Ryan Boyer Decl., ¶¶ 2-3; Ex. 9, Wilder Reed Decl., at ¶¶ 2-4. The D.C. Gas Ban will inflict serious harm on Plaintiffs in

---

[4] Appendix Z is available at
https://doee.dc.gov/sites/default/files/dc/sites/ddoe/service_content/attachments/2017%20DC%20Energy%20Conservation%20Code_Appendix%20Z.pdf.

the form of lost customers, sales, and revenue; loss of employment; increased expenses, including as a result of higher gas prices; and the inability of restaurants to cook with their preferred form of energy—and some those harms are already manifesting now even before the D.C. Gas Ban is fully implemented by December 31, 2026, at latest. *See* Ex. 2, Compl., at ¶¶ 11-17 (citing declarations from members detailing these harms); Ex. 3, Perry McGuire Decl., at ¶ 5; Ex. 4, Angelo Amador Decl., at ¶¶ 7-9; Ex. 5, Nicole Upano Decl., at ¶¶ 6-7; Ex. 6, Lori Graf Decl., at ¶¶ 6-8; Ex. 7, Donald "Blue" Jenkins Decl., at ¶¶ 6-8, 10; Ex. 8, Ryan Boyer Decl., ¶¶ 6-7; Ex. 9, Wilder Reed Decl., at ¶ 6. To prevent and mitigate these harms going forward, Plaintiffs brought this suit for declaratory and injunctive relief.

## LEGAL STANDARDS

Summary judgment is appropriate when the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *Thompson v. District of Columbia*, 832 F.3d 339, 344 (D.C. Cir. 2016) (citing Fed. R. Civ. P. 56.). Federal law, including statutes such as EPCA, is the "supreme Law of the Land" and therefore prevails over— that is, preempts—any conflicting state or local law. U.S. Const. art. VI, cl. 2. "Express preemption arises when," as here, "the federal statute itself announces its displacement of state law through 'an express preemption provision.'" *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). When a court finds that the challenged conduct is preempted, expressly or otherwise, it may enjoin that conduct. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (holding that federal courts "may issue an injunction" against state officials "upon finding the [challenged] state regulatory actions preempted"). Federal courts may also grant declaratory judgments in preemption cases, through which they can declare preempted state law "invalid under the Supremacy Clause." *Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256,

259 n.6 (1985).  Such declaratory relief, as the D.C. Circuit has made clear, "may be considered independently of whether other forms of relief are appropriate."  *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1366 (D.C. Cir. 2023) (internal quotation marks omitted).

**ARGUMENT**

**I.      EPCA's plain text expressly preempts the D.C. Gas Ban because it is a regulation "concerning" the "energy use" or "energy efficiency" of EPCA-covered appliances.**

Ascertaining the scope of EPCA's preemption provision "begins 'with the language of the statute itself,' and that 'is also where the inquiry should end,' [where, as here] 'the statute's language is plain.'"  *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989)).  "[B]ecause the statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'"  *Id.* (quoting *Chamber of Commerce of United States of America v. Whiting,* 563 U.S. 582, 594 (2011)).  Here, EPCA's plain text establishes its preemptive effect over state and local laws like the D.C. Gas Ban.

**A.      EPCA preempts the D.C. Gas Ban as a regulation "concerning the . . . energy use" of EPCA-covered appliances.**

1.      The D.C. Gas Ban falls to EPCA preemption because it is a regulation "concerning the . . . energy use" of EPCA-covered appliances.  42 U.S.C. §§ 6297(c), 6316(b)(2)(A).  The statute defines "energy" as "electricity[] or fossil fuels," such as natural gas.  42 U.S.C. §§ 6291(3), 6311(7).  It then defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use" for consumer products and as "the quantity of energy directly consumed by an article of industrial equipment at the point of use" for industrial products and specifies certain procedures for both.  *Id.* §§ 6291(4), 6311(4).  So EPCA preemption is aimed at regulations

10

concerning the "quantity"—*i.e.*, how much, if any—of "energy"—including "fossil fuels" such as natural gas—can be used by an EPCA-covered product at its "point of use"—*i.e.*, "the place where or time when a product or service is used," Cambridge English Dictionary Online (2025)[5]; *see also Cal. Rest. Ass'n*, 89 F.4th at 1101 ("'[P]oint of use' means the 'place where something is used.'" (quoting Oxford English Dictionary Online (2022)).

