## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **DISTRICT OF COLUMBIA,** <br><br> **Defendant.** | **No. 1:24-cv-02942-ACR** |

## <u>DEFENDANT'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Defendant District of Columbia (the District) moves for summary judgment under Fed. R. Civ. P. 56.  The District also opposes Plaintiffs' Motion for Summary Judgment [26].  A memorandum of points and authorities, statement of undisputed material facts, response to Plaintiffs' statement of undisputed material facts, and proposed order are attached.  Because this Motion is dispositive, the District has not sought Plaintiffs' consent.  *See* LCvR 7(m).

Date: May 28, 2025.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

_/s/ Adam J. Tuetken_

ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

_Counsel for Defendant_

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,<br><br>       **Plaintiffs,**<br><br>       **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>       **Defendant.** | **No. 1:24-cv-02942-ACR** |

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I.      EPCA and Its Amendments ........................................................................ 2

    II.    The Clean Buildings Act............................................................................. 4

    III.   This Lawsuit................................................................................................. 7

LEGAL STANDARD......................................................................................................... 7

ARGUMENT ..................................................................................................................... 7

    I.      Plaintiffs Bear a Heavy Burden to Prove Facial Preemption................... 8

    II.    EPCA Does Not Facially Preempt the Fossil Fuel Prohibition. .......................... 10

          A.     EPCA Preempts Regulations Concerning the Quantity of Energy
               That Covered Products Are Designed to Use. ........................................... 10

                 1.    Text ...................................................................................... 10

                 2.    Structure............................................................................... 15

                 3.    History.................................................................................. 17

          B.     The Fossil Fuel Prohibition Does Not Concern the Quantity of
               Energy That Covered Products Are Designed to Use............................... 21

          C.     Plaintiffs' Interpretation and Application of EPCA Are Wrong. ............. 25

                 1.    Plaintiffs Misread EPCA's Text and Structure............................ 25

                       a.    Plaintiffs Improperly Rewrite the Statutory
                             Definition of "Energy Use." ............................................... 26

                       b.    Plaintiffs Stretch the Word "Concerning" Beyond
                             Its Fair Contextual Meaning in EPCA. ............................. 30

                       c.    Plaintiffs' Fallback Arguments Fare No Better. ............... 33

2.  Plaintiffs' Interpretation Conflicts With EPCA's Purposes.......... 34

3.  Plaintiffs' Interpretation Will Lead to Absurd and Untenable Results. ........................................................................ 37

4.  Plaintiffs' Reliance on a Single, Out-of-Circuit Decision Is Misplaced. ................................................................................ 38

5.  At the Least, the Fossil Fuel Prohibition Is Not Facially Invalid. ...................................................................................... 40

III.  Plaintiffs' Attacks on Other Parts of the Clean Buildings Act Are Unavailing. ................................................................................................... 41

IV.  Even if Parts of the Clean Buildings Act Are Preempted, the Act Should Not Be Stuck Down. .................................................................................... 43

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES

## *Cases*

*Abuelhawa v. United States*,
  556 U.S. 816 (2009).................................................................................... 11

*Advoc. Health Care Network v. Stapleton*,
  581 U.S. 468 (2017).................................................................................... 31

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
  410 F.3d 492 (9th Cir. 2005) ................................................................ 14, 35

*Air Transp. Ass'n of Am., Inc. v. DOT*,
  613 F.3d 206 (D.C. Cir. 2010).............................................................. 10, 40

*Alexander v. Sandoval*,
  532 U.S. 275 (2001).................................................................................... 36

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019)......................................................................... 9

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008)........................................................................................ 9

*Am. Legion v. Derwinski*,
  54 F.3d 789 (D.C. Cir. 1995)..................................................................... 30

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................... 7

*Arizona v. United States*,
  567 U.S. 387 (2012)....................................................................................... 9

*Ass'n of Am. Railroads v. DOT*,
  896 F.3d 539 (D.C. Cir. 2018).................................................................... 43

*Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*,
  No. 23-cv-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025)..................... 17, 29, 32, 33, 39

*Ayotte v. Planned Parenthood of N. New England*,
  546 U.S. 320 (2006).................................................................................... 44

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020).................................................................................... 45

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005).................................................................................. 9, 33

*Beyond Pesticides v. Monsanto Co.*,
   311 F. Supp. 3d 82 (D.D.C. 2018) ..................................................................... 9

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
   683 F.3d 1144 (9th Cir. 2012) ....................................................................... 14

*Bondi v. VanDerStok*,
   145 S. Ct. 857 (2025) ..................................................................................... 29

*Burgess v. United States*,
   553 U.S. 124 (2008) ........................................................................................ 27

*Cal. Coastal Comm'n v. Granite Rock Co.*,
   480 U.S. 572 (1987) .................................................................................. 10, 41

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
   479 U.S. 272 (1987) ........................................................................................ 18

*Cal. Rest. Ass'n v. City of Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ........................................ 17, 29, 32, 38, 39, 40, 41

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ........................................................................................ 44

*Cannon v. Watermark Ret. Communities, Inc.*,
   45 F.4th 137 (D.C. Cir. 2022) ........................................................................ 37

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992) ........................................................................................ 18

*City & Cnty. of S.F. v. EPA*,
   145 S. Ct. 704 (2025) ..................................................................................... 31

*Cloud Found., Inc. v. Salazar*,
   999 F. Supp. 2d 117 (D.D.C. 2013) ............................................................... 42

*Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*,
   587 U.S. 262 (2019) ........................................................................................ 28

*Commissions Imp. Exp. S.A. v. Republic of the Congo*,
   757 F.3d 321 (D.C. Cir. 2014) ......................................................................... 8

*Concert Inv., LLC v. SBA*,
   100 F.4th 215 (D.C. Cir. 2024) ...................................................................... 29

*Coventry Health Care of Mo., Inc. v. Nevils*,
   581 U.S. 87 (2017) .......................................................................................... 31

*CTS Corp. v. Waldburger,*
    573 U.S. 1 (2014) ................................................................................... 24, 25

*Dan's City Used Cars, Inc. v. Pelkey,*
    569 U.S. 251 (2013) ........................................ 15, 21, 31, 32, 33, 34, 38

*Davis v. FEC,*
    554 U.S. 724 (2008) ...................................................................................... 42

*Dep't of Agric. v. Kirtz,*
    601 U.S. 42 (2024) ................................................................................. 26, 27

*Dubin v. United States,*
    599 U.S. 110 (2023) ............................................................................... 15, 32

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018) ...................................................................................... 24

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ............................................................................... 13, 24

*FDIC v. Bank of Am., N.A.,*
    No. 17-cv-36, 2025 WL 1100209 (D.D.C. Apr. 14, 2025) ........................ 30

*Forest Grove Sch. Dist. v. T.A.,*
    557 U.S. 230 (2009) ...................................................................................... 20

*Galper v. JP Morgan Chase Bank, N.A.,*
    802 F.3d 437 (2d Cir. 2015) ........................................................................ 31

*Garcia v. United States,*
    469 U.S. 70 (1984) ........................................................................................ 18

*Gary v. United States,*
    499 A.2d 815 (D.C. 1985) ............................................................................ 44

*Gonzaga Univ. v. Doe,*
    536 U.S. 273 (2002) ...................................................................................... 36

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ........................................................................................ 8

*Griffith v. Lanier,*
    521 F.3d 398 (D.C. Cir. 2008) ..................................................................... 23

*Haig v. Agee,*
    453 U.S. 280 (1981) ...................................................................................... 20

*Hearth, Patio & Barbecue Ass'n v. DOE*,
    706 F.3d 499 (D.C. Cir. 2013) ................................................................. 35

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................................... 19

*Hooks v. United States*,
    191 A.3d 1141 (D.C. 2018) ...................................................................... 44

*Huron Portland Cement Co. v. City of Detroit*,
    362 U.S. 440 (1960) ................................................................................... 8

*In re Pittsburgh & Lake Erie Props., Inc.*,
    290 F.3d 516 (3d Cir. 2002) ..................................................................... 11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    34 F.4th 1 (D.C. Cir. 2022) ............................................................... 11, 31

*Lamar, Archer & Cofrin, LLP v. Appling*,
    584 U.S. 709 (2018) ................................................................................. 32

*Leavitt v. Jane L.*,
    518 U.S. 137 (1996) ................................................................................. 44

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................. 44

*LG Elecs. U.S.A., Inc. v. DOE*,
    679 F. Supp. 2d 18 (D.D.C. 2010) ........................................................... 12

*Liu v. SEC*,
    591 U.S. 71 (2020) ................................................................................... 26

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ........................................................................... 16, 29

*Lozano v. Montoya Alvarez*,
    572 U.S. 1 (2014) ......................................................................... 31, 33, 36

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................. 42

*Massachusetts v. EPA*,
    549 U.S. 497 (2008) ................................................................................... 4

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ....................................................................... 8, 10, 17

*Mellouli v. Lynch*,
    575 U.S. 798 ..................................................................................................... 32

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) .......................................................................................... 31

*Monsalvo v. Bondi*,
    145 S. Ct. 1232 (2025) ...................................................................................... 20

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .......................................................................................... 10

*Mowrer v. DOT*,
    14 F.4th 723 (D.C. Cir. 2021) ........................................................................... 27

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) .................................................................. 16, 18, 19

*Nat. Res. Def. Council, Inc. v. Herrington*,
    768 F.2d 1355 (D.C. Cir. 1985) ............................................................... 2, 3, 12

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*,
    627 F.3d 730 (9th Cir. 2010) ............................................................................. 24

*Neb. Dep't of Health & Hum. Servs. v. HHS*,
    435 F.3d 326 (D.C. Cir. 2006) .......................................................................... 44

*New Fortress Energy Inc. v. FERC*,
    36 F.4th 1172 (D.C. Cir. 2022) ........................................................................ 24

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ............................................................................... 23, 32, 33

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
    413 U.S. 405 (1973) .......................................................................................... 23

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) .......................................................................................... 18

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015) ............................................................................................ 8

*Parker Drilling Mgmt. Servs. v. Newton*,
    587 U.S. 601 (2019) .......................................................................................... 26

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988) ................................................................................................ 8

*Phillips v. District of Columbia,*
    No. 22-cv-277, 2024 WL 3756385 (D.D.C. Aug. 12, 2024) ................................. 42

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
    579 U.S. 115 (2016) ........................................................................................... 9

*Rawat v. C.I.R.,*
    108 F.4th 891 (D.C. Cir. 2024) ................................................................. 15, 32

*Rudisill v. McDonough,*
    601 U.S. 294 (2024) ........................................................................................ 15

*Sackett v. EPA,*
    598 U.S. 651 (2023) ........................................................................................ 12

*Sandifer v. U.S. Steel Corp.,*
    571 U.S. 220 (2014) ........................................................................................ 30

*Sandpiper Residents Ass'n v. HUD,*
    106 F.4th 1134 (D.C. Cir. 2024) ............................................................... 28, 30

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983) .......................................................................................... 31

*Shuker v. Smith & Nephew, PLC,*
    885 F.3d 760 (3d Cir. 2018) .............................................................................. 9

*Sickle v. Torres Advanced Enter. Sols., LLC,*
    884 F.3d 338 (D.C. Cir. 2018) ...................................................................... 8, 9

*Student Loan Servicing All. v. District of Columbia,*
    351 F. Supp. 3d 26 (D.D.C. 2018) .................................................................... 9

*Sturgeon v. Frost,*
    587 U.S. 28 (2019) .......................................................................................... 26

*Tanzin v. Tanvir,*
    592 U.S. 43 (2020) .......................................................................................... 32

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................................ 42

*Trudel v. SunTrust Bank,*
    924 F.3d 1281 (D.C. Cir. 2019) ....................................................................... 42

*Trump v. New York,*
    592 U.S. 125 (2020) ........................................................................................ 43

*United States v. Am. Tobacco Co.*,
221 U.S. 106 (1911) .................................................................................. 24

*United States v. Hansen*,
599 U.S. 762 (2023) ............................................................................ 16, 29

*United States v. Little*,
78 F.4th 453 (D.C. Cir. 2023) .................................................................. 24

*United States v. Manafort*,
897 F.3d 340 (D.C. Cir. 2018) .................................................................. 28

*United States v. Miller*,
145 S. Ct. 839 (2025) ............................................................................... 32

*United States v. Torres*,
115 F.3d 1033 (D.C. Cir. 1997) .................................................................. 9

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .................................................................................. 27

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) ....................................................................... 35, 36, 38

*Validus Reinsurance, Ltd. v. United States*,
786 F.3d 1039 (D.C. Cir. 2015) ................................................................ 34