Congress's use of the term "concerning" further broadens the scope of EPCA's preemption provision. Congress could have employed narrower language—for example, preempting only regulations "of" the energy use of EPCA-covered appliances. Instead, Congress chose to preempt all regulations "*concerning* the . . . energy use of EPCA-covered appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A) (emphasis added). "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 717 (2018). Such language "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," and courts therefore read it "expansively." *Id.* at 717-18. Indeed, the D.C. Circuit has held as much: "We have noted that the 'ordinary meaning' of 'relating to' is a 'broad one' and that 'a statutory provision containing the phrase therefore has "broad scope."'" *United States v. Slatten*, 865 F.3d 767, 780 (D.C. Cir. 2017) (per curiam) (quoting *Friedman v. Sebelius*, 686 F.3d 813, 820 (D.C. Cir. 2012)). Specifically, "relating to"—the equivalent of "concerning"—means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Friedman*, 686 F.3d at 820 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). "[T]he words thus express a broad pre-emptive purpose." *Morales*, 504 U.S. at 383.

---

[5] https://dictionary.cambridge.org/us/dictionary/english/point-of-use.

Most importantly here, the word "concerning" indicates an intent to preempt not only regulations "of" the energy use of EPCA-covered appliances, but also regulations that merely "concern[]" those appliances' energy use. *Cf. Morales*, 504 U.S. at 383-90 (holding that the Airline Deregulation Act, which prohibits States from enforcing any law "relating to rates, routes, or services" of any air carrier, preempts not only State laws "actually prescribing rates, routes, or services," but also fare-advertising guidelines that "would have a significant impact upon . . . the fares [airlines] charge"). The Ninth Circuit's observations on this point are especially instructive here:

> By using the term "concerning," Congress meant to expand preemption beyond direct or facial regulations of covered appliances. And a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas "concerns" the energy use of those products as much as a direct ban on the products themselves.

*Cal. Rest. Ass'n*, 89 F.4th at 1103.

This "concerning" language is not the only textual indication of EPCA's preemption provision's broad scope. The preemption provision also contains explicit exceptions and waiver procedures that make plain that it reaches beyond regulation of how covered appliances are designed and manufactured. As for the exceptions, the statute contains an entire subsection detailing the "[e]xception for certain building code requirements" from the preemption provision for consumer appliances. 42 U.S.C. § 6297(f). It specifies the circumstances in which "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered product" can avoid preemption. *Id.* § 6297(f)(3). The requirements to trigger the exception include, for example, that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective" and that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of

energy . . . utilizing an equivalent amount of energy." *Id.* §§ 6297(f)(3)(A), (F).  To avoid reading this exception as a nullity, the implication must be that if the exception does not apply, then EPCA's preemption provision extends to building codes that set "energy consumption" requirements.  *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus 'render[s] an entire subparagraph meaningless,' this Court has noted, the canon against surplusage applies with special force.").  As the Ninth Circuit put it, "subsection (f) demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy . . . use' of such products." *Cal. Rest. Ass'n*, 89 F.4th at 1101.[6]

Also instructive are EPCA's provisions specifying the circumstances in which DOE can and cannot waive preemption.  DOE cannot waive preemption if the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis."  42 U.S.C. § 6297(d)(3); *see also id.* § 6316(b)(2)(D) (providing that § 6297(d) governs waivers for regulations concerning industrial appliances as well).  This is yet another indication that EPCA's preemption provision covers far more than direct regulations of an appliance's specifications, as the Ninth Circuit has explained:

> So the federal government must consider the complete lifecycle of an appliance—
> from manufacturing to servicing—in reviewing a waiver petition. Such a provision
> would make little sense if the scope of EPCA's preemption ends with the design or
> manufacture of the product. A burden on "servicing," for example, may implicate
> regulation of the installation and use of the product—like [a] building code. And
> no doubt [a building code gas] ban, if adopted by States and localities throughout

---

[6] EPCA's preemption provision for industrial appliances similarly provides that a "State or local building code for new construction" can avoid preemption if "the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1."  42 U.S.C. § 6316(b)(2)(B). The implication is similar—that if the exception does not apply, then EPCA's preemption provision extends to such building codes.

the country, would "significantly burden" the "sale" of covered products "on a national basis."

*Cal. Rest. Ass'n*, 89 F.4th at 1104.