*Van Buren v. United States*,
593 U.S. 374 (2021) .................................................................................. 11

*ViroPharma, Inc. v. Hamburg*,
898 F. Supp. 2d 1 (D.D.C. 2012) ............................................................. 30

*Wash. Gas Light Co. v. Prince George's Cnty. Council*,
711 F.3d 412 (4th Cir. 2013) .................................................................... 37

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011) .................................................................................. 21

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .................................................................. 45

*Wyeth v. Levine*,
555 U.S. 555 (2009) ............................................................. 10, 18, 19, 24, 25

*Ye v. GlobalTranz Enters., Inc.*,
74 F.4th 453 (7th Cir. 2023) ..................................................................... 31

*Zero Zone, Inc. v. DOE,*
   832 F.3d 654 (7th Cir. 2016) ............................................................. 13

## Statutes

42 U.S.C. § 6291(4) ....................................................................... 4, 11, 26

42 U.S.C. § 6291(5) ............................................................................... 4

42 U.S.C. § 6291(6) ....................................................................... 4, 13, 15

42 U.S.C. § 6291(6)(A) ...................................................................... 14, 15

42 U.S.C. § 6292(b)(1)(B) ................................................................... 27, 28

42 U.S.C. § 6292(b)(2)(A) ......................................................................... 27

42 U.S.C. § 6293 .................................................................................. 13

42 U.S.C. § 6293(c)(1) ....................................................................... 13, 14

42 U.S.C. § 6294 .................................................................................. 13

42 U.S.C. § 6295 ............................................................................... 4, 13

42 U.S.C. § 6295(a) ................................................................................ 4

42 U.S.C. § 6295(ii)(1)–(2) ...................................................................... 17

42 U.S.C. § 6295(*l*)(1) .......................................................................... 27

42 U.S.C. § 6297(a)(2)(A) ......................................................................... 11

42 U.S.C. § 6297(c) .............................................. 4, 11, 14, 15, 16, 28, 40

42 U.S.C. § 6297(d) ................................................................................ 16

42 U.S.C. § 6297(d)(3)(C) ......................................................................... 16

42 U.S.C. § 6297(d)(3) ............................................................................ 34

42 U.S.C. § 6297(d)(4) ............................................................................ 36

42 U.S.C. § 6297(f) ................................................................................ 33

42 U.S.C. § 6302(a)(5) ............................................................................ 14

42 U.S.C. § 6314 .................................................................................. 13

42 U.S.C. § 6315 ...................................................................................................... 13

42 U.S.C. § 6316(a)(10) ......................................................................................... 17

42 U.S.C. § 6316(d)(2) ........................................................................................... 17

42 U.S.C. § 6316(e)(2)(A) ...................................................................................... 17

42 U.S.C. § 6316(e)(3)(A) ...................................................................................... 17

42 U.S.C. § 6316(e)(4)(B) ...................................................................................... 17

42 U.S.C. § 6316(f)(1)(A)(ii) .................................................................................. 17

42 U.S.C. § 6316(f)(2)(A)(ii) .................................................................................. 17

42 U.S.C. § 6316(f)(3)(B) ....................................................................................... 17

42 U.S.C. § 6316(g)(1)(B) ...................................................................................... 17

42 U.S.C. § 6316(h)(1)(A)(ii) ................................................................................. 17

42 U.S.C. § 6316(h)(2)(B) ...................................................................................... 17

42 U.S.C. §§ 6321–6326 ......................................................................................... 23

42 U.S.C. § 6325(e)(1) ............................................................................................ 22

42 U.S.C. §§ 6372a–6372g ..................................................................................... 23

42 U.S.C. § 6833 ..................................................................................................... 22

42 U.S.C. § 6834(a)(3)(D)(i)(I) .............................................................................. 25

42 U.S.C. § 6838(d)(2)(A) ...................................................................................... 22

49 U.S.C. § 32919(a) .............................................................................................. 31

D.C. Code § 1-206.02(c)(1) ...................................................................................... 6

D.C. Code § 6-1409 .................................................................................................. 7

D.C. Code § 6-1453.01(a)(2) .................................................................................... 5

D.C. Code § 6-1453.01(a)(3) .................................................................................... 6

D.C. Code § 6-1453.01(a)(3)(B)(i) ........................................................................... 5

D.C. Code § 6-1453.01(a)(3)(B)(iii) ......................................................................... 6

D.C. Code § 6-1453.01(b)(2) ................................................................ 6

D.C. Code § 6-1453.01(b)(2) ................................................................ 6

D.C. Code § 45-201(a) ...................................................................... 44

### *Session Laws and Legislative Materials*

Energy Conservation Standards for New Buildings Act,
   Pub. L. No. 94-385, 90 Stat. 1125 (1976) ...................................... 22

Energy Independence and Security Act, Pub. L. No. 110-140, 121 Stat. 1492 (2007) ................. 3

Energy Policy Act, Pub. L. No. 102-486, 106 Stat. 2776 (1992) ................... 3

Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871 (1975) ..................... 2, 21

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ......................... 23

National Appliance Energy Conservation Act, Pub. L. No. 100-12, 101 Stat. 103 (1987) ........... 3

National Energy Conservation and Policy Act, Pub. L. No. 95-619, 92 Stat. 3206 (1978) ..... 2, 21

133 Cong. Rec. 3,070–72 (1987) ...................................................... 18

H.R. Rep. No. 100-11 (1987) ........................................ 18, 19, 20, 21, 33, 34, 35

S. Rep. No. 100-6 (1987) ........................................................ 3, 18, 33

S. Rep. No. 105-227 (1998) .......................................................... 29

### *Regulations and Administrative Materials*

10 C.F.R. § 429.12 ..................................................................... 13, 14

10 C.F.R. Pt. 430, Subpt. C, App. A, § 5(c) ..................................... 28

10 C.F.R. §§ 430–31 ................................................................... 13

10 C.F.R. § 431.77(a) ................................................................. 41

10 C.F.R. § 431.110 .................................................................... 41

16 C.F.R. § 305.17 ..................................................................... 13

1 DCMR § 600 ........................................................................ 6

12A DCMR § 101 ..................................................................... 5

12A DCMR § 101.10.5 ............................................................................................. 5

12A DCMR § 101.10.6.1 .......................................................................................... 5

12A DCMR § 105 ...................................................................................................... 5

D.C. Energy Conservation Code (2017) ................................................................... 5

47 Fed. Reg. 14,424 (Apr. 2, 1982) ........................................................................ 19

47 Fed. Reg. 57,198 (Dec. 22, 1982) ...................................................................... 33

69 Fed. Reg. 45,420 (July 29, 2004) ....................................................................... 29

71 Fed. Reg. 12,634 (Mar. 13, 2006) ...................................................................... 20

75 Fed. Reg. 51,423 (Aug. 20, 2010) ...................................................................... 29

75 Fed. Reg. 59,470 (Sept. 27, 2010) ..................................................................... 20

76 Fed. Reg. 51,281 (Aug. 18, 2011) ...................................................................... 12

79 Fed. Reg. 17,726 (Mar. 28, 2014) ...................................................................... 13

79 Fed. Reg. 77,868 (Dec. 29, 2014) ...................................................................... 14

85 Fed. Reg. 8,626 (Feb. 14, 2020) ........................................................................ 29

85 Fed. Reg. 30,878 (May 21, 2020) ....................................................................... 20

89 Fed. Reg. 28,856 (Apr. 19, 2024) ....................................................................... 20

89 Fed. Reg. 35,384 (May 1, 2024) ......................................................................... 25

## *Other Authorities*

Am. Gas Ass'n, *About AGA* ..................................................................................... 29

*The American Heritage College Dictionary* (3d ed. 1993) ...................................... 11

*The American Heritage Dictionary of the English Language* (1970) ....................... 30

*Concerning*, Collins Dictionary ............................................................................... 11

Fed. R. Civ. P. 56(a) .................................................................................................. 7

Rosa Hayes, *Obsolescent Preemption*, 103 Tex. L. Rev. 319 (2024) ...................... 39

Int'l Code Council, *2021 Int'l Energy Conservation Code*, App. CC ........................ 23

Candace Osmond, *Concerning – Usage, Meaning & Synonyms*, Grammarist............................ 11

*The Random House Dictionary of the English Language* (2d ed. 1987) ................................ 11, 30

2A *Sutherland Statutory Construction* § 47:29 (7th ed. 2024)..................................................... 29

U.S. Const. art. VI, cl. 2............................................................................................................ 8

U.S. Dep't of Energy, *Standards and Test Procedures* ........................................................... 4, 41

*Webster's Ninth New Collegiate Dictionary* (1985)............................................................. 11, 30

**INTRODUCTION**

Faced with threats to their environment, health, and economy, the people of the District acted.  Through their elected representatives, the people enacted the Clean Energy DC Building Code Amendment Act of 2022 (the Clean Buildings Act), which will transition new buildings away from reliance on fossil fuels—the main culprit of climate change, health hazards, and energy costs.  To that end, one of the Act's many varied measures instructs the Executive to implement a prohibition on burning fossil fuels in new buildings or substantial improvements of existing buildings (the fossil fuel prohibition).

While the Clean Buildings Act won unanimous approval from the District's elected branches and sailed through congressional review, Plaintiffs here (industry groups, labor unions, and a methane gas corporation) oppose the law.  Turning their policy dispute into federal litigation, Plaintiffs sued the District, alleging that the fossil fuel prohibition is preempted by the Energy Policy and Conservation Act (EPCA)—a decades-old federal law about appliance manufacturing and labeling.  Plaintiffs then go further by claiming that the supposed preemption of the fossil fuel prohibition is reason enough to invalidate the *entire* Clean Buildings Act.

Plaintiffs err as much as they overreach.  EPCA sets energy performance standards that appliance manufacturers must meet when designing products.  Through a preemption provision, EPCA prevents states from imposing their own standards on manufacturers.  But the fossil fuel prohibition sets no such standards.  It instead concerns the type of energy that buildings rely on.  Even if EPCA preempted the fossil fuel prohibition, Plaintiffs have not justified striking down the entire Clean Buildings Act, as several rules of constitutional adjudication establish.

To argue otherwise, Plaintiffs stretch EPCA's preemption provision beyond its text, structure, and history to sweep up any state law that tangentially touches appliances and energy.  That interpretation is wrong, and no surprise, thirteen federal judges have already rejected it.  For

good reason.  It would swallow not only any meaningful measure to mitigate climate change but also a range of reasonable regulations that touch on appliances, from fire codes to zoning plans. That is a result that neither the law, nor reason, nor future generations can bear.  Thus, the Court should enter summary judgment in favor of the District and deny summary judgment to Plaintiffs.

**BACKGROUND**

I.    <u>**EPCA and Its Amendments**</u>

Plaintiffs' claim arises under a statute (EPCA) from a different time, with different policymakers, with different policy concerns.  In 1973, foreign oil-producing countries imposed an oil embargo against the United States. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985).  To reduce dependency on "foreign sources of energy," Congress passed and President Ford signed EPCA.  *Id.*  EPCA enacted various policies to achieve its purpose, including policies "to reduce the demand for . . . natural gas," scientifically known as methane gas.  EPCA § 2, Pub. L. No. 94-163, 89 Stat. 871, 874 (1975).

Among those policies were provisions encouraging Americans to use consumer products, like appliances, that conserved energy.  *Herrington*, 768 F.2d at 1364–65.  EPCA required manufacturers of certain enumerated products (called covered products) to label those products with information regarding their energy performance.  *Id.* at 1365.  EPCA also authorized—but did not require—the Federal Energy Administration (the precursor to the Department of Energy (DOE)) to prescribe energy conservation standards (*i.e.*, performance standards) for manufacturers.  *Id.* at 1362.

A few years after EPCA's enactment, President Carter undertook an overhaul of EPCA, resulting in the National Energy Conservation and Policy Act (NECPA), Pub. L. No. 95-619, 92 Stat. 3206 (1978).  In enacting NECPA, Congress commanded that "all sectors of our Nation's

2

economy must begin immediately to significantly reduce the demand for nonrenewable energy resources such as oil and natural gas." NECPA § 102(a)(3), 92 Stat. at 3209. NECPA required the newly created DOE to adopt energy conservation standards for thirteen covered products or make determinations as to why a standard should not be adopted. *Herrington*, 768 F.2d at 1362–63. Upon issuance of a standard or a determination that no standard was needed, NECPA "preempt[ed] any state-law efficiency requirements for the appliance, although the state [could] then apply to [DOE] for an exemption" (also called a waiver). *Id.* at 1363.