Putting together all of that statutory text and context, in the words of the Ninth Circuit, "EPCA preempts regulations . . . [concerning] 'the quantity of [natural gas] directly consumed by' certain consumer [and industrial] appliances at the place where those products are used." *Id.* at 1101. That is precisely what the D.C. Gas Ban is. As described in detail above, the D.C. Gas Ban prohibits gas combustion—including gas combustion by EPCA-covered appliances—in the buildings it covers. *See supra* Background, Section II. In doing so, it regulates "the quantity of energy directly consumed by a [consumer or industrial EPCA-covered] product at point of use" by preventing such products from using any gas energy at all. 42 U.S.C. §§ 6291(4), 6311(4); *see also Champion v. Ames*, 188 U.S. 321, 358 (1903) ("[R]egulation may sometimes . . . assume the form of prohibition . . . ."). Indeed, such "a building code regulation that imposes a total ban on natural gas . . . lowers the 'quantity of energy' consumed to 'zero.'" *Cal. Rest. Ass'n*, 89 F.4th at 1102. At the very least, the D.C. Gas Ban qualifies as a regulation "concerning" the amount of natural gas EPCA-covered appliances consume since it makes it impossible for those appliances to consume any natural gas whatsoever at the "point of use." *Morales*, 504 U.S. at 390; *see also Cal. Rest. Ass'n*, 89 F.4th at 1107 ("EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings.").

2. The Ninth Circuit employed similar reasoning to come to same conclusion when it held that EPCA preempted the City of Berkeley's gas ban. *Cal. Rest. Ass'n*, 89 F.4th 1094. That case concerned an ordinance "prohibiting the installation of natural gas piping within newly constructed buildings." *Id.* at 1098. Much of the Ninth Circuit's reasoning has been discussed above and will not be repeated here. The key takeaway—that applies as much here as it did there—

14

is that "a building code that prohibits consumers from using natural gas-powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1102. "So, by its plain language, EPCA preempts Berkeley's regulation . . . because it prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used." *Id.* The same goes for the D.C. Gas Ban. Much as "Berkeley can't bypass EPCA's preemption of building codes that directly ban covered products by instead simply prohibiting the piping that transports natural gas from the utility's meter to the appliance," the District cannot circumvent EPCA preemption by technically permitting the presence of covered products but prohibiting them from combusting any gas. *Id.* at 1107.

One district court has held the opposite on this question, but its reasoning cannot be squared with the statutory text. The law at issue in that case "generally prohibit[ed] the use of fossil fuels such as natural gas and heating fuel in newly constructed residential buildings in New York City." *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *1 (S.D.N.Y. Mar. 18, 2025). The court held that EPCA did not preempt that law and based its holding principally on its interpretation of the term "energy use." According to the court, "'energy use' refers to a predetermined fixed value that measures the characteristics of a covered product as manufactured." *Id.* at *5. It follows, the court explained, that the gas ban was not preempted because it merely "affects the type of fuel that covered products may use in certain settings, not the performance standards applicable to covered products." *Id.* at *7.

The statutory text discussed above forecloses such a narrow view of EPCA's preemption provision. After all, EPCA broadly preempts any regulations "concerning" covered appliances'

"energy use."  So even if "energy use" were narrowly defined to refer only to a product's characteristics determined at the time of manufacture, regulations like New York City's gas ban and the D.C. Gas Ban still would "concern[]" an EPCA-covered product's energy use because they prohibit the use of any such gas-powered product with a non-zero energy use.  That conclusion becomes all the more clear when factoring in the "point of use" focus in the statutory definition of "energy use."  42 U.S.C. §§ 6291(4), 6311(4).  No amount of definitional narrowing can avoid the conclusion that a ban on a product using any gas energy whatsoever at its "point of use" must qualify as a regulation "concerning the . . . energy use" of the product.

And all of that is with assuming the court's overly narrow definition of "energy use."  To be sure, the statute provides that "energy use" is "determined in accordance with test procedures under section 6293 [or, for industrial products, section 6314]."  *Id.*  But it also uses the term "energy use" to refer broadly to the amount of energy a product consumes.  Section 6292(b)(1), for example, permits classification of a product as a covered product if, *inter alia*, the "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year."  *Id.* § 6292(b)(1) (emphasis added); *see also id.* § 6295(*l*)(1) (permitting the promulgation of energy conservation standards for products if, *inter alia*, "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period") (emphasis added).  Given that broader usage and the preemption provision's applicability to building codes—which establishes that it is not limited to regulations regarding a product's design and manufacture—nothing warrants a narrow, technical definition of "energy use."  The far more natural reading is that EPCA preempts regulations "concerning" the "quantity of energy" (such as

16

a natural gas) that an EPCA-covered product consumes at its "point of use."  42 U.S.C. §§ 6291(4), 6311(4).