A few years after NECPA's enactment, President Reagan took office, and his DOE largely declined to adopt any energy conservation standards. *Id.* at 1368. Instead, DOE regularly granted petitions from states to establish their own standards. S. Rep. No. 100-6, at 4 (1987). As a result, appliance manufacturers faced a "patchwork" of standards. *Id.*

The solution was the National Appliance Energy Conservation Act (NAECA), Pub. L. No. 100-12, 101 Stat. 103 (1987). NAECA amended EPCA to establish, as a matter of statutory law, energy conservation standards for certain consumer appliances and authorized DOE to amend or add standards. S. Rep. No. 100-6, at 2. NAECA also provided that, once a federal energy conservation standard took effect, it "would preempt all State standards." *Id.* Finally, NAECA set clearer requirements for states seeking waivers from preemption. *Id.* Later enactments created a similar energy conservation standards program for certain industrial equipment. Energy Policy Act, Pub. L. No. 102-486, 106 Stat. 2776 (1992); Energy Independence and Security Act, Pub. L. No. 110-140, 121 Stat. 1492 (2007).[1]

---

[1]    Because EPCA enacts similar, often identical, policies for industrial equipment, this brief will refer primarily to EPCA's consumer provisions, and the same interpretations will apply to the corresponding industrial provisions, unless noted.

As it stands today, EPCA and implementing rules establish energy conservation standards for covered products.  42 U.S.C. § 6295(a); *see* DOE, *Standards and Test Procedures*, https://tinyurl.com/x4stj5tf (listing covered products).  An "energy conservation standard" means either a "design requirement" or "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use."  42 U.S.C. § 6291(6).  Energy efficiency and energy use are different ways to measure a product's energy conservation performance.  "Energy efficiency" "means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures" established by DOE.  *Id.* § 6291(5).  "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures" established by DOE.  *Id.* § 6291(4).  DOE's test procedures "measure energy efficiency [or] energy use . . . of a covered product during a representative average use cycle or period of use."  *Id.* § 6293(b)(3).  EPCA uses energy use for a minority of products, while using energy efficiency for the majority.  *See id.* § 6295.

EPCA contains a "[g]eneral rule of preemption for energy conservation standards when [a] Federal standard becomes effective for [a] product."  *Id.* § 6297(c).  It provides that once the federal government sets an "energy conservation standard . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product."  *Id.*

## II.    **The Clean Buildings Act**

When EPCA was enacted, "the study of climate change was in its infancy." *Massachusetts v. EPA*, 549 U.S. 497, 507 (2008).  Today, much more is understood about climate change, *id.* at 521, including that "energy production for buildings is by far the largest source of greenhouse gas emissions in the District," Def.'s Statement of Undisputed Material

Facts (Def.'s SUMF) ¶ 4.  And so, "reducing buildings' energy burden and reliance on fossil fuels for energy is critical to [the District's] emissions reduction goals."  *Id.* ¶ 5.

Accordingly, to begin construction on a building in the District, the owner or agent must obtain a permit after showing compliance with the District's Energy Conservation Code.  *See* 12A DCMR §§ 101, 105; D.C. Energy Conservation Code (2017), https://tinyurl.com/yeudrb84. As one compliance pathway, projects may comply with Appendix Z to the Energy Conservation Code, which provides specifications for designing a net-zero-energy building.  12A DCMR § 101.10.6.1.  In short, a net-zero-energy building reduces its energy needs such that it can satisfy those needs with renewable energy.  Def.'s Ex. 5, 2017 App. Z1; Def.'s Ex. 2, Clean Energy DC Building Code Amendment Act of 2022 Comm. Rep. (Comm. Rep.) at 2.

The Clean Buildings Act represents the next step in the District's transition to net-zero-energy buildings.  The Act provides that "[b]y December 31, 2026, the Mayor . . . shall issue final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard."  D.C. Code § 6-1453.01(a)(3)(B)(i).  "Covered buildings" include commercial buildings and residential buildings over three stories.  *See id.* § 6-1453.01(a)(2); 12A DCMR § 101.10.5; D.C. Energy Conservation Code R202.  Under the Act, a "net-zero-energy standard" means

a standard under which:

(A) A building conserves an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z; and

(B) A building obtains energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z; provided, that the following restrictions shall apply:

(i) Renewable energy shall be generated at the building site wherever feasible;

> (ii) To the extent a building owner procures renewable energy through offsite sources, the building owner may not rely on unbundled renewable energy credits to satisfy the renewable energy requirement; and
>
> (iii) On-site fuel combustion shall not be permitted for the provision of thermal energy to the building.

D.C. Code § 6-1453.01(a)(3).

If the Mayor does not adopt a net-zero-energy standard by December 31, 2026, then building permit applications submitted after that date must comply with the most recent version of Appendix Z. *Id.* § 6-1453.01(b)(2). Currently, Appendix Z provides that "[o]n-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building." 2017 App. Z3.1. This brief uses "fossil fuel prohibition" to refer to the prohibition on "[o]n-site fuel combustion," which is to be implemented either by the Mayor, D.C. Code § 6-1453.01(a)(3)(B)(iii), or by incorporation of Appendix Z, *id.* § 6-1453.01(b)(2).

The Clean Buildings Act was unanimously passed by the Council, Def.'s SUMF ¶ 1, after finding that it would not only cut emissions but also reduce "exposure to the harmful pollutants that natural gas combustion releases into the air" and "offer owners and tenants significant savings on energy bills," *id.* ¶ 7. The Mayor also approved the Act. *Id.* ¶ 2. Then it cleared congressional review. *Id.* ¶ 3; *see* D.C. Code § 1-206.02(c)(1) (requiring congressional approval of District statutes).

The Mayor has delegated authority for amending the Energy Conservation Code—and thus implementing the Clean Buildings Act—to the Construction Codes Coordinating Board (Board). 1 DCMR § 600. So the next step is for the Board to conduct notice-and-comment rulemaking to implement the Act.

Finally, the Board approved a new version of Appendix Z. Def.'s SUMF ¶ 8. To have the force of law, the new version must, among other things, go through notice-and-comment

rulemaking and be approved by the Council.  D.C. Code § 6-1409.  As relevant here, the new

version provides that "[a]ll buildings shall be all-electric buildings."  Def.'s Ex. 6, 2023 App.

Z4.2.

### III.    <u>This Lawsuit</u>

Plaintiffs here include industry groups that lobby and litigate on behalf of developers,

Compl. [1] ¶¶ 11, 14, landlords, *id.* ¶ 13, and restauranteurs, *id.* ¶ 12.  Plaintiffs also include two

labor unions.  *Id.* ¶¶ 16, 17.  Finally, Plaintiffs include a gas company.  *Id.* ¶ 15.  What unites

Plaintiffs is that they make money off methane gas.  *See id.* ¶¶ 6, 11–17.

Delaying two years after the Clean Buildings Act's enactment, Plaintiffs sued the

District, alleging that EPCA expressly preempts the fossil fuel prohibition.  *Id.* ¶ 1.  Based on the

prohibition's supposed invalidity, Plaintiffs allege that the entire Act is preempted on its face,

and they seek a declaration and injunction invalidating the Act.  *Id.* ¶¶ 1, 20, 84–85.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the

governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

## ARGUMENT

Plaintiffs bear a heavy burden to prove that the Clean Buildings Act is preempted on its

face.  They do not meet it.  They chiefly attack the fossil fuel prohibition, but it is not preempted.

Although they belatedly attack a few other parts of the Act, that new claim fails, too.  Even if the

Court disagrees, the supposed invalidity of parts of the Act is not sufficient to invalidate the entire Act.

I.    **Plaintiffs Bear a Heavy Burden to Prove Facial Preemption.**

Because Plaintiffs largely ignore the applicable legal framework, a clarification of preemption principles is needed. *See* Pls.' Mem. of P. & A. in Supp. of Their Mot. for Summ. J. (Pls.' Mot.) [26] at 9–10. Our federalist system leaves most policymaking powers to the states. *Gregory v. Ashcroft*, 501 U.S. 452, 457–58 (1991); *see Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 326 (D.C. Cir. 2014) (same "preemption principles" apply to the District). This includes the powers to protect "the lives, limbs, health, comfort, and quiet of all persons," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks and citation omitted), enact housing and building ordinances, *Pennell v. City of San Jose*, 485 U.S. 1, 12 (1988), free the air of pollution, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960), and regulate the distribution of gas to consumers, *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 378 (2015). In contrast, the Constitution gives the federal government only "limited powers." *Gregory*, 501 U.S. at 457.

When the federal government acts within the confines of those limited powers, the Supremacy Clause makes federal law "supreme." U.S. Const. art. VI, cl. 2. That is, federal law "preempts" state law. Preemption may occur when a federal statute includes an express provision stating what state laws are preempted. *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 347 (D.C. Cir. 2018). This is known as express preemption, *id.*, and it is what Plaintiffs invoke here, Pls.' Mot. at 1.

Nonetheless, preemption "is a power that we must assume Congress does not exercise lightly." *Gregory*, 501 U.S. at 457. Accordingly, the Court starts with the "assumption . . . that federal law does not override 'the historic police powers of the States.'" *Sickle*, 884 F.3d at 346

(quoting *Arizona v. United States*, 567 U.S. 387, 400 (2012)).  To overcome that assumption (also called a presumption), the party advocating preemption must show that it was "the 'clear and manifest' intent of Congress" for a federal statute to supersede state law.  *Id.* (quoting *Arizona*, 567 U.S. at 400).  This means that "[w]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'"  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

Plaintiffs dismiss the presumption against preemption, claiming it was abandoned in *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).  Pls.' Mot. at 10.  *Puerto Rico*, however, did not purport to overrule precedent applying the presumption, and the Supreme Court does not silently overrule precedent.  *Al-Tamimi v. Adelson*, 916 F.3d 1, 12 (D.C. Cir. 2019); *see Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (*Puerto Rico* did not overrule cases applying the presumption to claims involving the historic powers of the states).  Post-*Puerto Rico*, the D.C. Circuit continues to apply the presumption.  *Sickle*, 884 F.3d at 346.  Because this Court "follow[s] controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule[s] it," *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997), the presumption continues to apply in this circuit, *e.g.*, *Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 47 (D.D.C. 2018); *Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82, 91 (D.D.C. 2018).

Regardless of whether the presumption applies, the Court follows the basic tools of statutory construction when interpreting the preemption provision to "'identify the domain expressly pre-empted' by [its] language" and determine "the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law."

9

*Medtronic*, 518 U.S. at 484–86.  The Court looks not just to the preemption provision but also to the statute's other parts and history.  *Id.* at 486; *Wyeth v. Levine*, 555 U.S. 555, 566 (2009).

Plaintiffs' burden is compounded because they bring a facial challenge, Compl. ¶ 20, which is "hard to win," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  Plaintiffs must "establish that no set of circumstances exists under which [the Act] would be valid."  *Air Transp. Ass'n of Am., Inc. v. DOT*, 613 F.3d 206, 216 (D.C. Cir. 2010).  On the flip side, to defeat Plaintiffs' claim, the District "need[ ] merely to identify a possible set of" of circumstances in which the Act can be applied without being preempted.  *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987).

## II.    EPCA Does Not Facially Preempt the Fossil Fuel Prohibition.

Plaintiffs' facial-preemption claim fails because EPCA preempts regulations concerning the quantity of energy that covered products (*e.g.*, appliances) are designed to use, while the fossil fuel prohibition regulates the *type* of energy that *buildings* are permitted to use.  Plaintiffs' contrary interpretation of EPCA is wrong.

### A.    EPCA Preempts Regulations Concerning the Quantity of Energy That Covered Products Are Designed to Use.

EPCA's text and structure reveal that it preempts regulations concerning the quantity of energy that products are designed to use (*i.e.*, energy conservation standards or their equivalents).  EPCA's history confirms as much.

#### 1.    Text

The "analysis of the scope of the pre-emption statute must begin with its text." *Medtronic*, 518 U.S. at 484.  EPCA's preemption provision states in relevant part: "effective on the effective date of an energy conservation standard . . . , no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with

respect to such product." 42 U.S.C. § 6297(c). Plaintiffs argue that the fossil fuel prohibition is a "regulation concerning the . . . energy use" of covered products. Pls.' Mot. at 10. This case thus turns on the meaning of that phrase and the larger preemption provision.