*       *       *

In sum, the textual analysis yields a single inexorable conclusion: the D.C. Gas Ban falls squarely within EPCA's preemption provision as a regulation "concerning" the "quantity of [natural gas]" consumed by an EPCA-covered product at its "point of use."  42 U.S.C. §§ 6291(4), 6311(4).

### B. Even without its outright prohibition on gas combustion, the D.C. Gas Ban still would be preempted as a regulation "concerning" the "energy use" or "energy efficiency" of EPCA-covered appliances.

The D.C. Gas Ban's outright prohibition on gas combustion is not the only reason for EPCA preemption.  Even beyond that provision, the D.C. Gas Ban otherwise "concern[s]" the "energy use" or "energy efficiency" of gas appliances.

Most notably, the D.C. Gas Ban requires compliance with the Appendix Z provisions regarding energy conservation.  *See* D.C. Code § 6-1453.01(a)(3), (b).  Specifically, Appendix Z provides that buildings must have a Zero Energy Performance Index ("zEPI") of 30 or lower as determined by the following equation: $zEPI = 50.4 \times (EUIp/EUI)$.  D.C. Energy Conservation Code, Appendix Z, § Z2.1.1.  In this equation, EUIp is "[t]he annual energy use of the building in source kBtu/ft$^2$,[7] for the proposed design of the building and its site . . . not taking into account any onsite or off-site renewable energy."  *Id.*  EUI is "[t]he annual energy use of the building in source

---

[7] "Source kBtu/ft$^2$" stands for thousand British thermal units per square foot of source energy. Source energy "represents the total amount of raw fuel that is required to operate the building" and "incorporates all transmission, delivery, and production losses."  EPA, *The Difference Between Source and Site Energy*, https://www.energystar.gov/buildings/benchmark/understand-metrics/source-site-difference.

kBtu/ft$^2$ for a baseline building and its site . . . not taking into account any on-site or off-site renewable energy." *Id.*

All of that technical minutiae aside, the point is that zEPI caps the amount of non-renewable energy a building can use. And since gas appliances consume natural gas, that makes these restrictions regulations "concerning" their "energy use." 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). By restricting the amount of energy that gas appliances can use, those regulations necessarily "concern[]" the "the quantity of energy directly consumed by [the gas appliance] at point of use." *Id.* §§ 6291(4), 6311(4). Similarly, these regulations also "concern[]" gas appliances' "energy efficiency"—*i.e.*, "the ratio of the useful output of services from a [consumer or industrial appliance] to the energy use [of the appliance]," *id.* §§ 6291(5), 6311(3)—since they penalize less efficient gas appliances and reward more efficient gas appliances.

Appendix Z also penalizes EPCA-covered gas appliances by requiring that covered buildings be provided with renewable energy "equal to the EUIp on an annual basis." D.C. Energy Conservation Code, Appendix Z, § Z3. In other words, 100% of the building's energy usage must be covered by renewable energy. Even if that were compatible with the use of any gas appliances, at the very least such appliances would increase the buildings' EUIp and therefore require more renewable energy to be provided to the building. That would be a regulation "concerning" the "energy use" and "energy efficiency" of gas appliances. *Id.* §§ 6291(4), 6311(4).

Thus, this is a second path to the same conclusion—that EPCA preempts the D.C. Gas Ban as a regulation otherwise "concerning" the "energy use" or "energy efficiency" of gas appliances.

## II. EPCA's history and purpose further confirm its preemption of the D.C. Gas Ban.

EPCA's history and purpose confirm what the statute's plain text already makes evident— that EPCA preempts the D.C. Gas Ban. *Cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 490 (1996) (noting the relevance "of the basic purpose of the legislation and its history" to preemption).

As explained above, EPCA embodies a sweeping national policy concerning the energy use and efficiency of consumer and industrial appliances.  In response to the 1970s oil crises, "President Ford called for 'the strongest and most far-reaching energy conservation program we have ever had.'" *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985) (quoting 11 Weekly Comp. Pres. Doc. 40, 41 (Jan. 20, 1975)).  Hearing the call, Congress enacted what it regarded as a "comprehensive national energy policy."  *E.g.*, S. Rep. No. 94-516, at 116-17 (1975).  It is no surprise, then, that EPCA has something to say about the District's authority to ban gas appliances in covered buildings.