Ticking through each constituent term, "regulation" means "a law, regulation, or other requirement of a State or its political subdivisions." 42 U.S.C. § 6297(a)(2)(A). "Concerning" can mean "regarding," "about," "in reference to," "of," or "relating to." *Webster's Ninth New Collegiate Dictionary* 272 (1985); *The Random House Dictionary of the English Language* 423 (2d ed. 1987); *The American Heritage College Dictionary* 288 (3d ed. 1993). It more often and more naturally means "about." *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 34 F.4th 1, 10 (D.C. Cir. 2022) (construing "concerning" to mean "about"); Candace Osmond, *Concerning – Usage, Meaning & Synonyms*, Grammarist, https://tinyurl.com/ubr2bd2v (explaining that "concerning" is commonly used to mean "about"); *Concerning*, Collins Dictionary, https://tinyurl.com/mwpezh7f (similar); *Abuelhawa v. United States*, 556 U.S. 816, 820 (2009) (interpreting a term narrowly based on its "common usage"). At bottom, "concerning" "is essentially a connecting term, the scope and meaning of which is defined in part by the terms it modifies." *In re Pittsburgh & Lake Erie Props., Inc.*, 290 F.3d 516, 519 (3d Cir. 2002) (Hall, J., joined by Alito & Rendell, JJ.). Here, those terms are, in addition to "regulation," "the . . . energy use of such covered product."

"Energy use" has a statutory definition, which the Court follows. *Van Buren v. United States*, 593 U.S. 374, 387 (2021). EPCA defines "energy use" to mean "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). Section 6293, in turn, provides for test procedures that "measure . . . energy use . . . of a covered product during a

representative average use cycle or period of use, as determined by [DOE]." *Id.* § 6293(b)(3).

The definition uses a technical term—"point of use"—as an instruction to measure "the use of

electricity, natural gas, propane, and/or fuel oil by an appliance at the site where the appliance is

operated," also called *site energy*. 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011). This measure

does not include "the energy losses associated with generation, transmission, and distribution of

electricity, and the energy consumed in extracting, processing, and transporting or distributing

primary fuels," also called *source energy*. *Id.* at 51,282.

Putting those pieces together, "energy use" is a representative measure of how much site

energy a product typically consumes per use cycle or in a given period, measured under

controlled conditions. As such, energy use is a function of a covered product's manufacture or

design. It is a fixed value that estimates and describes the performance of products.

Importantly, how a consumer actually uses a product has no effect on "energy use," as

defined by EPCA. That is because "energy use" is measured according to DOE test procedures

in laboratory settings and seeks to approximate the *typical*—not actual—quantity of energy

consumed by a product. *See Herrington*, 768 F.2d at 1404 (explaining that DOE test procedures

test "the performance of appliances under conditions *simulating* actual use" (emphasis added));

*LG Elecs. U.S.A., Inc. v. DOE*, 679 F. Supp. 2d 18, 24–25, 32–33 (D.D.C. 2010) (describing

laboratory testing of covered products). If a consumer never installs a product, or it sits unused

in her home, that figure is unchanged. The product still has the same "energy use" as when the

manufacturer made it.

EPCA makes sense only if "energy use" is understood as a fixed value measuring the

characteristics of the product as manufactured. *See Sackett v. EPA*, 598 U.S. 651, 674–76 (2023)

(considering how a term is used throughout a statute to derive its meaning in the provision at

issue); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (construing

provision as part of "a symmetrical and coherent regulatory scheme" (internal quotation marks

and citation omitted)).  The way EPCA works is that the statute or DOE sets "energy

conservation standards" for covered products.  42 U.S.C. § 6295.  As relevant here, an "energy

conservation standard" is "a performance standard which prescribes . . . a maximum quantity of

*energy use* . . . for a covered product, determined in accordance with test procedures prescribed"

by DOE.  *Id.* § 6291(6) (emphasis added).[2]  Once an energy conservation standard is in place,

manufacturers "use different design paths in order to attain the performance levels required" by

the standard.  *Zero Zone, Inc. v. DOE*, 832 F.3d 654, 666 (7th Cir. 2016) (internal quotation

marks omitted) (quoting 79 Fed. Reg. 17,726, 17,750 (Mar. 28, 2014)).  Before a manufacturer

may distribute a covered product, the manufacturer must (1) test the product, 42 U.S.C.

§§ 6293, 6314; 10 C.F.R. §§ 430–31; (2) certify to DOE that the product meets the standard, 10

C.F.R. § 429.12; and (3) label the product with its energy use, *see* 42 U.S.C. §§ 6294, 6315; 16

C.F.R. § 305.17.  Once a product is on the market, EPCA imposes several obligations on

manufacturers, including that they cannot "make any representation" "with respect to the *energy*

*use* . . . of a covered product . . . unless such product has been tested in accordance with such test

procedure and such representation fairly discloses the results of such testing," 42 U.S.C.

§ 6293(c)(1) (emphasis added), and that they must supply, on DOE's request, "information or

reports . . . with respect to . . . *energy use* . . . of such covered product" so DOE can, among other

things, "insure compliance" with EPCA, *id.* § 6296(d)(1) (emphasis added).

---

[2]      "Energy conservation standard" is also defined as "a performance standard which prescribes a minimum level of energy efficiency" or a "design requirement."  42 U.S.C. § 6291(6).  Plaintiffs do not argue that the fossil fuel prohibition concerns the "energy efficiency" of covered products or that the prohibition is a design requirement.  Pls.' Mot. at 10.  So the District focuses on how "energy use" is used throughout EPCA.

At every turn, EPCA reflects that "energy use" is a characteristic of the product as manufactured—it is not a measure of how a consumer actually uses the product. To take a few illustrations, a manufacturer cannot label a product with its energy use if energy use changes based on how a particular consumer uses the product. *See* 79 Fed. Reg. 77,868, 77,874 (Dec. 29, 2014) (providing example of EPCA label). A manufacturer cannot certify that its product meets an energy conservation standard before the product enters the market if energy use is determined by how consumers use the product once it is on the market. *See* 42 U.S.C. § 6302(a)(5); 10 C.F.R. § 429.12. And a manufacturer cannot make representations about energy use in advertising campaigns if energy use is different for every consumer. *See* 42 U.S.C. § 6293(c)(1).

With this understanding of "energy use," the preemption provision's meaning comes into focus. A "regulation concern[s]" the "energy use" of a "covered product" when it regulates the typical quantity of energy that a product is designed to use. In other words, EPCA's preemption clause covers state regulations that directly or indirectly set energy conservation standards because such standards establish a product's "maximum quantity of energy use." *Id.* § 6291(6)(A); *see Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1148 (9th Cir. 2012) (EPCA "preempts state attempts to impose minimum standards greater than the federal law . . . ."); *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005) ("Congress intended to preempt state energy efficiency standards . . . .").

The remaining terms in the preemption provision confirm that EPCA's focus is on state regulations targeting products themselves. The provision specifies that a state regulation must concern the energy use "of *such covered product*" and that the state regulation will not "be effective *with respect to* such product." 42 U.S.C. § 6297(c) (emphases added). The phrase

"*with respect to*" "massively limits the scope of preemption." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013) (cleaned up).  That phrase combined with product-focused language indicates that the domain of EPCA preemption is state regulations aimed at covered products.  Energy conservation standards are the prime example of such regulations because they set "a performance standard . . . for a covered product."  42 U.S.C. § 6291(6).

    2.    **Structure**

This reading is confirmed by structural cues.  First, the preemption provision is titled, "General rule of preemption for energy conservation standards when Federal standard becomes effective for product."  42 U.S.C. § 6297(c).  The title "suppl[ies] cues as to what Congress intended" the provision that follows to cover.  *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (internal quotation marks and citation omitted).  A title is especially helpful when, as here, terms in the provision are sensitive to context.  *Dubin v. United States*, 599 U.S. 110, 120 (2023).  In EPCA, the preemption provision's title plainly "tells us that its provision[ ] prevent[s]" state-level energy conservation standards.  *Rudisill*, 601 U.S. at 309.

Second, EPCA employs the same key terms ("energy efficiency," "energy use," and "water use" for a "covered product") to define both "energy conservation standard" and the scope of preemption.  *Compare* 42 U.S.C. § 6291(6)(A), *with id.* § 6297(c).  Further, the preemption provision is only triggered when a federal "energy conservation standard" comes into effect "for any covered product."  *Id.* § 6297(c).  "The interlocking nature of those provisions, as well as their conspicuously similar language, provides a strong indication that they are alike in scope and effect."  *Rawat v. C.I.R.*, 108 F.4th 891, 895 (D.C. Cir. 2024).  Thus, the preemption provision's scope lines up with DOE's authority and prevents states from doing what DOE does under EPCA: issue energy conservation standards for covered products.

That common-sense conclusion comports with constitutional principles.  A federal agency "may preempt state law only when and if it is acting within the scope of its congressionally delegated authority."  *Mozilla Corp. v. FCC*, 940 F.3d 1, 74–75 (D.C. Cir. 2019) (per curiam) (internal quotation marks omitted) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).  "By the same token, in any area where the [agency] lacks the authority to regulate, it equally lacks the power to preempt state law."  *Id.* at 75.  DOE's regulatory authority is centered around energy conservation standards.  *E.g.*, 42 U.S.C. §§ 6294–6296.  DOE's preemptive authority should be the same as its regulatory authority and preempt state energy conservation standards or their equivalents.  *Mozilla*, 940 F.3d at 74–75.  Congress intended as much because it textually tied EPCA's preemptive scope to energy conservation standards for covered products by providing that there is no preemption unless and until a federal energy conservation standard is in place.  42 U.S.C. § 6297(c).  Stretching EPCA's preemptive scope beyond DOE's authority would create a constitutional problem that the Court must avoid. *United States v. Hansen*, 599 U.S. 762, 781 (2023).

Third, EPCA's waiver provisions show that EPCA's preemptive focus is on state laws that require the redesign of a product, like energy conservation standards.  A state can petition DOE to waive preemption and allow the state to implement an otherwise preempted regulation. 42 U.S.C. § 6297(d).  DOE must then consider "the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class)." *Id.* § 6297(d)(3)(C).  Similarly, DOE can delay approval of a state regulation if "additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation."  *Id.* § 6927(d)(5)(A).

Fourth, throughout EPCA, the statute refers to state and local "standards" as the preempted domain.  EPCA contains numerous carveouts from preemption, and each one provides that a state or local "standard" shall not be preempted.  *E.g.*, *id.* § 6295(ii)(1)–(2); *id.* § 6316(a)(10), (d)(2), (e)(2)(A), (e)(3)(A), (e)(4)(B), (f)(1)(A)(ii), (f)(2)(A)(ii), (f)(3)(B), (g)(1)(B), (h)(1)(A)(ii), (h)(2)(B).  If substantially more state regulations besides energy conservation standards were preempted, it would be odd for EPCA to frequently carve out only "standards" from preemption.

Altogether, how "Congress intended [EPCA] and its surrounding regulatory scheme to affect business, consumers, and the law" is straightforward.  *Medtronic*, 518 U.S. at 486.  EPCA sets energy conservation standards that establish the typical quantity of energy that covered products are designed to use.  Then, EPCA preempts state laws that would require manufacturers to design their products to use a lower quantity of energy than what federal standards prescribe.  Recognizing as much, federal judges across the country have endorsed that interpretation.  *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York* (*New York*), No. 23-cv-11292, 2025 WL 843619, at *4–5 (S.D.N.Y. Mar. 18, 2025), *appeal docketed*, No. 25-977 (2d Cir. Apr. 21, 2025); *Cal. Rest. Ass'n v. City of Berkeley* (*Berkeley*), 89 F.4th 1094, 1121–26 (9th Cir. 2024) (Friedland, J., dissenting from denial of rehearing en banc); *id.* at 1126 (Berzon, J., respecting the denial of rehearing en banc).

### 3.    History

EPCA's statutory and regulatory history likewise reflects that Congress sought to prevent states from enacting, whether directly or indirectly, their own energy conservation standards that would require manufacturers to design their products differently.  In addressing preemption questions, the Supreme Court has often looked to the history of the preemption provision and

larger statutory scheme. *E.g.*, *Wyeth*, 555 U.S. at 566; *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 284 (1987). Here, that history tells a clear story.

The current version of the preemption provision grew out of a particular need. Manufacturers faced a "patchwork of differing State regulations," S. Rep. No. 100-6, at 2, that "complicate[d] their design, production and marketing plans," *id.* at 4. The solution was to impose federal energy conservation standards and then preempt state standards. *Id.* Congress could not have been clearer that the purpose of the preemption provision was to preempt "State standards." *Id.* at 1.[3] Reading the preemption provision to target state energy conservation standards or their equivalents thus accurately reflects the context in which the provision arose. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518–19 (1992) (adopting "narrow reading" of preemption provision as targeting the patchwork of state laws that prompted the provision).