The several amendments to EPCA over the years, which have progressively clamped down on state regulatory departures and ratcheted up on federal uniformity, further contextualize EPCA's broad preemptive scope.  *Cf. United States v. Burwell*, 122 F.4th 984, 991 (D.C. Cir. 2024) (considering the statute's history, prior amendments, and contemporaneous legislative reports for interpretive guidance).  As originally enacted in 1975, EPCA permitted differing state appliance regulations, so long as there was a demonstrated need, the regulations did not interfere with interstate commerce, and the regulations were more stringent than the federal standard.  *See* Pub. Law No. 94-163, § 327(b)(2), 89 Stat. 871, 927 (1975).  Three years later, the National Energy Conservation and Policy Act amended portions of EPCA, specifying that states could prescribe regulations more stringent than federal regulations only if DOE granted a waiver.  *See* Pub. L. No. 95-619, § 424(a), 92 Stat. 3206, 3264 (1978).  But in the ensuing years, as states frequently sought waivers from EPCA's preemption provision, Congress came to recognize "the problem of a growing patchwork of differing State regulations" across the country that had "increasingly complicate[d] [appliance manufacturers'] design, production and marketing plans."  S. Rep. No. 100-6, at 4 (1987).  The parochial state regulatory regimes had, according to federal lawmakers,

19

created "an era of confusion and uncertainty" for appliance manufacturers, who were forced to comply with "numerous conflicting State requirements."  H.R. Rep. No. 100-11, at 23, 30 (1987).

Congress fixed this problem of balkanization by amending EPCA to centralize appliance regulation in DOE and strengthen EPCA's preemptive effect, both of which brought needed uniformity to the appliance industry.  As a Senate report at the time put it, the overarching purpose of the amendments was "to reduce the regulatory and economic burdens on the appliance-manufacturing industry through the establishment of national energy conservation standards for major residential appliances."  S. Rep. No. 100-6, at 1 (1987).  Nationalizing these standards and tightening waiver requirements benefitted consumers as well.  Rather than subjecting them to a "patchwork" of state regulations, under which some appliances would be outlawed, Congress expressly sought to avoid any state deviation that would "result in the unavailability in the State of a product type or of products of a particular performance class."  *Id.* at 2; *see* 42 U.S.C. §§ 6295(o)(4), 6297(d)(4).[8]  Thus, with the amendments over the years, Congress continually strengthened EPCA's preemptive effect and substantially narrowed states' ability to depart from the federal regime.

The upshot of these several amendments is that EPCA became a muscular federal regulatory regime that protects consumer choice from local regulatory deviations.  Or, in the Ninth Circuit's words, "by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses."  *Cal. Rest. Ass'n*, 89 F.4th at 1103.  Hence EPCA's now broadly phrased preemption clause preempting "any

---

[8] The same Senate Report provided an example: "[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product."  S. Rep. 100-6, at 8-9 (1987).

State or local regulation concerning [covered appliances'] energy efficiency or energy use," 42 U.S.C. §§ 6297(c); 6316(b)(2)(a), along with the stringent requirements for a waiver or exception, *id*. §§ 6297(d), (f); 6316(b)(2)(D).

The purpose and history of EPCA, in short, reinforce Congress' intent to preempt state regulations concerning appliances' energy use and energy efficiency.  And it demonstrates, more specifically, that the D.C. Gas Ban is exactly the sort of localized regulation that Congress sought to prevent.  If allowed to stand, appliance manufacturers would once again be subjected to a "patchwork" of regulatory regimes across the nation.  S. Rep. No. 100-6, at 4 (1987).  Likewise, consumers and builders in all these jurisdictions would have the choice of gas appliances stripped from them, rendering those "covered products" effectively "unavailable."  *Id.* at 8.  It is clear from EPCA's history and purpose that Congress intended to avoid all of this.  That manifest intention bolsters the plain-text analysis discussed above and confirms that EPCA preempts the D.C. Gas Ban.

## III.    No exception or waiver applies to save the D.C. Gas Ban from preemption.

The D.C. Gas Ban does not qualify for any waiver of or exception to EPCA preemption. DOE can grant a waiver from preemption in some circumstances.  42 U.S.C. § 6297(d).  But here the District admits that it has not even applied for such a waiver.  Ex. 2, Compl., at ¶ 74; Answer, ECF No. 18, at ¶ 74.  So that avenue for avoiding preemption is off the table.