The history of EPCA's regulatory implementation illustrates the same point. Since EPCA was enacted, the agency charged with implementing EPCA (DOE) has consistently interpreted the statute to preempt state energy conservation standards or proxy standards—and nothing more. DOE's consistent approach to EPCA preemption deserves weight because agencies "have a unique understanding of the statutes they administer and an attendant ability to

---

[3]      *See also, e.g.*, H.R. Rep. No. 100-11, at 24 (1987) (NAECA's "basic concept" is "preempting State energy efficiency standards"); 133 Cong. Rec. 3,070 (1987) (statement of Sen. Johnston) ("to preempt State efficiency standards and prevent the development of a patchwork of 50 separate and potentially conflicting State standards"); *id.* at 3,071 (statement of Sen. Weicker) ("the bill would establish uniform national appliance standards which would preempt the growing number of separate and conflicting State standards"); *id.* at 3,072 (statement of Sen. Bingaman) ("a multitude of differing State standards adds unduly to the costs and risks in developing more energy-efficient products"); *id.* (statement of Sen. Evans) ("The manufacturers were brought to the negotiating table because they were faced with an increasing number of States developing their own efficiency standards, a trend which could conceivably force them to comply with 50 different standards"). For those who consult legislative history, committee reports and statements by sponsors are "authoritative." *Garcia v. United States*, 469 U.S. 70, 76 (1984); *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526 (1982).

make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wyeth*, 555 U.S. at 577 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Early on in EPCA's history, DOE proposed rules on how it would assess waiver petitions from states. DOE indicated that it would "review only State regulations that are appliance efficiency standards," not "State or local regulations that have only a peripheral effect on the energy efficiency of a covered product." 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982). That was because, under EPCA's preemption provision, "a rule that established the energy efficiency of a particular appliance would be superseded by the Federal rule," but "[a] rule whose purpose is other than energy efficiency [of a covered product] such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Id.* Thus, from EPCA's earliest days, DOE took the position that EPCA preempted state energy conservation "standards," meaning state laws that "established the energy efficiency [or energy use] of a particular appliance," not just any regulation affecting covered products. *Id.*

Congress has acquiesced in DOE's understanding of EPCA's preemptive scope. When passing NAECA, Congress "follow[ed] substantially the preemption requirements in current EPCA" by "continu[ing] the basic concept of preempting State energy efficiency standards." H.R. Rep. No. 100-11, at 23–24. What NAECA "significantly change[d]" was "the criteria" that DOE applied when determining whether to permit a state to enact a preempted law. *Id.* at 24. But Congress did not question how DOE determined the antecedent question of what laws were preempted and eligible for a waiver. When, as here, "Congress adopts a new law against the backdrop of a 'longstanding administrative construction,' [the Supreme] Court generally

presumes the new provision should be understood to work in harmony with what has come

before." *Monsalvo v. Bondi*, 145 S. Ct. 1232, 1242 (2025) (quoting *Haig v. Agee*, 453 U.S. 280,

297–298 (1981)).  Congress's choice to "continue[ ]" the understanding that EPCA preempts

state standards, H.R. Rep. No. 100-11, at 24, "is all but dispositive," *Monsalvo*, 145 S. Ct. at

1242.

"Tellingly, too, if Congress meant to depart from" DOE's prior interpretation of the

scope of preemption, "the government itself seems not to have noticed." *Id.* at 1242–43.  Since

NAECA, DOE has maintained that it "interprets 'regulation concerning energy use' to be

equivalent to 'energy conservation standard.'" 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010).

That interpretation has prevailed across administrations, as DOE has often repeated that

"[f]ederal energy efficiency requirements for covered products established under EPCA

generally supersede State laws and regulations concerning energy conservation testing, labeling,

and *standards*." 89 Fed. Reg. 28,856, 28,865 (Apr. 19, 2024) (emphasis added) (Biden

Administration); *see also, e.g.*, 85 Fed. Reg. 30,878, 30,879 (May 21, 2020) (Trump

Administration) (same statement); 71 Fed. Reg. 12,634, 12,635 (Mar. 13, 2006) (Bush

Administration) (same statement).  Congress has never once sought to alter DOE's correct

understanding of preemption.  All the while, Congress has amended EPCA several times.

Congress is presumed to know of DOE's interpretation, so its decision to consistently preserve

DOE's interpretation signals that courts should "continue to read" EPCA as DOE has.  *Forest

Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009).

Recently, DOE reaffirmed this interpretation and—what is more—took the position that

EPCA does not preempt laws that prohibit gas appliances.  Br. for the U.S. at 1–2, *Berkeley*, No.

21-16278 (9th Cir. Feb. 2, 2022); Br. for the U.S. at 1–2, *Berkeley*, No. 21-16278 (9th Cir. June

20

12, 2023).  Given the consistency of DOE's views, its position that similar policies are *not* preempted "should make a difference."  *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 335 (2011) (internal quotation marks and citation omitted).

### B.    The Fossil Fuel Prohibition Does Not Concern the Quantity of Energy That Covered Products Are Designed to Use.

Applying the understanding above, EPCA does not preempt the fossil fuel prohibition because the prohibition does not concern the quantity of energy that covered products are designed to use.  The prohibition does not prescribe an energy conservation standard commanding manufacturers to redesign their products to meet a District-specific level of energy performance.  Once the prohibition is implemented, manufacturers will still be subject to nationally uniform standards, so the prohibition is "far removed from Congress' driving concern" of a patchwork of state appliance standards.  *Dan's City*, 569 U.S. at 263.  If anything, the prohibition serves one of EPCA's chief goals: reducing the demand for methane gas.  EPCA § 2, 89 Stat. at 874; NECPA § 102(a)(3), 92 Stat. at 3209.  Nor does the prohibition prescribe an energy use of "zero."  *Contra* Pls.' Mot. at 14, 16.  As explained, "energy use" does not depend on a product's actual use because it is a fixed, representative figure measured according to test procedures in laboratories.  Argument § II.A.1, *supra*.

In fact, the prohibition requires nothing of manufacturers and does not mention a single covered product.  Perhaps that is why, tellingly, the appliance manufacturing industry—the industry that Congress sought to "protect," H.R. Rep. No. 100-11, at 24—has not joined Plaintiffs' suit.  And Plaintiffs put up no evidence of their own to suggest that the fossil fuel prohibition will result in a redesign of covered products.  The best Plaintiffs can do is a single, barebones declaration by one manufacturer speculating that it will face "sales losses" if the

prohibition goes into effect.  Pls.' Ex. 3 [26-5] ¶ 5.  Notably, the lone manufacturer does not allege that it will need to redesign its products to market them in the District.

Rather than preempt the fossil fuel prohibition, EPCA and related federal statutes *support* state building codes that transition buildings away from fossil fuels and towards net-zero-energy. Such support affirms that the fossil fuel prohibition is not preempted.  Since its enactment, EPCA has authorized DOE to fund state energy conservation plans.  EPCA §§ 361–62, 89 Stat. at 932–33.  Most relevant here, EPCA authorizes DOE to fund "renewable-resource energy measures," 42 U.S.C. § 6325(e)(1), defined to include measures for pre-1976 buildings that "involve changing, in whole or in part, the fuel or source of the energy used to meet the requirements of such building or plant from a depletable source of energy to a nondepletable source of energy," *id.* § 6321(c)(7)(A).

Similarly, a law enacted by the same Congress a year after EPCA, the Energy Conservation Standards for New Buildings Act (New Buildings Act), Pub. L. No. 94-385, 90 Stat. 1125 (1976), provides federal funding for states to create and implement building codes that conserve energy, 42 U.S.C. § 6833.  Congress found that "State and local building codes or similar controls can provide an existing means by which to assure, . . . with a minimum of Federal interference in State and local transactions, that newly constructed buildings contain adequate energy conservation features."  *Id.* § 6831(a)(4).  Congress directed DOE to help states develop building codes with an eye toward "stimulation of use of nondepletable sources of energy."  New Buildings Act § 310, 90 Stat. at 1149.  Through recent amendments, Congress likewise gives grants to states to create trainings and materials on "zero-net-energy buildings." 42 U.S.C. § 6838(d)(2)(A).  Other examples abound in EPCA and related statutes of support for state energy conservation efforts regarding building codes.  *E.g.*, *id.* §§ 6323(e) (providing funds

if "a State has demonstrated a commitment to improving the energy efficiency of buildings within such State"), 6372a–6372g (providing grants and technical assistance to states in improving the energy efficiency of buildings owned by local governments and public care institutions).

Recently, the Inflation Reduction Act (IRA) directed DOE to issue grants to states and localities to adopt "building energy code[s] . . . that meet[ ] or exceed[ ] the zero energy provisions in the 2021 International Energy Conservation Code or an equivalent stretch code." Pub. L. No. 117-169, § 50131(c)(1), 136 Stat. 1818, 2042 (2022). The IRA further directed that these funds be dispersed pursuant to DOE's authority under EPCA to support state energy conservation plans. *Id.* § 50131(a)(2), 136 Stat. at 2042 (citing 42 U.S.C. §§ 6321–6326). The zero energy provisions incorporated by the IRA provide that energy generation from renewable sources must be greater than or equal to the building's energy consumption. Int'l Code Council, *2021 Int'l Energy Conservation Code*, App. CC, https://tinyurl.com/3ktyskjb. That is the same requirement that the Clean Buildings Act imposes.

Altogether, EPCA and related statutes create a federal scheme that supports and preserves state efforts to enact energy-conserving building codes—including codes that shift to reliance on renewable fuels. *See Griffith v. Lanier*, 521 F.3d 398, 402 (D.C. Cir. 2008) (statutes addressing the same subject are interpreted as one statute); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 667 (1995) (relying on enactments by the same Congress to construe a preemption provision). When Congress supports state regulation or declines to interfere with known state regulation, such support or acquiescence strongly indicates that state regulation is not preempted. *See N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973) ("Where coordinate state and federal efforts exist within a complementary

administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one."); *CTS Corp. v. Waldburger*, 573 U.S. 1, 18 (2014) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts . . . ." (internal quotation marks omitted) (quoting *Wyeth*, 555 U.S. at 574–75)). Given EPCA's support for policies like those in the Clean Buildings Act, the only "coherent" interpretation of EPCA is that it does not preempt the Act. *Brown & Williamson*, 529 U.S. at 133 (internal quotation marks and citation omitted).[4]

A contrary conclusion would defy both logic and law. As to logic, it would make no sense "if [EPCA] took away from the states with one hand what it granted with the other." *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 737 (9th Cir. 2010). As to law, there is a firmly established legal principle that the Court must avoid an interpretation that creates a conflict amongst federal laws. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). To conclude that the Clean Buildings Act and similar policies are preempted would mean that Congress wasted $670 million in the IRA alone supporting laws that were preempted. It also would mean that a variety of congressionally mandated programs have been pursuing preempted ends for decades. Yet, "Congress isn't in the business of putting a statute 'at war with itself.'" *United States v. Little*, 78 F.4th 453, 460–61 (D.C. Cir. 2023) (quoting *United States v. Am. Tobacco Co.*, 221 U.S. 106, 180 (1911)).

---

[4]    Because Congress so extensively supports states in their efforts to reduce energy consumption by buildings, Amicus American Gas Association (AGA) is mistaken in suggesting that regulations that reduce energy demand are somehow constitutionally suspect. *See* AGA Amicus Br. [27] at 3. To the extent AGA asks the Court to "review" the Clean Buildings Act under the "doctrine of regulatory compact," *id.* at 10, an amicus cannot expand the claims before the Court, *New Fortress Energy Inc. v. FERC*, 36 F.4th 1172, 1179 (D.C. Cir. 2022).

A conclusion that the fossil fuel prohibition is anathema to EPCA and "national energy policy," Pls.' Mot. at 28, also cannot square with the fact that EPCA imposes an identical requirement on federal buildings.  EPCA, as amended, requires a phase-out of fossil fuels in federal buildings such that, after 2030, "new Federal buildings and Federal buildings undergoing major renovations" must have zero "fossil fuel-generated energy consumption," 42 U.S.C. § 6834(a)(3)(D)(i)(I); *see also* 89 Fed. Reg. 35,384, 35,394 (May 1, 2024).  "If Congress thought" that prohibitions on fossil fuels in new construction "posed an obstacle to its objectives" under EPCA, "surely" Congress would not have enacted such a prohibition with regard to federal buildings.  *Wyeth*, 555 U.S. at 574.