Nor does the D.C. Gas Ban qualify for any exception to EPCA preemption.  For starters, these exceptions apply only to new construction.  42 U.S.C. § 6297(f)(2) (specifying that the exception applies only to regulations "contained in a State or local building code for new construction"); *id.* § 6316(b)(2)(B) (same).  Yet the D.C. Gas Ban applies not only to new construction, but also to substantial improvements in existing buildings.  D.C. Code § 6-1453.01(b)(1) (requiring the Mayor to adopt final regulations "requiring all new construction or

substantial improvements of covered buildings to be constructed to a net-zero-energy standard");
*id.* § 6-1453.01(b)(2) (mandating, if the Mayor does not adopt net-zero-energy standard regulations
by the deadline, that "no building permit application submitted after December 31, 2026, shall be
approved unless the building design complies with the most recent version of Appendix Z").
Therefore, because the D.C. Gas Ban applies to existing buildings, it cannot qualify for an
exception.

The D.C. Gas Ban fails to qualify for an exception for other reasons as well.  The exception
for consumer appliances sets forth a strict, seven-part test for performance-based building codes.
42 U.S.C. § 6297(f)(3).  The D.C. Gas Ban fails that test.

For example, the first requirement to avoid preemption under this test is that "[t]he code
permits a builder to meet an energy consumption or conservation objective for a building by
selecting items whose combined energy efficiencies meet the objective."    42 U.S.C.
§ 6297(f)(3)(A).  The D.C. Gas Ban does not meet this requirement because rather than setting an
"energy consumption or conservation objective for a building" and allowing a builder to select
items that, in combination, meet the objective, it instead imposes a blanket prohibition on the
selection of *any* EPCA-covered gas appliance.

The second requirement is that "[t]he code does not require that the covered product have
an energy efficiency exceeding the" federal EPCA standards.  *Id.* § 6297(f)(3)(B).  The D.C. Gas
Ban does not meet this requirement because it prohibits the use of EPCA-covered gas appliances
that meet federal energy efficiency standards.  This plainly contradicts both the text of EPCA as
well as the legislative history behind this exemption.  Instructively, the relevant House Report
explains that the § 6297(f) exception is intended to "prevent[] state building codes from being used
as a means of setting mandatory State appliance standards in excess of the Federal Standards."

H.R. Rep. No. 100-11, at 26 (1987).  In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ."  *Id.*  Banning EPCA-covered gas appliances outright is incompatible with that goal.

The third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis."  *Id.* § 6297(f)(3)(C).  The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards."  S. Rep. No. 100-6, at 10-11 (1987).  The D.C. Gas Ban does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than the federal standards require.  Instead, the D.C. Gas Ban bans the use of EPCA-covered consumer products and plainly results in "undue pressure on builders to install covered products exceeding Federal standards."

The fifth requirement is that "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [federal energy efficiency standards for consumer products], there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard."  42 U.S.C. § 6297(f)(3)(E).  Here, however, the D.C.

Gas Ban does not allow for any combination where builders can install EPCA-covered gas appliances that meet applicable EPCA energy use and efficiency standards.

The sixth requirement is that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of energy . . . utilizing an equivalent amount of energy." *Id.* § 6297(f)(3)(F). Yet the D.C. Gas Ban specifies its objective as banning gas appliances, period. That outright ban of gas appliances is incompatible with this sixth requirement.

Thus, the D.C. Gas Ban fails multiple times over to qualify for the consumer-appliance exception.

It is much the same for the exception for industrial appliances. To avoid preemption regarding industrial appliances, a state building code for new construction must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(i). The D.C. Gas Ban does not meet this requirement because it bans EPCA-covered gas industrial appliances altogether, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

In sum, the D.C. Gas Ban does not qualify for a waiver from or an exception to EPCA preemption.

## IV.    Plaintiffs are entitled to declaratory and injunctive relief.

Because EPCA expressly preempts the D.C. Gas Ban, and because no waiver or exception can save it, this Court should (1) enter a judgment declaring as much and (2) enjoin the District from enforcing the D.C. Gas Ban.