### C.  Plaintiffs' Interpretation and Application of EPCA Are Wrong.

Plaintiffs nonetheless interpret EPCA to preempt any "regulations that merely 'concern[ ]' . . . appliances' energy use," Pls.' Mot. at 12, where "energy use" broadly means "the quantity of natural gas directly consumed by certain consumer and industrial appliances at the place where those products are used," *id.* at 14 (cleaned up).  From this, Plaintiffs argue that EPCA preempts the fossil fuel prohibition because it concerns the energy use of covered products "by preventing such products from using any gas energy."  *Id.*  But Plaintiffs' interpretation misreads the statute, flies in the face of Congress's purposes, and will produce absurd results.  Nor can their interpretation be saved by reliance on an outlier, out-of-circuit opinion.  If the Court nonetheless adopts Plaintiffs' interpretation, Plaintiffs still fail to show that the fossil fuel prohibition is preempted in all applications, so their claim fails.

### 1.  Plaintiffs Misread EPCA's Text and Structure.

Plaintiffs' misreading of the preemption provision largely rests on misinterpretations of "energy use" and "concerning."  Plaintiffs also resort to a few other provisions of EPCA to support their interpretation, but they are equally unavailing.

a.     **Plaintiffs Improperly Rewrite the Statutory Definition of "Energy Use."**

Plaintiffs misinterpret "energy use" to mean "'the quantity of energy directly consumed by a consumer product at point of use' for consumer products"—full stop.  Pls.' Mot. at 10 (quoting 42 U.S.C. § 6291(4)).  But Plaintiffs nix the other half of the definition of "energy use," thus rewriting it to say:

> the quantity of energy directly consumed by a consumer product at point of use, ~~determined in accordance with test procedures under section 6293 of this title.~~

42 U.S.C. § 6291(4).  In crossing out the definition's reference to test procedures, Plaintiffs rewrite the statute to mean energy use in a colloquial sense, rather than a fixed, representative measure meant to approximate typical use.  As a result, EPCA would preempt any state regulations affecting appliances and energy, rather than regulations that concern the quantity of energy that appliances are designed to use.  That is wrong and "violate[s] the 'cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute.'" *Liu v. SEC*, 591 U.S. 71, 89 (2020) (quoting *Parker Drilling Mgmt. Servs. v. Newton*, 587 U.S. 601, 611 (2019)).

Plaintiffs are brazen about their rewrite.  They *ask* the Court to cast aside EPCA's "definition of 'energy use'" in the preemption provision because two other provisions supposedly use "energy use" "to refer broadly to the amount of energy a product consumes." Pls.' Mot. at 16.  The Supreme Court has rejected this reasoning.  *Dep't of Agric. v. Kirtz*, 601 U.S. 42, 62 (2024).  "When Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" *Id.* at 59 (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56 (2019)).  A court "will deviate from a statutory definition only when applying the definition would be incompatible with Congress's regulatory scheme or would destroy one of the statute's major purposes." *Id.* at 60 (cleaned up).  Nonetheless, if a court finds that applying the

definition in one provision would produce an absurdity, that absurdity does not give a court license to abandon the definition wherever else the term is used. *Id.* at 61–62. The determination whether to abandon a statutory definition is a context- and provision-specific inquiry. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014); *Mowrer v. DOT*, 14 F.4th 723, 730 (D.C. Cir. 2021). Plaintiffs' argument thus fails because even if the statutory definition of "energy use" does not work in two provisions, that says nothing about whether the statutory definition can be abandoned in the *preemption provision*. *Kirtz*, 601 U.S. at 62.

Indeed, the two provisions cited by Plaintiffs use the term "energy use" as part of a larger and entirely different phrase with its *own* definition. They authorize DOE to designate new covered consumer products and establish energy conservation standards for them if the "average annual per-household energy use" by those products exceeds a certain amount. 42 U.S.C. § 6292(b)(1)(B); *see id.* § 6295(*l*)(1) (similar language).[5] But EPCA specifically defines the phrase "average annual per-household energy use with respect to a type of product" elsewhere in the statute, *id.* § 6292(b)(2)(A), thus clearly signaling that the phrase carries a specific meaning that is distinct from the preemption provision's use of the term "energy use." When, as here, a statute separately defines a phrase that nonetheless uses a defined term, the separately defined phrase can take on its own meaning that does not incorporate the defined term's definition. *See Burgess v. United States*, 553 U.S. 124, 129–31 (2008) (holding that "felony drug offense" did not incorporate the statutory definition of "felony").

Context further undermines Plaintiffs' argument. The two provisions charge DOE with determining whether household energy consumption by a product is so high it warrants

---

[5]    There is no similar provision for industrial products. So Plaintiffs' argument does not work for the industrial half of EPCA.

regulating the product under EPCA.  This determination comes *before* test procedures and an energy conservation standard are established.  10 C.F.R. Pt. 430, Subpt. C, App. A, § 5(c).  As a result, these provisions could not use energy use as determined by DOE test procedures when test procedures are not yet established.  In contrast, the preemption provision only applies once an energy conservation standard and accompanying test procedures have been established for a product.  42 U.S.C. § 6297(c).  Thus, "energy use" in the context of energy conservation standards and preemption follows its definition in the statute, which measures energy consumption according to DOE test procedures.

Still further, Plaintiffs overlook that the preemption provision refers to *the* energy use of a covered product, while the two provisions Plaintiffs cite refer to energy use without the definite article (*the*) and not in relation to covered products.  *Compare id.* § 6297(c) (preempting "regulation[s] concerning *the* . . . energy use . . . of such covered product" (emphasis added)), *with id.* § 6292(b)(1)(B) ("average annual per-household energy use").  By using "energy use" with the definite article, Congress signals that "energy use" does not refer to "any and all" forms of energy use.  *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 587 U.S. 262, 272 (2019).  Rather, the definite article indicates that "energy use" references "energy use" as defined in EPCA and a set figure.  *See Sandpiper Residents Ass'n v. HUD*, 106 F.4th 1134, 1144 (D.C. Cir. 2024) ("[T]he definite article 'the' particularizes the subject which it precedes." (internal quotation marks and citation omitted)).  In that way, the definite article "suggests a narrow reading." *United States v. Manafort*, 897 F.3d 340, 347 (D.C. Cir. 2018).

Plaintiffs next try to support their erroneous interpretation of "energy use" by misconstruing the term "point of use" as "the place where or time when a product or service is used."  Pls.' Mot. at 11 (internal quotation marks and citation omitted).  From there, Plaintiffs

conclude that "energy use" means the quantity of energy actually consumed by an appliance whenever and wherever a consumer uses it.  *Id.* at 14.

But in the context of EPCA, "point of use" has a specialized, technical meaning that controls.  *Hansen*, 599 U.S. at 774–75; *Concert Inv., LLC v. SBA*, 100 F.4th 215, 222 (D.C. Cir. 2024).  Again, "point of use" in EPCA serves as a technical instruction to measure site energy, not source energy, when determining a product's energy consumption.  Argument § II.A.1, *supra*.  DOE, Congress, industry, a dozen judges, and even *Plaintiffs* and their amicus have long understood "point of use" this way.[6]  These sources provide evidence of technical meaning.  *See La. Pub. Serv. Comm'n*, 476 U.S. at 357 ("technical terms of art should be interpreted by reference to the trade or industry to which they apply"); *Bondi v. VanDerStok*, 145 S. Ct. 857, 874 (2025) ("the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning").  Plaintiffs thus err—plus contradict themselves—by ignoring the term's technical meaning.

Plaintiffs give no good reason for abandoning this well-established technical meaning. Yet, Plaintiffs must provide evidence indicating that Congress did not intend a technical meaning.  2A *Sutherland Statutory Construction* § 47:29 (7th ed. 2024).  At most, as "evidence" of a non-technical meaning, Plaintiffs cite dictionary definitions for "point of use" dating from 2025 and 2022.  Pls.' Mot. at 11.  But "[w]here courts address a complex statutory regime, laden with scientific language and other terms of art, dictionary definitions do not suffice to show an

---

[6]    *E.g.*, 69 Fed. Reg. 45,420, 45,426 (July 29, 2004); 75 Fed. Reg. 51,423, 51,424 (Aug. 20, 2010); 85 Fed. Reg. 8,626, 8,668 (Feb. 14, 2020); Def.'s Ex. 7, Nat'l Rrsch. Council Rep. at 4; Def.'s Ex. 8, RAND Rep. at xiii–xiv, 6–7; S. Rep. No. 105-227, at 100 (1998); Def.'s Ex. 9, APGA Comments at 3; *Berkeley*, 89 F.4th at 1123–25 (Friedland, J.); *New York*, 2025 WL 843619, at *5; Def.'s Ex. 10, NAHB Comments at 1; Def.'s Ex. 11, AGA Comments at 2; *see* AGA, *About AGA*, https://perma.cc/XMS9-2RWW (captured May 2, 2025) (listing the president of Plaintiff Washington Gas as second vice chair).

unambiguous meaning." *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 19 (D.D.C. 2012).

Moreover, dictionary definitions must come "from the era of [the statute's] enactment." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014).  Major dictionaries from the era of EPCA's enactment and even beyond did not define "point of use."  *See The American Heritage Dictionary of the English Language* 1013 (1970); *Webster's*, *supra*, at 908; *Random House*, *supra*, at 1494.  Plaintiffs thus fail to establish that "point of use" was "a phrase 'of common parlance'" with a clear, ordinary meaning when EPCA was enacted, so "point of use" instead must be treated as "a technical term." *FDIC v. Bank of Am., N.A.*, No. 17-cv-36, 2025 WL 1100209, at *14 n.7 (D.D.C. Apr. 14, 2025) (quoting *Am. Legion v. Derwinski*, 54 F.3d 789, 796 (D.C. Cir. 1995)).

All said, Plaintiffs' redline of EPCA combined with their violations of major rules of statutory interpretation foreclose their interpretation of "energy use."  What cinches that conclusion is Plaintiffs' failure to explain how their version of "energy use" works with foundational parts of EPCA.  Plaintiffs do not explain how a manufacturer can label its appliances, certify its compliance with energy conservation standards, make representations, and fulfill all its other duties under EPCA if energy use is an ever-changing number that depends on how a consumer uses the product.  Plaintiffs' redefinition just does not work.

> **b.**    **Plaintiffs Stretch the Word "Concerning" Beyond Its Fair Contextual Meaning in EPCA.**

If Plaintiffs' understanding of "energy use" was not erroneously broad enough, Plaintiffs compound their error by reading "concerning" to "further broaden[ ] the scope of EPCA's preemption provision."  Pls.' Mot. at 11.  Plaintiffs argue that "concerning" is the same as "relating to," and "relating to" has a broadening effect, capturing all regulations that "merely" relate to appliances' energy.  *Id.* at 11–12.  Plaintiffs falter at each step of their argument.

For one, "concerning" is not "relating to." *Rail Freight*, 34 F.4th at 10. While the terms may sometimes have the same meaning, context determines meaning. *City & Cnty. of S.F. v. EPA*, 145 S. Ct. 704, 715 (2025). In the preemption context, "Congress characteristically employs" "related to" to "express[ ] a broad pre-emptive purpose." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (internal quotation marks and citation omitted). The judicially recognized broad meaning of "relating to" was known to Congress when it enacted NAECA. *E.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983); *see Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."). Yet, Congress did not adopt "relating to." "When legislators did not adopt 'obvious alternative' language, 'the natural implication is that they did not intend' the alternative." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014)). Thus, in the preemption context, Congress's choice of other connecting terms instead of "relating to" expresses an intent for the preemption provision to be interpreted more narrowly than ones using "relating to." *See, e.g.*, *Dan's City*, 569 U.S. at 261 (using "concern" and "with respect to" interchangeably and noting that "the addition of the words 'with respect to the transportation of property' . . . massively limits the scope of preemption" in a provision using "relate to"); *Ye v. GlobalTranz Enters., Inc.*, 74 F.4th 453, 465 (7th Cir. 2023) (holding that "concerns" is narrower than "relating to"), *cert. denied*, 144 S. Ct. 564 (2024); *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 446 (2d Cir. 2015) (using "concern" and "with respect to" interchangeably); *id.* at 447 n.8 (holding that "relating to" is broader). That conclusion obtains with force here because elsewhere in EPCA Congress used "relating to" in a preemption provision, 49 U.S.C. § 32919(a), but chose not to in

the provision at issue here.  *See Rawat*, 108 F.4th at 898 (courts draw a negative inference from the use of language in one section but not another).