### A.    The Court should enter a declaratory judgment that EPCA preempts the D.C. Gas Ban.

The D.C. Gas Ban is preempted by EPCA, and this Court has the power to say so in a declaratory judgment. *See* 28 U.S.C. § 2201(a). A court may grant a declaratory judgment when

there is "a case of actual controversy within its jurisdiction" that satisfies "Article III's case-or-controversy requirement." *Hemp. Indus. Ass'n v. DEA*, 36 F.4th 278, 290 (D.C. Cir. 2022) (quoting 28 U.S.C. § 2201(a) and *California v. Texas*, 593 U.S. 659, 672 (2021)). "'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Plaintiffs meet these basic requirements here. There is a substantial, ongoing controversy between the parties: the District asserts the power to ban the use of gas appliances, while Plaintiffs assert their right under federal law to be free from this overreach of parochial regulation. A declaratory judgment "would finally settle the controversy between the parties," *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976), and "terminate and afford relief from the uncertainty, insecurity, and controversy" that the D.C. Gas Ban wreaks on Plaintiffs and their livelihoods, *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). And although the D.C. Gas Ban restrictions have not yet been implemented for covered buildings, its inevitability, *see supra* Background, Section II, confirms that this dispute is ripe for declaratory relief. *See C.F. Folks, Ltd. v. DC Jefferson Building, LLC*, 308 F.Supp.3d 145, 150 (D.D.C. 2018) ("[I]f there is a practical likelihood that the future or contingent event will occur, a declaratory judgment claim may nonetheless present a justiciable controversy.") (internal quotation marks omitted). Put differently, this dispute is neither "nebulous" nor "contingent" but instead has "taken on a fixed a final shape so that [this] court can see what legal issues it is deciding, what effect its decision will

have on the adversaries, and some useful purpose to be achieved in deciding them." *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc*, 344 U.S. 237, 244 (1952).

**B.    The Court should enjoin the District from enforcing the D.C. Gas Ban.**

Plaintiffs are also entitled to an injunction preventing the District from enforcing the D.C. Gas Ban. Federal courts "may issue an injunction" against state officials "upon finding the [challenged] state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."). To be entitled to permanent injunctive relief, Plaintiffs must show "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006). Plaintiffs satisfy each of those elements.

First, the D.C. Gas Ban irreparably harms Plaintiffs. Plaintiffs will experience—and in some cases have already experienced—serious harms. These include lost customers, sales, and revenue; loss of employment; increased expenses, including as a result of higher gas prices; and the inability of restaurants to cook with their preferred form of energy. *See* Ex. 2, Compl., at ¶¶ 11-17 (citing declarations from members detailing these harms); Ex. 3, Perry McGuire Decl., at ¶ 5; Ex. 4, Angelo Amador Decl., at ¶¶ 7-9; Ex. 5, Nicole Upano Decl., at ¶¶ 6-7; Ex. 6 Lori Graf Decl., at ¶¶ 6-8; Ex. 7, Donald "Blue" Jenkins Decl., at ¶¶ 6-8, 10; Ex. 8, Ryan Boyer Decl., ¶¶ 6-7; Ex. 9, Wilder Reed Decl., at ¶ 6. Even the purely economic harms among these "can be irreparable" where, as here, the "economic loss will be unrecoverable . . . [because this] case [is] against a Government defendant where sovereign immunity will bar recovery." *Whitman-Walker Clinic v.*

*Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 58 (D.D.C. 2020); *see also Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (economic losses may be considered irreparable "[i]f expenditures cannot be recouped"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."   (emphasis in original)); *Rieser v. District of Columbia*, 563 F.2d 462, 474-75 (D.C. Cir. 1977) (discussing the District of Columbia's sovereign immunity), *modified on reh'g*, 580 F.2d 647 (D.C. Cir. 1978).

Second, there is no adequate remedy at law for Plaintiffs' harms.  Plaintiffs' monetary losses cannot be made whole in an action at law against the District because the District has sovereign immunity.  *Rieser*, 563 F.2d at 474-75.  Without an injunction, moreover, Plaintiffs and their members will be denied the right to plan and conduct their lives and businesses unburdened by the prospect of the enforcement of a preempted law.  Money damages would do little to remedy that harm.