To argue otherwise, Plaintiffs cite one case that noted that the dictionary definition of "concerning" included "relating to."  Pls.' Mot. at 11 (citing *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)).  But *Lamar* did not address a preemption statute or even a statute using "concerning" and thus is of little help here.  *See* 584 U.S. at 717 (limiting its observations to "this context").  Reasoning similarly, the Supreme Court rejected a party's insistence, based on *Lamar*, that a term had a broad meaning because *Lamar* "concern[ed] different statutory terms . . . in very different statutory contexts."  *United States v. Miller*, 145 S. Ct. 839, 852 (2025).  Anyway, *Lamar* postdates NAECA by several decades, so any equivalence it established between "concerning" and "relating to" could not have informed Congress when it enacted NAECA.  *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020).

Even if "concerning" is the same as "relating to," it does not do as much work as Plaintiffs argue it does.  The Supreme Court has repeatedly warned against reading "relating to" too broadly, especially when, as here, a party offers no limiting principle.  *E.g.*, *Dan's City*, 569 U.S. at 260; *Travelers*, 514 U.S. at 656.  Determining what is covered by a phrase using "relating to" requires looking to the context in which the phrase appears, particularly "the title and terms" surrounding it.  *Dubin*, 599 U.S. at 118–20; *see also Mellouli v. Lynch*, 575 U.S. 798, 808–13 & nn.9–11 (2015) (construing the phrase "relating to" narrowly based on structure, context, and history).  As explained above, the title and terms surrounding "concerning," along with the rest of EPCA, "point to a narrower reading" of the preemption provision's reach than Plaintiffs' interpretation.  *Dubin*, 599 U.S. at 120; *see* Argument § II.A, *supra*; *Berkeley*, 89 F.4th at 1125–26 (Friedland, J.); *New York*, 2025 WL 843619, at *6–7.

c.    **Plaintiffs' Fallback Arguments Fare No Better.**

Plaintiffs pluck a few other provisions of EPCA to argue that its preemption provision has a "broad scope." Pls.' Mot. at 12. Their arguments lack merit.

Plaintiffs make much of the fact that EPCA can preempt building codes, as evidenced by its provision excepting building codes from preemption if they meet certain requirements. *Id.* (citing 42 U.S.C. § 6297(f)). From this, Plaintiffs leap to conclude that EPCA "reaches beyond regulation of how covered appliances are designed and manufactured," *id.*, and the Court should ignore the definition of "energy use," *id.* at 16.

Plaintiffs leap too far. "That [EPCA] may pre-empt [building codes] says nothing about the *scope* of that pre-emption." *Bates*, 544 U.S. at 443–44. It is unremarkable that building codes can be preempted because building codes can be used as a backdoor method of imposing energy conservation standards by, for example, mandating that all refrigerators installed in new buildings have a maximum energy use of *x* kwh. Congress was clear about this, explaining that it wanted to "prevent[ ] State building codes from being used as a means of setting mandatory State appliance standards in excess of the Federal standards." H.R. Rep. No. 100-11, at 26; *see also* S. Rep. No. 100-6, at 11; 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982). Thus, there is nothing incompatible with the District's—and DOE's and Congress's—interpretation of the preemption provision and the fact that building codes are covered by the provision. And contrary to Plaintiffs' suggestion, Pls.' Mot. at 13 n.6, the fact that EPCA exempts some building codes from preemption does not indicate that all other building codes are preempted, *Dan's City*, 569 U.S. at 263–64. If, in the first place, a building code does not concern the energy use of a covered product, as defined in EPCA, then it is not preempted, and there is no need to satisfy the requirements in the exemption provision. That is the case here.

Plaintiffs also argue that because DOE, when deciding waiver petitions, must consider whether the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," 42 U.S.C. § 6297(d)(3), EPCA preemption must cover "far more than direct regulations of an appliance's specifications," Pls.' Mot. at 13. That proves too much. If states impose competing energy conservation standards for covered products, then manufacturers or others in the supply chain will have to alter their "marketing, distribution, sale, [and] servicing" of products nationally. For example, refrigerators that use 30 kwh per year cannot be marketed, distributed, or sold in California, if California requires that refrigerators cannot use more than 20 kwh per year. So this provision is simply another reflection of Congress's concern with a patchwork of energy conservation standards.

### 2.    Plaintiffs' Interpretation Conflicts With EPCA's Purposes.

In addition to being at odds with EPCA's text, Plaintiffs' interpretation is at "odds with [the] clear purpose[s] of the statute." *Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1045 (D.C. Cir. 2015). Nullifying every state regulation that merely concerns appliances' energy use in the broadest sense far exceeds "[t]he target at which [EPCA's preemption provision] aimed": a patchwork of energy conservation standards. *Dan's City*, 569 U.S. at 263. Congress sought to ease burdens on "the appliance industry," H.R. Rep. No. 100-11, at 24—not give landlords, restauranteurs, and other industries veto power over the people's efforts to protect themselves from climate change or exposure to hazardous pollutants.

Because Plaintiffs' interpretation is so out of step with EPCA's purposes, Plaintiffs must reimagine EPCA. According to Plaintiffs, Congress sought to create a "muscular federal regulatory regime," "centralize appliance regulation in DOE," and enshrine a right for consumers and businesses to use appliances whenever and wherever they want. Pls.' Mot. at 20–21.

That is news to Congress.  While Congress has amended the preemption provisions over time, Congress was targeted in its approach.  True, Congress imposed energy conservation standards by statute and tightened the waiver process, but it otherwise "continu[ed] the basic concept of preempting State energy efficiency standards."  H.R. Rep. No. 100-11, at 23–24.  Congress expressed no intent in the statute or legislative history to revolutionize the role of the federal government vis-à-vis the states in all matters of energy conservation and appliances.  In fact, Plaintiffs' retelling of NAECA is contrary to the D.C. Circuit's observation that "Congress revisit[ed] the EPCA with purpose, taking to the statutory scheme a scalpel, not a cudgel." *Hearth, Patio & Barbecue Ass'n v. DOE*, 706 F.3d 499, 505 (D.C. Cir. 2013).

Moreover, Congress has only ever given DOE limited authority to regulate certain appliances' energy efficiency.  EPCA's regulation of *some* aspects of appliances does not mean that Congress sought to regulate *all* aspects of appliances and preempt *all* state regulation that could affect appliances.  *See Air Conditioning*, 410 F.3d at 494 (EPCA did not preempt a host of state requirements imposed on manufacturers).  "[F]ederal regulation of certain activities does not mean that States must authorize activities antecedent to those federally regulated.  For example, federal regulation of nuclear powerplants does not demand that States allow the construction of such powerplants in the first place."  *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 793 (2019) (Ginsburg, J., concurring in the judgment); *see also id.* at 777–78 (Gorsuch, J., joined by Thomas & Kavanaugh, JJ.) ("sound preemption analysis cannot be as simplistic" as arguing federal "authority to regulate later stages of the nuclear fuel life cycle would be effectively undermined if mining laws like Virginia's [prohibiting uranium mining] were allowed").  Applying the *Virginia Uranium* majority's logic here, federal regulation of appliances' energy efficiency does not demand that states allow those appliances in the first place.

35

DOE's authority is particularly limited when it comes to building codes, while, in contrast, EPCA and related laws preserve and support state building codes that do just what the law challenged here does.  Argument § II.B, *supra*.  As the lead Plaintiff told the D.C. Circuit, DOE's "role with respect to residential building energy codes is circumscribed . . . and limited to that of a technical advisor."  Br. Amicus Curiae Nat'l Ass'n of Home Builders in Supp. of Resp'ts at 9, *Am. Lung Ass'n v. EPA*, No. 19-1173 (D.C. Cir. June 23, 2020).  In contrast, "State and local governments, which are closer to the needs and realities of their economies and constituents, have primary authority to adopt and enforce building energy codes."  *Id.*; *see also id.* at 5–6.  That position contradicts Plaintiffs' newfound notion that the District has stepped into a domain occupied by DOE.  *See* Pls.' Mot. at 21.

Plaintiffs' conception of EPCA as codifying a right to use appliances is just as misguided.  Clear, specific "'rights-creating' language [is] critical to showing the requisite congressional intent to create new rights."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001)).  EPCA lacks such language and is focused on regulating manufacturers.  "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."  *Id.* (internal quotation marks omitted) (quoting *Alexander*, 532 U.S. at 289).

Instead of rights-creating language, Plaintiffs' textual support for the alleged consumer right in EPCA is a provision stating that DOE cannot waive preemption if "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes."  42 U.S.C. § 6297(d)(4); *see* Pls.' Mot. at 20.  But this provision simply reflects that Congress did not want DOE to approve state standards that would prompt manufacturers to pull out of a state's

market and thus result in the very patchwork economy that Congress sought to avoid.  It is too far a jump to conclude that this provision sought to bestow on consumers—who are unmentioned in this provision—an inviolable right to use covered products.

### 3.     Plaintiffs' Interpretation Will Lead to Absurd and Untenable Results.

Rather than serve EPCA's purposes, Plaintiffs' interpretation will lead to "unreasonable results, or unjust and absurd consequences" that the Court avoids.  *Cannon v. Watermark Ret. Communities, Inc.*, 45 F.4th 137, 149 (D.C. Cir. 2022) (internal quotation marks and citation omitted).  The reach of Plaintiffs' interpretation is staggering—and devastating.  Plaintiffs' interpretation would seem to cover any building energy code.  *See, e.g.*, Pls.' Mot. at 13 ("EPCA's preemption provision extends to building codes that set 'energy consumption' requirements.").  At the same time, buildings' use of fossil fuels accounts for a majority of greenhouse gas emissions.  Def.'s SUMF ¶ 4.  So it will be numerically impossible to meet emissions targets without addressing emissions from buildings.  *See id.* ¶ 5.  Meeting those targets "is necessary to avoid or mitigate the most catastrophic possible effects of climate change."  *Id.* ¶ 6.  Yet, Plaintiffs cannot cite anything in EPCA's text or history evincing congressional intent to kneecap states as they stand to the challenge of climate change.

Plaintiffs' interpretation does not stop at climate policy.  All sorts of laws merely concern appliances' energy use in the colloquial sense or prevent consumers from using covered products.  To name a few: fire codes restricting where gas appliances can be installed, *see* N.Y.C. Admin. Code, Fuel Gas Code §§ 303.3, 303.5.1; zoning plans precluding industrial appliances in residential areas and vice versa, *see Wash. Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 421 (4th Cir. 2013); and design defect or consumer protection claims against manufacturers, *see* Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss [14-1] at 3–4, *Sherzai v. LG Elecs. USA, Inc.*, No. 23-cv-429 (E.D. Cal. May 13, 2023).  These laws are

"peculiarly within the province of state and local legislative authorities," so the Court is loath to read federal law to preempt them. *Dan's City*, 569 U.S. at 264.

While Plaintiffs' interpretation would preempt these laws, it is not clear that the federal government could step in and enact similar laws. EPCA does not give DOE the power to enact any regulation concerning the energy use of appliances, such as a national building energy code or fire code. And it is doubtful that Congress's enumerated powers would permit it to enact such codes. The startling result is a regulatory void in which a variety of laws would no longer exist because state versions would be preempted, yet the federal government could not enact its own versions. The Supreme Court has refused to allow such a result. *Id.* at 265; *Va. Uranium*, 587 U.S. at 770–71 (Gorsuch, J.); *id.* at 781 (Ginsburg, J.).

### 4.  **Plaintiffs' Reliance on a Single, Out-of-Circuit Decision Is Misplaced.**

Were Plaintiffs right, one would expect to see scores of decisions from the past several decades striking down all types of laws that merely concern appliances' energy use under EPCA. Yet, Plaintiffs cite just a single out-of-circuit case, *Berkeley*, a somewhat fractured panel opinion from the Ninth Circuit that became the first judicial decision ever to endorse Plaintiffs' sweeping interpretation of EPCA. This Court should decline to follow *Berkeley*'s unprecedented path because *Berkeley* is wrong and contrary to precedent that this Court applies.

First, *Berkeley* is profoundly wrong. Like Plaintiffs, *Berkeley* wholly ignored half of the definition of "energy use." 89 F.4th at 1101, 1103, 1105. Like Plaintiffs, *Berkeley* improperly treated the phrase "point of use" as "ordinary" language rather a technical term. *Id.* at 1101. Like Plaintiffs, *Berkeley* impermissibly "expanded" EPCA's preemption provision by equating "concerning" with "relating to" and then ignoring all contextual limitations on that language. *Id.* at 1103. Like Plaintiffs, *Berkeley* overlooked Congress's extensive support for state-level building energy codes that phase out fossil fuels, all of which would make little sense if EPCA

preempted laws like the fossil fuel prohibition. *See id.* at 1101–07. And like Plaintiffs, *Berkeley* paid short shrift to the range of laws on matters of traditional state concern that would be nullified by its interpretation. *See id.* at 1103. That is not how statutes are read, and that is not how federal preemption analysis is conducted. *Berkeley*'s revisionist view of EPCA's key provisions and its failure to consider other important indicia of legislative purpose give this Court good reason to decline to follow *Berkeley*. Rosa Hayes, *Obsolescent Preemption*, 103 Tex. L. Rev. 319, 337 (2024).