The third and fourth factors—the balance of harms and the public interest—merge where, as here, the government is the defendant.  *Anatol Zukerman & Charles Krause Reporting, LLC*, 64 F.4th at 1364 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  As detailed above, Plaintiffs and their members are suffering, and will continue to suffer, substantial harm.  The District, by contrast, will suffer no harm at all.  That is because the District has no legitimate interest in enforcing a preempted law.  *See Kiakombua v. Wolf*, 498 F.Supp.3d 1, 57-58 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice.").  By the same token, there is a "substantial public interest" in ensuring that federal law is followed and that unlawful action is ended.  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  And as many courts, including the D.C. Circuit, have held,

requiring compliance with a law that is unlawful is "always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[W]e hold that granting preliminary injunctive relief here is in the public interest because the enforcement of an unconstitutional law vindicates no public interest."). Finally, EPCA embodies a strong public interest in a uniform national energy policy, and specifically one that encourages a diverse domestic supply of energy and protects consumer choice—all of which the D.C. Gas Ban undermines. Plaintiffs satisfy all four factors for injunctive relief.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs summary judgment, enter a permanent injunction enjoining the District from enforcing or attempting to enforce the D.C. Gas Ban, and enter a declaratory judgment that the D.C. Gas Ban is void and unenforceable because it is preempted by EPCA.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *J. Mark Little*
J. MARK LITTLE [admitted pro hac vice]
910 Louisiana Street
Houston, TX 77002
Phone: (713) 229-1489
Email: mark.little@bakerbotts.com

SCOTT NOVAK [1736274]
700 K St NW
Washington, D.C. 20001
Phone: (202) 639-1316
Email: scott.novak@bakerbotts.com

*Counsel for National Association of Home Builders
of the United States, Restaurant Law Center,
National Apartment Association, Maryland Building
Industry Association, and Washington Gas Light
Company*


RESTAURANT LAW CENTER

/s/ *Angelo Amador*
ANGELO AMADOR [480031]
2055 L St NW
Washington, D.C. 20036
Phone: (202) 331-5913
Email: AAmador@restaurant.org

*Counsel for Restaurant Law Center*

LIUNA, MID-ATLANTIC REGION

/s/ *Brian Petruska*
BRIAN PETRUSKA [498321]
1875 Explorer Dr, Ste. 920
Reston, VA 20190
Phone: (703) 860-4194
Email: bpetruska@maliuna.org

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

MOONEY, GREEN, SAIDON, MURPHY & WELCH, P.C.


/s/ *Lauren McDermott*
LAUREN MCDERMOTT [1008301]
1920 L St NW
Washington, D.C. 20036
Phone: (202) 783-0010
Email: lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.***,** | |
| **Plaintiffs,** | **No. 1:24-cv-02942-ACR** |
| **v.** | |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## [PROPOSED] ORDER

Upon consideration of Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction, any oppositions and replies thereto, any arguments of counsel, and the entire record, it is hereby

ORDERED that Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction is GRANTED.

It is DECLARED that D.C. Law 24-177 is preempted by the federal Energy Policy and Conservation Act and is therefore void and unenforceable.

It is FOUND and CONCLUDED that D.C. Law 24-177 irreparably harms Plaintiffs, that Plaintiffs lack any adequate remedy at law, that the balance hardships between Plaintiffs and the District of Columbia weigh in favor the issuance of an injunction against D.C. Law 24-177, and that a permanent injunction against D.C. Law 24-177 is in the public interest.  Therefore, it is ORDERED that the District of Columbia is ENJOINED from enforcing or attempting to enforce D.C. Law 24-177.

Dated:_____          _____
                                                UNITED STATES DISTRICT JUDGE

**NAMES OF PERSONS TO BE SERVED WITH PROPOSED ORDER UPON ENTRY**

Pursuant to Local Rule 7(k), listed below are the names and addresses of the attorneys entitled to be notified of the proposed order's entry:

Brian L. Schwalb
Attorney General for the District of Columbia
400 6th Street, NW
Washington, D.C. 20001

Stephanie E. Litos
Deputy Attorney General, Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001

Matthew R. Blecher
Chief, Civil Litigation Division, Equity Section
400 6th Street, NW
Washington, D.C. 20001

Honey Morton
Assistant Chief, Equity Section
400 6th Street, NW
Washington, D.C. 20001

Adam J. Tuetken
Assistant Attorney General
400 6th Street, NW
Washington, D.C. 20001

J. Mark Little
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002

Scott Novak
Baker Botts L.L.P.
700 K St NW
Washington, D.C. 20001

Angelo Amador
Restaurant Law Center
2055 L St NW
Washington, D.C. 20036

Brian Petruska
LIUNA, Mid-Atlantic Region
1875 Explorer Dr, Ste. 920
Reston, VA 20190

Lauren McDermott
Mooney, Green, Saidon, Murphy & Welch, P.C.
1920 L St NW
Washington, D.C. 20036