The Court need not take the District's word that *Berkeley* is wrong. The panel opinion was so flawed that Judge Friedland, with support from *ten* other judges, wrote: "In nearly a decade on the bench, I have never previously written or joined a dissent from a denial of rehearing en banc. I feel compelled to do so now to urge any future court that interprets [EPCA] not to repeat the panel opinion's mistakes." *Berkeley*, 89 F.4th at 1119 (Friedland, J.) (footnote omitted). As Judge Friedland and her ten colleagues explained, "EPCA is a technical statute," and reading the full definition of "energy use" in light of its neighboring provisions shows that it refers to "a performance standard"—that is, "a fixed measure that results from the manufacturing and design of the product"—not simply "the *use* of natural gas products in a colloquial sense." *Id.* at 1121–22. The phrase "'point of use' does not change this analysis," Judge Friedland reasoned, because that term "has a well-establish technical meaning" that "refers to a technical way of measuring energy consumption," not "to the place where an appliance is used." *Id.* at 1122–25. Nor does the word "concerning" "transform the meaning of 'energy use'" or otherwise extend EPCA preemption to any state law that "concerns natural gas." *Id.* at 1125–26. Agreeing with Judge Friedland, Judge Abrams in the Southern District of New York recently rejected *Berkeley*'s "flawed reading" of EPCA. *New York*, 2025 WL 843619, at *5. Combined with the

district court in *Berkeley*, that makes thirteen federal judges who support the District's interpretation—compared to the three that support Plaintiffs' (really two, as explained next).

Second, this case is not governed by the same precedent that applied in *Berkeley*.  For one, some of the most important—and potentially dispositive—precedents here are either circuit precedent (*Rail Freight*, *Rawat*, *Mozilla*, *Little*, *Concert Investors*, *Hearth, Patio & Barbecue Ass'n*) or Supreme Court precedent issued after *Berkeley* was decided (*Rudisill*, *Monsalvo*, *Kirtz*, *Miller*).  For another, *Berkeley* not only eschewed the presumption against preemption, 89 F.4th at 1101, it went out of its way to construe EPCA's preemption provision "expansively" and give it an "extensive scope," *id.* at 1103 (internal quotation marks omitted).  But the D.C. Circuit's presumption against preemption does not permit the same result here, as a member of the *Berkeley* panel recognized.  Judge O'Scannlain wrote separately that he joined the *Berkeley* opinion "only" because the Ninth Circuit had abandoned the Supreme Court's presumption against preemption, a move he sharply criticized.  89 F.4th at 1107, 1111–13 (O'Scannlain, J., concurring).  Here, the presumption applies, so, as a *Berkeley* panel member says, the result should be different.

### 5.    At the Least, the Fossil Fuel Prohibition Is Not Facially Invalid.

No matter what, Plaintiffs' facial challenge fails because they cannot and do not show that the fossil fuel prohibition is preempted in *all* applications.  *Air Transp. Ass'n*, 613 F.3d at 216.  Recall that EPCA preemption applies only if an energy conservation standard for a product has been issued, and even then, a state regulation is preempted only to the extent it applies to that product.  42 U.S.C. § 6297(c).  Recall, too, that Plaintiffs only argue that the fossil fuel prohibition is preempted to the extent it regulates "energy use"—not "energy efficiency."  Pls.' Mot. at 10.  Thus, to show that the prohibition is preempted in all applications, Plaintiffs must show that every possible building project covered by the Act has (1) covered products, (2) that

use gas, (3) for which an energy conservation has been set, (4) that prescribes energy use, not energy efficiency. If any "possible" projects do not meet these conditions, then the fossil fuel prohibition can be applied without preventing the use of products to which EPCA's preemption provision, as interpreted by Plaintiffs, is applicable. *Cal. Coastal Comm'n*, 480 U.S. at 593.

One can readily foresee such projects. Plaintiffs supply one example. Plaintiffs provide hearsay complaints from restaurants that the fossil fuel prohibition will force them to switch from using gas cooking appliances and gas space and water heaters. Pls.' Ex. 4 [26-6] ¶ 7. Yet, there are no energy conservation standards for commercial cooking appliances, *see Standards*, *supra*, and commercial space and water heaters only have energy conservation standards for energy *efficiency*, not energy *use*, 10 C.F.R. §§ 431.77(a), 431.110. So even under Plaintiffs' theory, applying the fossil fuel prohibition to restaurants would not run into EPCA's preemptive scope (as Plaintiffs interpret it). There are even some buildings, like warehouses, that can be built without the need for covered products at all. Indeed, while Plaintiffs heavily rely on *Berkeley*, even the panel recognized that a facial challenge against Berkeley's prohibition on gas hookups failed because "Berkeley may enforce its building code on non-covered products." 89 F.4th at 1104; *see also id.* at 1104 n.7. The same should be true here.

### III.  Plaintiffs' Attacks on Other Parts of the Clean Buildings Act Are Unavailing.

As a last-ditch effort, Plaintiffs argue that certain provisions of Appendix Z that the Clean Buildings Act allegedly incorporates are also preempted. Pls.' Mot. at 17–18. Plaintiffs attack provisions that, simplified, guide building designers in how much they need to reduce the building's energy needs "*prior to* adding renewable energy generation." 2017 App. Z2 (emphasis added). These provisions use a formula relying on a Zero Energy Performance Index (zEPI) score. 2017 App. Z2.1.1. According to Plaintiffs, these provisions either "cap[ ] the amount of non-renewable energy a building can use" or require that renewable energy be used,

so they concern gas appliances' energy use or efficiency.  Pls.' Mot. at 18.  Plaintiffs' arguments are unavailing for three reasons.

First, Plaintiffs pursue a new claim that was neither pleaded nor preserved.  A district court may reject a claim that a plaintiff raises for the first time at summary judgment.  *Trudel v. SunTrust Bank*, 924 F.3d 1281, 1286 (D.C. Cir. 2019); *see also, e.g.*, *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 127 (D.D.C. 2013).  A plaintiff presents a new claim when she challenges a policy or aspects of a policy that she never challenged before.  *Phillips v. District of Columbia*, No. 22-cv-277, 2024 WL 3756385, at *4 (D.D.C. Aug. 12, 2024).  Here, the Complaint contains not a single allegation about the Appendix Z provisions that Plaintiffs challenge now.  Worse still, Plaintiffs never even hinted at a challenge to these provisions in their pre-motion notice or at the pre-motion hearing.  They should not be able to launch a surprise attack now.

Second, even if the Court entertains this new claim, Plaintiffs fail to establish standing to pursue it.  Plaintiffs must establish standing for each claim and each part of the Clean Buildings Act they challenge.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Davis v. FEC*, 554 U.S. 724, 733–34 (2008).  Plaintiffs, however, provide zero facts—let alone the "specific facts" required now—to explain how these parts of Appendix Z injure them.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).  Their sparse declarations, even if admissible, are limited to attacking the fossil fuel prohibition.  *E.g.*, Pls.' Ex. 4 ¶ 7.

Plaintiffs also lack standing because they can only speculate whether these parts of Appendix Z will become law.  Generally, when the executive has discretion in implementing a policy directive, a plaintiff will lack standing to challenge how the executive might implement the policy because such a challenge would be "riddled with contingencies and speculation that

impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam).  Here, the

Clean Buildings Act "simply provides a broad directive for the [Board] to implement, leaving to

the [Board] . . . to fill in the details."  Comm. Rep. at 10.  It "does not mandate that the executive

adopt . . . each and every detail of Appendix Z."  *Id.* at 4.  What is more, the new version of

Appendix Z under consideration does not even include the provisions that Plaintiffs complain

about, as it "shift[s] [away] from the zEPI score."  2023 App. Z at 1.  So it is unlikely—not just

speculative—that those provisions will ever "injure" Plaintiffs.

Third, this new claim fails on the merits.  In the main, Plaintiffs misinterpret these

provisions.  The provisions do not "cap[ ] the amount of non-renewable energy a building can

use."  Pls.' Mot. at 18.  The provisions just guide buildings in reducing their energy consumption

regardless of source.  There are a multitude of ways to reduce energy consumption without

affecting gas appliances (*e.g.*, increased insultation, less lighting).  As a result, these provisions

do not "concern" gas appliances' energy use or efficiency in even the colloquial sense.  Even if

Plaintiffs correctly understood these provisions, they are not preempted because they do not

concern the typical quantity of energy that a covered product is designed to use.  And for similar

reasons as the fossil fuel prohibition, these provisions are not preempted on their face because

not all buildings may use covered products.  Argument § III, *supra*.

## IV.    <u>Even if Parts of the Clean Buildings Act Are Preempted, the Act Should Not Be Stuck Down.</u>

If the Court concludes that the fossil fuel prohibition or Appendix Z provisions are

preempted, Plaintiffs still are not entitled to the drastic relief they seek: a declaration and

injunction invalidating the entire Clean Buildings Act.  Rather, the Court "must preserve as much

of a statute as is constitutionally possible."  *Ass'n of Am. Railroads v. DOT*, 896 F.3d 539, 544

(D.C. Cir. 2018).  Here, the rest of the Act can be saved even if the fossil fuel prohibition or

Appendix Z provisions are preempted.  That is true as a matter of severability and equity.

 To start, the allegedly preempted provisions can be severed from the Clean Buildings

Act.  When faced with an unconstitutional provision in a state statute, the Court strives to find

that the provision is severable.  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320,

328–29 (2006).  Severability is a matter of District law.  *Leavitt v. Jane L.*, 518 U.S. 137, 139

(1996) (per curiam).  All District statutes are presumptively severable.  D.C. Code § 45-201(a);

*see Hooks v. United States*, 191 A.3d 1141, 1145 (D.C. 2018).  The Court severs offending

provisions if the "statute remains operative" without them.  *Hooks*, 191 A.3d at 1146.  Plaintiffs

bear the burden to show that severance would render the statute inoperable.  *Gary v. United*

*States*, 499 A.2d 815, 822 (D.C. 1985).

 Plaintiffs have not even tried to meet their burden.  Nor could they if they tried.  Were the

fossil fuel prohibition severed, the Board could implement a net-zero-energy standard without it

because net-zero-energy buildings can still use fossil fuels.  *See* Def.'s Ex. 12, *A Common*

*Definition for Zero Energy Buildings* 7, 9 (explaining how buildings can achieve net-zero-energy

even when using fossil fuels).  Similarly, if the Appendix Z provisions belatedly challenged by

Plaintiffs are invalid, the Board can decide not to adopt those provisions.

 Besides severability doctrine, basic principles of equity prevent enjoining the entire Clean

Buildings Act.  "[A]n injunction must be narrowly tailored to remedy the specific harm shown."

*Neb. Dep't of Health & Hum. Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006) (cleaned up).

An injunction should be limited to addressing "the extent of the violation established," *Califano*

*v. Yamasaki*, 442 U.S. 682, 702 (1979), and "the injury in fact that the plaintiff has established,"

*Lewis v. Casey*, 518 U.S. 343, 357 (1996).  And the only remediable injuries in the injunction

context are those that are irreparable, that is, "both certain and great," "actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Here, Plaintiffs have not established that all provisions of the Act are preempted because they do not address any other provisions besides the fossil fuel prohibition and certain parts of Appendix Z. Nor have Plaintiffs shown that the other provisions cause them harm—let alone certain harms that qualify as irreparable—because their declarations only allege harms from the fossil fuel prohibition and do not mention other parts of the Act. In fact, Plaintiffs have not established irreparable harm at all because their allegations of harm are unsupported by admissible evidence and speculative. Def.'s Counter-Statement of Disputed Facts ¶¶ 5–16.

In sum, Plaintiffs urge the Court to strike down the entire Clean Buildings Act based on the supposed preemption of a handful of discrete provisions. But "[c]onstitutional litigation is not a game of gotcha against [the District], where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020) (plurality). The Court should not countenance that sort of tactic here—especially when it comes at the expense of the people's efforts to protect their environment, health, and economy.

## CONCLUSION

The Court should grant summary judgment in favor of the District and deny summary judgment to Plaintiffs.

Date: May 28, 2025.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*

MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*

HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*

ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendant*