**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*, <br><br>     **Plaintiffs,** <br><br>     **v.** <br><br> **DISTRICT OF COLUMBIA,** <br><br>     **Defendant.** | **No. 1:24-cv-02942-ACR** |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT
INJUNCTION AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ ii

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 3

I.  The D.C. Gas Ban falls squarely within the scope of EPCA's preemption
    provision. ........................................................................................................... 3

    A.  Under the District's own reasoning, the D.C. Gas Ban is precisely the kind
        of law that Congress intended to preempt in EPCA. ............................... 3

        1.  The D.C. Gas Ban is a backdoor energy conservation standard. ................ 3

        2.  The D.C. Gas Ban and similar bans would result in the very
            patchwork of gas-appliance regulations Congress sought to avoid. ........... 5

    B.  Regardless of whose definition of "energy use" is correct, the D.C. Gas Ban
        is a regulation "concerning" the "energy use" of EPCA-covered
        appliances. ............................................................................................... 8

II. The District's various counterarguments do not save the D.C. Gas Ban from
    preemption. ...................................................................................................... 19

III. None of *amici*'s arguments can save the D.C. Gas Ban. ................................. 25

IV. The D.C. Gas Ban is facially invalid, and its prohibition on gas combustion cannot
    be severed. ....................................................................................................... 29

    A.  The prohibition on gas combustion cannot be severed from the D.C. Gas
        Ban. ......................................................................................................... 29

    B.  This Court can tailor its injunction to comport with principles of equity and
        the scope of Plaintiffs' facial challenge. ................................................ 32

Conclusion .................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Air Evac EMS v. Cheatham*,
910 F.3d 751 (4th Cir. 2018) ......................................................................................20

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987)......................................................................................................30

*Alexander v. Sandoval*,
532 U.S. 275 (2001)................................................................................................24, 25

*Asgrow Seed Co. v. Winterboer*,
513 U.S. 179 (1995)......................................................................................................14

*Assoc. of Contracting Plumbers of City of New York, Inc. v. City of New York*,
No. 23-cv-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025)..................................7

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006)......................................................................................................30

*Blanchette v. Conn. Gen. Ins. Corps*,
419 U.S. 102 (1974)......................................................................................................34

*Bowers v. Kerbaugh-Empire Co.*,
271 U.S. 170 (1926)......................................................................................................18

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*,
519 U.S. 316 (1997)......................................................................................................18

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ..............................................7, 9, 10, 11, 14, 16, 19, 21, 24, 34

*Carson v. Monsanto Co.*,
72 F.4th 1261 (11th Cir. 2023) ...................................................................................21

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)......................................................................................................34

*Cole v. Young*,
226 F.2d 337 (D.C. Cir. 1955)......................................................................................17

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013)......................................................................................................19

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*,
938 F.3d 246 (5th Cir. 2019) ........................................................................................20

*Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*,
642 F.2d 527 (D.C. Cir. 1980) ....................................................................................5, 23

*Dorchy v. Kansas*,
264 U.S. 286 (1924) .......................................................................................................30

*EagleMed LLC v. Cox*,
868 F.3d 893 (10th Cir. 2017) ......................................................................................21

*Engine Mfrs. Ass'n v. S. Coast Air Q. Mgmt. Dist.*,
541 U.S. 246 (2004) .........................................................................................................7

*Env't Def. v. Duke Energy Corp.*,
549 U.S. 561 (2007) ........................................................................................................13

*Espresso, Inc. v. District of Columbia*,
884 F. Supp. 7 (D.D.C. 1995) .......................................................................................29

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................................................................33

*Firemen's Ins. Co. of Washington, D.C. v. Washington*,
483 F.2d 1323 (D.C. Cir. 1973) ...................................................................................25

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101 (1989) ........................................................................................................25

*Food & Drug Admin. v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ........................................................................................................34

*Friedman v. Sebelius*,
686 F.3d 813 (D.C. Cir. 2012) .....................................................................................16

*Georgia v. Pub. Res. Org.*,
590 U.S. 255 (2020) ........................................................................................................14

*Gomez-Perez v. Potter*,
553 U.S. 474 (2008) ........................................................................................................25

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) ...................................................................................................24, 25

*He Depu v. Yahoo! Inc.*,
950 F.3d 897 (D.C. Cir. 2020) .....................................................................................31

iii

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017) .................................................................................................10

*Holland v. Burlington Indus., Inc.*,
    772 F.2d 1140 (4th Cir. 1985) ...............................................................................25

*Huerta v. Ducote*,
    792 F.3d 144 (D.C. Cir. 2015) ...............................................................................27

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010).................................................................................................33

*Krieger v. Fadely*,
    211 F.3d 134 (D.C. Cir. 2000) ...............................................................................31

*Lamar, Archer & Cofrin, LLP v. Appling*,
    584 U.S. 709 (2018).........................................................................................16, 17

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024).................................................................................................15

*Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico v. Hernandez*,
    58 F.4th 5 (1st Cir. 2023).......................................................................................20

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992).........................................................................................16, 17

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996)................................................................................21

*Mowrer v. U.S. Dep't of Transp.*,
    14 F.4th 723 (D.C. Cir. 2021).................................................................................13

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
    567 U.S. 519, 585 (2012)........................................................................................19

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)...................................................................................................4

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998).................................................................................................11

*Pharm. Care Mgmt. Ass'n v. Webi*,
    18 F.4th 956 (8th Cir. 2021)...................................................................................20

*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987)...................................................................................................17

iv

*Puerto Rico v. Franklin California Tax-Free Tr.*,
　579 U.S. 115 (2016)..........................................................................................20, 21

*Pulsifer v. United States*,
　601 U.S. 124 (2024)..................................................................................................9

*R.R. Ret. Bd. v. Alton R. Co.*,
　295 U.S. 330 (1935)................................................................................................30

*Rowe v. N.H. Motor Transp. Ass'n*,
　552 U.S. 364 (2008)................................................................................................25

*Shady Grove Orthopedic, P.A. v. Allstate Ins. Co.*,
　559 U.S. 393 (2010)................................................................................................18

*Shaw v. Delta Air Lines, Inc.*,
　463 U.S. 85 (1983)..................................................................................................33

*Shuker v. Smith & Nephew, PLC*,
　885 F.3d 760 (3d Cir. 2018)....................................................................................21

*Sickle v. Torres Advanced Enter. Solutions, LLC*,
　884 F.3d 338 (D.C. Cir. 2018).............................................................................20, 21

*Tainmen v. Baltimore & Ohio R. Co.*,
　331 U.S. 519 (1947)................................................................................................11

*United States v. Carrell*,
　231 F. Supp. 724 (D.D.C. 1964).............................................................................21

*United States v. Halliburton Co.*,
　954 F.3d 307 (D.C. Cir. 2020).................................................................................14

*United States v. Hansen*,
　599 U.S. 762 (2023)................................................................................................24

*United States v. Jackson*,
　390 U.S. 570 (1968)................................................................................................29

*United States v. Miller*,
　145 S. Ct. 839 (2025).........................................................................................16, 17

*United States v. Price*,
　361 U.S. 304 (1960)................................................................................................18

*United States v. Slatten*,
　865 F.3d 767 (D.C. Cir. 2017).................................................................................16

*United States v. Sup. Ct. of New Mexico*,
   839 F.3d 888 (10th Cir. 2016) ....................................................................................33

*Util. Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014) .................................................................................................13

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001) .................................................................................................13

*Whole Women's Health v. Jackson*,
   595 U.S. 30 (2021) ...................................................................................................32

*Ye v. GlobalTranz Enter., Inc.*,
   74 F.4th 453 (7th Cir. 2023) ....................................................................................20

**CONSTITUTIONAL & STATUTORY PROVISIONS**

U.S. Const. art. VI, cl. 2.........................................................................................23, 24

42 U.S.C. § 6291............................................................................................4, 9, 10, 13, 31

42 U.S.C. § 6292......................................................................................................11, 12

42 U.S.C. § 6293.............................................................................................................4

42 U.S.C. § 6295.........................................................................................10, 11, 12, 13

42 U.S.C. § 6297................................................................2, 7, 9, 10, 11, 12, 13, 18, 27, 28

42 U.S.C. § 6311.........................................................................................................9, 31

42 U.S.C. § 6321............................................................................................................22

42 U.S.C. § 6831............................................................................................................22

42 U.S.C. § 6834............................................................................................................23

42 U.S.C. § 6851............................................................................................................22

42 U.S.C. § 7543............................................................................................................26

49 U.S.C. § 32919..........................................................................................................18

D.C. Code § 6-1453.01 ..................................................................................4, 28, 30, 31

D.C. Code § 8-101.05 ....................................................................................................26

D.C. Code § 45.201........................................................................................................29

**REGULATIONS**

76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011)..............................................................15

**BOOKS & ARTICLES**

American Heritage Dictionary (1969) ..........................................................................17

Black's Law Dictionary (5th ed. 1979)........................................................................17

Bryan A. Garner, et al., The Law of Judicial Precedent (2016) ...................................21

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ........................33

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts
   (2012)........................................................................................................................14

Webster's New Twentieth Century Dictionary (2d ed. 1979) .......................................17

**INTRODUCTION**

This case boils down to a straightforward question:  Whether the D.C. Gas Ban, which expressly bans the use of gas appliances in a wide variety of commercial and residential buildings, "concerns" the "energy use" or "energy efficiency" of those appliances.  As Plaintiffs demonstrated in their motion, the intuitive answer—confirmed by statutory text, context, and history—is yes.  The D.C. Gas Ban is therefore preempted by the federal Energy Policy Conservation Act ("EPCA").  If allowed to stand, the D.C. Gas Ban would replace EPCA's promise of national uniformity with the very patchwork regulatory regime it was passed to prevent.

The District responds by offering its contrasting view of EPCA as a statute with a vanishingly narrow preemption provision that covers only state and local laws that directly regulate the design and manufacture of appliances.  But that vision of EPCA cannot be squared with its text, history, and purpose, and it is ultimately self-defeating.  Consider the District's view that EPCA preempts only "state conservation standards or their equivalents."  Def. Mot., ECF 30, at 18.  This case may not involve formal state conservation standards, but the D.C. Gas Ban certainly qualifies as "their equivalent[]."  Indeed, the District concedes that "building codes can be used as a backdoor method of imposing energy conservation standards."  *Id.* at 33.  That is exactly what the D.C. Gas Ban does.  It effectively sets an "energy use" standard of zero for gas appliances.  That is the case regardless of whether "energy use" is a static value that is measured at the time the appliance leaves the factory or the actual amount of energy an appliance uses in its real-world operations.  Either way, zero is zero.  Thus, the D.C. Gas Ban functions as a backdoor energy conservation standard that imposes a zero-gas-energy-use standard on covered appliances.

As the District recognizes, the D.C. Gas Ban also would result in precisely the ill consequences that Congress feared.  Congress sought to prevent state laws that would "prompt manufacturers to pull out of a state's market and thus result in the very patchwork economy that

1

Congress sought to avoid." *Id.* at 36-37. Yet that is precisely what the D.C. Gas Ban and other state and local laws like it do. Indeed, the U.S. Department of Energy ("DOE") could not even grant a preemption waiver for the D.C. Gas Ban because it "will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," which further confirms that it falls within the core of EPCA's preemptive scope. 42 U.S.C. § 6297(d)(3). If left unchecked, the eventual result of the D.C. Gas Ban would be a checkerboard of gas bans across the country, with gas appliances allowed in some states and localities and banned in others. That is the opposite of the "nationally uniform standards" Congress sought to create through EPCA. Def. Mot., ECF 30, at 21.

Recall, too, that Congress purposefully did not limit EPCA's preemptive effect only to state energy conservation standards, but rather extended it to cover all regulations "concerning" the "energy use" or "energy efficiency" of EPCA-covered appliances. That includes building codes, as evidenced by the narrow exception from preemption that applies only to building codes that meet a list of strict requirements. *See* 42 U.S.C. § 6297(f)(3). There would be no point for Congress to create an exception for building codes if EPCA's preemption provision were concerned with only the design and manufacture of appliances.

Putting that all together, the D.C. Gas Ban's prohibition on appliances in covered buildings from using any gas energy whatsoever is a regulation "concerning" the "energy use" or "energy efficiency" of covered gas appliances. It also is a backdoor energy conservation standard that imposes an "energy use" limit of zero for covered gas appliances. As such, it falls squarely within the scope of EPCA's preemption provision. There simply is no other reasonable way to interpret the statute. After all, no rational interpretation of EPCA could allow its express preemption provision to be rendered a nullity through the equivalent of artful pleading. The kinds of

technicalities the District spends so much time on, at best, miss the forest for the trees.  Reading

the statute as a whole and interpreting it in a commonsense manner that considers its text, structure,

and purpose, the only permissible result is preemption of laws like the D.C. Gas Ban.

ARGUMENT

**I.      The D.C. Gas Ban falls squarely within the scope of EPCA's preemption provision.**

Nothing in the District's response casts serious doubt on what the text of EPCA's

preemption provision plainly provides: regulations "concerning" the "energy use" or "energy

efficiency" of EPCA-covered appliances—such as an outright ban of appliances that use fossil

fuels—cannot stand under federal law.  The intuitive and settled meanings of "energy use" and

"concerning," coupled with EPCA's surrounding context and multi-decade historical record,

establish that parochial and overreaching regulations like the D.C. Gas Ban have no place in the

nationally uniform regime that Congress has so painstakingly provided.

**A.      Under the District's own reasoning, the D.C. Gas Ban is precisely the kind of law that Congress intended to preempt in EPCA.**

**1.      The D.C. Gas Ban is a backdoor energy conservation standard.**

In a telling and accurate description of EPCA's preemptive scope, the District concedes

that it cannot do indirectly what it is prohibited from doing directly.  Specifically, regarding

building codes like the one at issue here, the District finds it "unremarkable that building codes

can be preempted because building codes can be used as a backdoor method of imposing energy

conservation standards by, for example, mandating that all refrigerators installed in new buildings

have a maximum energy use of $x$ kwh."  Def. Mot., ECF 30, at 33.  The District insists that

"Congress was clear" on that point.  *Id.*  Plaintiffs agree: Congress was clear that states and

localities cannot impose backdoor energy conservation standards.  And yet that is exactly what the

3

District has done with the D.C. Gas Ban's prohibition of covered gas appliances. Recall how EPCA defines "energy conservation standard":

> The term "energy conservation standard" means— (A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title . . . .

42 U.S.C. § 6291(6). State and local regulations that effectively cover that same ground using different means—such as by setting a "maximum quantity of energy use" for a covered appliance through a building code—are preempted, just as more direct state and local energy conservation standards that did the same would be. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly."). So if, for example, the District promulgated a building code tomorrow that capped refrigerators', dishwashers', or clothes dryers' energy use at so many kilowatt-hours per year, everyone agrees that EPCA would preempt that code. That would be a classic backdoor energy conservation standard, and it would plainly be preempted as a regulation "concerning" appliances' "energy use."

The D.C. Gas Ban is no different. It may not speak in the language of kilowatt-hours ("kWh"), British thermal units ("BTUs"), or any other technical "energy use" measurement, but it nevertheless sets a "maximum quantity of energy use" standard for gas appliances. By prohibiting gas use entirely, it sets that value at zero. *See* D.C. Code § 6-1453.01(a)(3)(iii) ("On-site fuel combustion shall not be permitted for the provision of thermal energy to the building."). And that is true whether their "energy use" is determined on the factory floor using test procedures, as the District insists upon, or where consumers actually use the appliances in the real world. Either way, gas appliances cannot use any gas energy whatsoever under the D.C. Gas Ban: zero therms, zero BTUs, zero anything. Framed in terms of the parties' differing views of the preemption provision, that means both prohibiting all gas appliances that have a figure greater than zero specified on their

kBTUs/year energy use labels, *see* Def. Mot., ECF 30, at 14, 30 (emphasizing EPCA's labeling requirements), and barring the actual use of any gas appliance in practice.  So however "energy use" may be defined and measured for the particular EPCA-covered gas appliance at issue, the D.C. Gas Ban dials back the maximum quantity of energy it may use to nil.

The D.C. Gas Ban is, in short, an indirect yet heavy-handed way of achieving the equivalent of a stringent energy conservation standard.  Everyone agrees that the District could not impose such a backdoor energy conservation standard that sets a "maximum quantity of energy use" for gas stoves at, say, 1,000 kBtu/year.  The same goes for the 0 kBtu/year standard the District set in the D.C. Gas Ban.  That backdoor energy conservation standard must fall to EPCA preemption.

### 2.    The D.C. Gas Ban and similar bans would result in the very patchwork of gas-appliance regulations Congress sought to avoid.

Preemption of the D.C. Gas Ban is also the only result that can be squared with the raison d'être of EPCA's preemption provision.  The driving force behind EPCA and its express-preemption clause is the desire to provide manufacturers and purchasers the national uniformity needed for a healthy and robust appliance market.  The D.C. Gas Ban, if allowed to stand, would thwart that legislative vision.  That cannot be permitted, as "constitutionally-grounded federal operations may not—absent congressional consent—be thwarted by local fiat."  *Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*, 642 F.2d 527, 533-34 (D.C. Cir. 1980).

Both the legislative and statutory history of EPCA confirm this central focus on national uniformity.  EPCA, enacted in 1975, began as a "comprehensive national energy policy" thought necessary to address the nation's reliance on foreign energy, S. Rep. No. 94-516, at 116 (1975), and from there only ratcheted up on federal uniformity of appliance standards.  The 1978 National Energy Conservation Policy Act ("NECPA") amendment, for example, required DOE to prescribe minimum energy-efficiency standards and tightened EPCA's preemption provision, allowing state

regulatory involvement only if there was a significant local interest in the regulation and it did not unduly interfere with interstate commerce.  Pub. L. No. 95-619, § 424, 92 Stat. 3206, 3264 (1978).

Even with the NECPA amendment, though, DOE refused to prescribe minimum standards and instead "initiated a general policy of granting petitions from States requesting waivers from preemption." S. Rep. No. 100-6, at 4 (1987).  "As a result, a patchwork of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." *Id.*  Lawmakers, in turn, recognized "the problem of the growing patchwork of differing regulations." *Id.*  What followed was a desire to "end the era of confusion and uncertainty" and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements."  H.R. Rep. No. 100-11, at 23 (1987).

Congress followed through and passed the National Appliance Conservation Act of 1987 ("NAECA"), Pub. L. No. 100-12, 101 Stat. 103 (1987), aiming "to reduce the regulatory and economic burdens on the appliance-manufacturing industry through the establishment of national energy conservation standards for major residential appliances," S. Rep. No. 100-6, at 1 (1987). The result was "[t]he establishment of Federal standards and the preemption of State standards," along with a preemption waiver that was "difficult" for states to obtain. *Id.* at 2.  Congress later expanded this federal appliance program in 1992 to include industrial appliances, Pub. L. No. 102-486, 106 Stat. 2776 (1992), once again preempting any state and local deviation concerning a covered product's "energy use" or "energy efficiency."

As this abbreviated recap of EPCA's legislative and statutory history shows, Congress continually sought less variance and more uniformity in the appliance-manufacturing market. Whatever experimental breathing room states previously had under the original EPCA regime was

subsequently smothered by NAECA, and for good reason: only then could the appliance industry be unburdened by the weight of patchwork local regulations and thrive nationwide.

It is against this backdrop that the District now seeks to chart its own unique path and ban gas appliances within its borders.  Some localities have already gone down that path,[1] and many others may very well follow.  If such bans are allowed to proliferate, appliance manufacturers would be forced to radically shift their production lines—by redesigning and retooling them for electric appliances rather than gas ones, for example—in an attempt to accommodate discrete jurisdictions all over the nation.  *Contra* Def. Mot., ECF 30, at 16 (erroneously asserting that a ban on gas appliances would not result in the "redesign" of appliances).  The sale and marketing of gas appliances would, in turn, become increasingly complex, with no-go zones scattered across the country.  So would the servicing of gas appliances, as consumers in an area where new gas appliances are banned could find themselves hours away from a business that could repair their gas appliances.  *Cf.* 42 U.S.C. § 6297(d)(3) (DOE cannot grant a preemption waiver if, *inter alia*, the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis.").

All this would "prompt manufacturers to pull out of a state's market and thus result in the very patchwork economy that Congress sought to avoid."  Def. Mot., ECF 30, at 36-37.  That sort of balkanized regulatory landscape is a far cry from what Congress contemplated when it federalized regulation of the appliance industry.

*             *             *

---

[1] *E.g.*, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024); *Assoc. of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-cv-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025).

The District's response, while it contains many errors that Plaintiffs will address below, hits at least two points on the nose: (1) states and localities cannot smuggle in backdoor energy conservation standards through a building code, and (2) state and local regulations that prompt appliance manufacturers to pull out of the market and thereby create the patchwork economy that Congress sought to avoid cannot be squared with EPCA.  Those two points alone confirm just how out of step the D.C. Gas Ban is with EPCA.  It is a local law that (1) effectively sets a backdoor "energy use" standard of zero for gas appliances, and (2) if allowed to stand, would undoubtedly force manufacturers out of the appliance market and add to the checkerboard of gas bans that disrupt the nationally uniform standards Congress envisioned.  This is all the Court needs to deny the District's cross-motion and grant Plaintiffs the declaratory and injunctive relief they seek.

**B.      Regardless of whose definition of "energy use" is correct, the D.C. Gas Ban is a regulation "concerning" the "energy use" of EPCA-covered appliances.**

The parties disagree on what "energy use" means in the context of EPCA's preemption provision.  This dispute ultimately does not matter, however, because the D.C. Gas Ban is preempted either way.  EPCA broadly preempts all state and local regulations "concerning" a covered appliance's "energy use."  An outright ban on gas appliances' use of gas energy "concern[s]" their "energy use" regardless of whether that is a static value that is measured at the factory (as the District prefers) or is based on the appliances' actual energy use in practice (as Plaintiffs believe).  A ban sets both of those values at zero and therefore "concern[s]" their "energy use" under either understanding of the term.

1.      The District takes issue with Plaintiffs' interpretation of "energy use" as the term appears in EPCA's preemption provision, but the statute as a whole confirms that "energy use" refers to the quantity of energy an appliance uses at its point of use.  EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use" for consumer

8

products and "the quantity of energy directly consumed by an article of industrial equipment at the point of use" for industrial products and specifies certain test procedures for determining it for both types of products.  42 U.S.C. §§ 6291(4), 6311(4).  The statute thus takes aim at state and local regulations that dictate (or even merely "concern[]") the quantity (how much, if any) of energy (like natural gas) that can be used at a covered appliance's point of use (such as a building).  *See* Pls. Mot., ECF 26, at 10-11.  The Ninth Circuit, for its part, has reached the same conclusion, holding that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations, like restaurants."  *Berkeley*, 89 F.4th at 1102.

The District resists this natural reading and presses the notion that "energy use," as used in EPCA's preemption provision, is nothing more than something manufacturers must consider when designing the appliance in "laboratory settings."  Def. Mot., ECF 30, at 12.  "[H]ow a consumer actually uses a product," the District submits, "has no effect on 'energy use,' as defined by EPCA."  *Id.*  That interpretation, if correct, would defeat the statute's purpose and produce all the deleterious consequences that EPCA was passed to prevent.

Take § 6297(f), for example, which exempts building codes from preemption when they meet certain requirements.  Buildings, of course, are where consumers will ultimately use many EPCA-covered appliances.  It would be curious indeed for Congress to make an exception for certain *building codes* if, as the District argues, EPCA concerned itself with only the *design and manufacture* of appliances.  Presumably, such a factory-floor focused statute would not overlap with buildings codes to begin with.  So an express exemption for a certain narrow class of building codes would be not only unnecessary, but downright bizarre.  *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus renders an entire subparagraph

9

meaningless, this Court has noted, the canon against surplusage applies with special force." (internal quotation marks omitted)).

Consider also § 6297(d), which permits DOE to grant waivers of federal preemption in some limited circumstances.  It specifies that DOE cannot grant a waiver if, *inter alia*, the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis."  42 U.S.C. § 6297(d)(3).  Thus, under that provision, DOE "must consider the complete lifecycle of an appliance—from manufacturing to servicing— in reviewing a waiver petition." *Berkeley*, 89 F.4th at 1104.  "Such a provision would make little sense if the scope of EPCA's preemption ends with the design or manufacture of the product." *Id.*; *see also* 42 U.S.C. § 6295(o)(4) (effectively requiring DOE to consider impacts to end use, by prohibiting the agency from prescribing standards that would "likely result in the unavailability [of] any covered product type (or class)").

In trying to wave away these problems, the District conflates the terms "regulation[s] concerning . . . energy use" and "energy conservation standard." *E.g.*, Def. Mot., ECF 30, at 10 ("EPCA's text and structure reveal that it preempts regulations concerning the quantity of energy that products are designed to use (*i.e.*, energy conservation standards or their equivalents)."); *see also id.* at 33 (arguing that the building-code exception was meant to prevent the imposition of "backdoor . . . energy conservation standards").  That perhaps could be a plausible interpretation of EPCA but for the fact that the statute defines "energy use" and "energy conservation standard" differently, *compare* 42 U.S.C. § 6291(6) (defining "energy conservation standard"), *with id.* § 6291(4) (defining "energy use"), and never uses the terms interchangeably, *see, e.g.*, *id.* § 6297(c).  It almost goes without saying that "differences in language like this convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017).  That is why the

Ninth Circuit rejected this same faulty premise that permeates the District's motion, and rightly so. *See Berkeley*, 89 F.4th at 1105 ("[E]lsewhere EPCA uses both phrases [energy conservation standard and energy use] *together*—which shows that they aren't simply interchangeable.").[2]

In the same breath as it conflates statutory terms, the District also accuses Plaintiffs of "rewriting" the definition of "energy use" in EPCA and offers a dramatic redline to illustrate its point. *See* Def. Mot., ECF 30, at 26.  Plaintiffs do nothing of the sort.  Plaintiffs have acknowledged all along that the definition of "energy use" also contains a technical component that is determined in accordance with "test procedures." *E.g.*, Pls. Mot., ECF 26, at 16.  But it is also true that EPCA employs "energy use" in other ways that broadly refer to the amount of energy a product consumes. *E.g.*, 42 U.S.C. 6292(b)(1)(B) (permitting classification of covered product if the "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year" (emphasis added)); *id.* § 6295(*l*)(1)(B) (permitting the promulgation of energy conservation standards for products if, *inter alia*, "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period." (emphasis added)).

The District shrugs off those inconvenient usages by pointing out that EPCA supplies a definition for "average annual per-household energy use with respect to a type of product." Def. Mot., ECF 30, at 27 (citing 42 U.S.C. § 6292(b)(2)(A)).  But, at best, that could explain away only § 6292(b)(1)(B) since § 6295(*l*)(1)(B) does not use that term.  And, in fact, the District's

---

[2] In conflating these two terms, the District also relies on the fact that the title of section 6297(c) refers to "energy conservation standards" and not "energy use." Def. Mot., ECF 30, at 15.  Such reliance is misplaced.  The Supreme Court has repeatedly held that "[t]he title of a statute cannot limit the plain meaning of the text." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (alterations omitted) (quoting *Tainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947)).

interpretation does not work even for § 6292(b)(1)(B).  That is because the very definition the

District invokes itself uses the term "energy use" in a manner that takes into account real-world

energy usage:

> The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual *energy use* (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

42 U.S.C. § 6292(b)(2)(A) (emphasis added).  That plainly is referring not to some value that is

measured as the product leaves the factory floor, but rather to the estimated annual amount of

actual energy used by products in consumer households.  Thus, the District's efforts on this front

ultimately are self-defeating and end up confirming that EPCA at times uses the term "energy use"

to refer not to some immutable property of a product, but rather to the amount of energy the product

actually uses in real-world operation.[3]

Then, in a captious attempt to back up its interpretation of "energy use," the District zooms

in on the word "the" and proceeds to parse that article in its favor.  *See* Def. Mot., ECF 30, at 28.

According to the District, presence of the word "the" in § 6297(c) is significant because it makes

no appearance in Plaintiffs' two statutory examples, §§ 6292(b)(1)(B) and 6295(*l*)(1)(B).  *Id.*

Whatever significance this notion has in the abstract, it falls apart upon closer examination.  For

starters, § 6297(c) would be grammatically erroneous if it did not include "the."  *See* 42 U.S.C.

§ 6297(c) ("[N]o state regulation concerning [] energy use . . . of such covered product shall be

effective with respect to such product . . . .").  Then there is the inconvenient fact that

---

[3] In fact, in setting energy conservation standards, DOE itself conducts an Energy Use Analysis, which evaluates end-user consumption data, not test procedure estimates.  *See, e.g.*, U.S. Dep't of Energy, Technical Support Document: Energy Efficiency Program for Consumer Products and Commercial and Industrial Equipment: Consumer Conventional Cooking Products (Jan. 2024), available at https://perma.cc/52PW-76YK.

12

§ 6295(*l*)(1)(B) clearly does use the word "the," referencing "*the* aggregate household energy use within the United States." *Id.* § 6295(*l*)(1)(B) (emphasis added).  Nor, tellingly, does the District draw the opposite conclusion from the *in*definite article "an" that proceeds defined terms such as "energy conservation standard." *See id.* § 6297(c) ("effective on the effective date of *an* energy conservation standard established or prescribed under section 6295 of this title for any covered product" (emphasis added)).  As far as Plaintiffs can tell, the District has not taken the corresponding position that "an" expands the meaning of "energy conservation standard," and so it is unclear why "the" would narrow the meaning of "energy use."  Thus, this is all much ado about nothing.  Congress was simply employing standard syntax when drafting EPCA and did not intend to "hide elephants in mouseholes" by smuggling in a specific meaning with a "the." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

Next, the District insists that the Court should blindly apply the definition of "energy use" in § 6291(4) to § 6297(c) without regard to overall statutory context.  *See* Def. Mot., ECF 30, at 26-27.  It assumes, for example, that "energy use" as used in EPCA's labeling requirements must retain its identical meaning when used in EPCA's preemption provision.  *E.g.*, Def. Mot., ECF 30, at 30.  But that is not how this works.  The Supreme Court has recognized that "the presumption of consistent usage 'readily yields' to context, and a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'"  *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)).  The D.C. Circuit has followed the same principle, departing from a statutory definition when context calls for it.  *E.g.*, *Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 730 (D.C. Cir. 2021) ("[W]e may assume that contextual considerations would prevent application of the 'person' definition as written.").  Cases

13

like *Mowrer*, 14 F.4th at 729-30, *Utility Air Regulatory Group*, 573 U.S. at 319-20, and *Duke Energy*, 549 U.S. at 574, make clear that doing so is particularly appropriate where a particular term is used in multiple statutory provisions in multiple different senses.

That is undoubtedly the case here. The relevant context here—*e.g.*, use of the word "concerning," which broadens EPCA's preemptive scope (*see infra* § I.B.2), and the building-code exception, which shows that Congress was not too near-sighted to think that only regulations that apply on the factory floor could affect appliances' energy use (*see supra* § I.B)—is more than enough to conclude that the District has sold the term "energy use" far too short. *Cf.* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (2012) ("One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").

Finally, after repeatedly emphasizing EPCA's statutory definitions, the District turns to a phrase that lacks one—"point of use"—and contends that it has a specialized meaning that Congress never bothered to mention. *See* Def. Mot., ECF 30, at 28-29. This is a break from a basic rule of statutory construction, which is to give undefined terms their ordinary meaning. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *United States v. Halliburton Co.*, 954 F.3d 307, 310 (D.C. Cir. 2020) (similar). Fighting that rule, the District faults Plaintiffs for citing only two contemporary dictionaries that show the ordinary meaning of "point of use." Def. Mot., ECF 30, at 29. Yet the District cites none. For such a precise, technical term, as the District thinks it is, one might think there would be scientific literature or technical dictionaries bearing this out. Their absence from the District's Motion speaks volumes.

The District instead relies on the dissent in *Berkeley* and some agency regulations. *See* Def. Mot., ECF 30, at 29. But neither of those get the District where it needs to go. *See Georgia*

14

*v. Pub. Res. Org.*, 590 U.S. 255, 273 (2020) ("[C]omments in a dissenting opinion . . . are just that: comments in a dissenting opinion"); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024) ("[A]gencies have no special competence in resolving statutory ambiguities.  Courts do."). In fact, one of the DOE regulations that the District cites actually *supports* Plaintiffs' reading of "point of use."  *See* 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011) ("The point-of-use method for measuring energy consumption considers the use of electricity, natural gas, propane, and/or fuel oil by an appliance at the site where the appliance is operated.").  So the idea that "point of use" could have an ordinary meaning should not be surprising, especially considering that EPCA focuses on the real-world use of appliances.[4]

2. Assuming, *arguendo*, that all of that was otherwise and that the District's narrow reading of "energy use" governs here, the D.C. Gas Ban would *still* be preempted since it would still "concern[]" covered appliances' "energy use" even under the District's cramped understanding of that term.  A ban on gas appliances "concern[s]" how much gas energy an appliance is designed and manufactured to use just as much as some non-zero energy conservation standard setting a positive value on their "maximum quantity of energy use" would.  In both scenarios, appliances with immutable characteristics that exceed the designated upper limit cannot be used.  The only difference is that the D.C. Gas Ban is the harshest possible type of regulation that "concern[s]" gas appliances' "energy use" since it prohibits entirely the use of any appliance that uses gas energy.  Under it, no appliance that is designed and manufactured to use any gas energy may be operated in covered buildings.  If that does not "concern" the factory-floor "energy use" values of gas appliances, it is hard to know what would.

---

[4] Although the D.C. Gas Ban most directly concerns the energy use of gas appliances, it also concerns their energy efficiency, in that it plainly bans gas appliances with federally approved energy efficiency standards that inherently contemplate the combustion of gas.

Congress's deliberate use of the broadening term "concerning" confirms that EPCA's broad preemptive scope would encompass the D.C. Gas Ban regardless of whose understanding of "energy use" applies.  As Plaintiffs have explained, the word "concerning" is synonymous with "relating to" and is yet another textual indication of the broad scope of EPCA's preemption provision.  Pls. Mot., ECF 26, at 11.  Supreme Court and D.C. Circuit precedent confirm as much.  In *Lamar, Archer & Cofrin, LLP v. Appling*, for example, the Supreme Court observed that "[c]oncerning means 'relating to'" and that such language "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."  584 U.S. 709, 717 (2018).  The Court said the same in *Morales v. Trans World Airlines, Inc.*, noting that the "ordinary meaning" of "relating to" is a "broad one" and "thus express[es] a broad pre-emptive purpose."  504 U.S. 374, 383 (1992).  The D.C. Circuit's precedent is in accord:  "We have noted that the 'ordinary meaning' of 'relating to' is a 'broad one' and that a statutory provision containing the phrase therefore has 'broad scope.'"  *United States v. Slatten*, 865 F.3d 767, 780 (D.C. Cir. 2017) (quoting *Friedman v. Sebelius*, 686 F.3d 813, 820 (D.C. Cir. 2012)).  The Ninth Circuit agreed in *Berkeley*, observing that "[b]y using the term 'concerning,' Congress meant to expand [EPCA's] preemption beyond direct or facial regulations of covered appliances."  89 F.4th at 1103.

The District strains to distinguish these on-point precedents.  *See* Def. Mot., ECF 30, at 31-32.  According to the District, *Lamar* "is of little help here" because it was not decided in the preemption "context" and it "postdates NAECA by several decades, so any equivalence between 'concerning' and 'relating to' could not have informed Congress when it enacted NAECA."  *Id.* at 32.  But it is unclear why the fact that *Lamar* was not a preemption case matters.  The District implies that *United States v. Miller*, 145 S. Ct. 839 (2025), supports it on that point since the

16

Supreme Court distinguished *Lamar* as arising in a different "context." *Id.* at 852. The issue there, however, had nothing to do with preemption being some special context, but rather the fact that waivers of sovereign immunity (one of which was at issue in *Miller*) are construed narrowly. *See id.* at 852-53 ("Giving breadth to a discrete statutory term like "financial condition" is a far cry from expanding a sovereign-immunity waiver, especially when our general rule is that waivers of sovereign immunity are to be read *narrowly*." (internal quotation marks omitted)). That reasoning has no application here, however, since this Court does not apply a presumption against preemption or otherwise put its thumb on the scale in express preemption cases. *See infra* at 19-21. And, in any event, the Court in *Lamar* cited *Morales* for support, *see Lamar*, 584 U.S. at 718, which *is* a preemption case and held that the phrase "relate to" meant "to have bearing or concern" and expressed "a broad pre-emptive purpose" with an "expansive sweep," *Morales*, 504 U.S. at 378 (quoting Black's Law Dictionary 1158 (5th ed. 1979), and *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)).

As for the District's post-dating argument, even without *Lamar* on the books when it passed NAECA, Congress still had every reason to think that "concerning" was synonymous with "relating to" and thus a term of substantial breadth. As the Court in *Lamar* explained, dictionaries throughout the 20th Century used "concern" and "relate to" interchangeably. *See Lamar*, 584 U.S. at 716 (citing, among other sources, the American Heritage Dictionary (1969) and Webster's New Twentieth Century Dictionary (2d ed. 1979) for the proposition that "concern" is synonymous with "relate to"). This meaning remained unchanged in 1987—the year NAECA passed. *See, e.g.*, The Random House Dictionary of the English Language 423 (2d ed. 1987) (defining "concern" as "to relate to; be connected with"). So, if anything, the fact that *Lamar* "postdates NAECA by several decades," as the District emphasizes, shows how enduring the meaning of "concerning" is and

17

how familiar with its breadth Congress would have been when it passed NAECA. *Cf. Cole v. Young*, 226 F.2d 337, 341 (D.C. Cir. 1955) ("The statute here used a well-known word, and we give it its well-known meaning.").

The District adds two more points on this score, neither of which finds purchase. First, it divines some implicit purpose in the fact that "elsewhere in EPCA Congress used 'relating to' in a preemption provision, 49 U.S.C. § 32919(a), but chose not to in the provision at issue here." Def. Mot., ECF 30, at 31-32. One problem with this argument is that the preemption provisions in 49 U.S.C. § 32919(a) and 42 U.S.C. § 6297(c) were passed by different Congresses in different sessions. *Compare* Pub. L. No. 100-12, 101 Stat. 103 (1987) (legislation containing "energy use" and "energy efficiency" preemption clause), *with* Pub. L. No. 103-272, 108 Stat. 745 (1994) (legislation containing the fuel-economy standards preemption clause). So it was not as if the lawmakers passing those two different pieces of legislation made some conscious and contemporaneous choice to distinguish between the two. *Cf. United States v. Price*, 361 U.S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."). More importantly, Supreme Court precedent and modern English usage have long established that the two phrases are broad and synonymous, so there is no reason to start giving them different constructions now. Congress should not be made to aim at a moving target. *See Shady Grove Orthopedic, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 414 (2010) ("We do Congress no service by presenting it a moving target."); *see also Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 174 (1926) (standing by a definition that "has been adhered to and applied repeatedly").

The District concludes its assault on "concerning" by contending that even if Plaintiffs are correct about its meaning, it does not do "much work" because Plaintiffs offer no limiting principle. Def. Mot., ECF 30, at 32. The irony here is that Plaintiffs actually agree with the District

18

that Congress's intent—as understood in light of statutory text, context, and history—provides the limiting principle in all cases, including this one.  *See* Def. Mot., ECF 30, at 32; *see, e.g.*, *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997).  As Plaintiffs have explained at length, all show that the D.C. Gas Ban cannot be reconciled with EPCA.

Undeterred, the District's suspicion that no limiting principle exists leads it to claim that Plaintiffs' interpretation of EPCA produces "absurd and untenable results" by calling into question fire codes, zoning plans, and consumer-protection claims.  Def. Mot., ECF 30, at 37.  Not so. While "concerning" is indeed broad, the Ninth Circuit got it right when it pointed out that "the breadth of ECPA's preemption provision 'does not mean sky is the limit.'"  *Berkeley*, 89 F.4th at 1103 (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)).  The Ninth Circuit had no occasion to explore the outer reaches of those limits in *Berkeley*, and its holding thus had "nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used."  *Id.*

This Court finds itself in the same position.  While delineating the outer bounds of EPCA's broad preemption provision will not be an easy task, this Court has no occasion to undertake it here.  This is not an edge case.  It does not concern some tailored regulation of a building code, but rather an outright ban of the use of covered gas appliances in many commercial and residential buildings throughout the District.  This case, therefore, does not require the Court to delimit the boundaries of EPCA preemption.  *Cf. Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) ("It is enough for today that wherever that line may be, the statute is surely beyond it.").

## II.    The District's various counterarguments do not save the D.C. Gas Ban from preemption.

The District's motion contains an assortment of other arguments in support of its attempt to save the D.C. Gas Ban from EPCA preemption, but none can change the result here.

19

*First*, the District understandably, but mistakenly, props up its textual analysis with the presumption against preemption, suggesting that it still applies despite the fact that the Supreme Court held the opposite in *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115 (2016): "Because the statute contains an express pre-emption clause, we do not invoke any presumption against preemption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent." *Id.* at 125 (internal quotation marks omitted). True, the D.C. Circuit recited the presumption in *Sickle v. Torres Advanced Enterprise Solutions, LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018), which post-dates *Franklin*. But, contrary to the District's claims, *Sickle* does not represent the court's authoritative application of *Franklin*'s rule. Quite the contrary. For one, neither the panel nor the parties in *Sickle* even cited *Franklin*, much less grappled with its holding. There was no occasion to, as the court merely recited the presumption in the legal-standards section of its opinion before engaging in a full-scale express *and implied* preemption analysis. *Sickle*, 884 F.3d at 346-50. That is hardly noteworthy since the presumption continues to apply even post-*Franklin* in implied preemption cases. And it becomes even less so when considering that the court in no way actually applied the presumption in its express preemption analysis. *See id.* at 347-48. So it is hard to see how *Sickle* could possibly represent the D.C. Circuit's considered view on how *Franklin* applies to express preemption cases.

The truth is that the D.C. Circuit has not confronted the question of how *Franklin* impacts the applicability of the presumption against preemption. Neither *Sickle* nor any other D.C. Circuit case controls that issue. While the D.C. Circuit has not tackled that question, many other circuits have. The vast majority agree that, post-*Franklin*, the presumption against preemption does not apply in express-preemption cases. *See Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico v. Hernandez*, 58 F.4th 5, 11-12 (1st Cir. 2023); *Air Evac EMS v. Cheatham*, 910 F.3d 751,

761-62 (4th Cir. 2018); *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258-59 (5th Cir. 2019); *Ye v. GlobalTranz Enterp., Inc.*, 74 F.4th 453, 465 (7th Cir. 2023); *Pharm. Care Mgmt. Ass'n v. Webi*, 18 F.4th 956, 967 (8th Cir. 2021); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024); *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023).[5]  Given *Franklin*'s clear language on this matter, that is plainly the right result.

In any event, to the extent there is an actual conflict between *Franklin* and *Sickle*, the choice is easy: Supreme Court precedent controls.  *See* Bryan A. Garner, et al., The Law of Judicial Precedent 305 (2016) ("When actual discord exists, the higher court obviously governs."); *United States v. Carrell*, 231 F. Supp. 724, 728 (D.D.C. 1964) ("It is superfluous to state that manifestly in case of an inconsistency between a decision of the Supreme Court and an opinion of a Court of Appeals, it is incumbent on the District Court to follow the ruling of the Supreme Court.").  Either way, the presumption against preemption does not apply here.

*Second*, the District suggests that Plaintiffs' reliance on the Ninth Circuit's decision in *Berkeley* is not that compelling because it is "a single out-of-circuit case" in which "*ten* other judges" joined a dissent from rehearing en banc.  Def. Mot, ECF 30, at 38-39 (emphasis in original).  It is unclear why the District feels the need to start counting noses.  Judge Friedland's dissent and the panel's opinion can speak for themselves.  But to the extent raw numbers matter, it bears pointing out that Judge Friedland's dissent is just that: a dissent.  There were obviously not enough votes on the Ninth Circuit to disturb the panel's opinion, which is now the law of that circuit and a decision from which the D.C. Circuit would be reluctant to depart.  *See Mountain*

---

[5] Only the Third Circuit has held otherwise and confined *Franklin* to the bankruptcy context.  *See Shuker v. Smith & Nephew*, *PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018).

*States Legal Found. v. Glickman*, 92 F.3d 1228, 1237 (D.C. Cir. 1996) (observing that the court "would be most reluctant to create a circuit split").

*Third*, the District makes the related point that if Plaintiffs' interpretation of EPCA were correct, "one would expect to see scores of decisions from the past several decades striking down all types of laws that merely concern appliances' energy use under EPCA." Def. Mot., ECF 30, at 38. Plaintiffs are hesitant to engage in counterfactuals or speculation about litigation trends. But Plaintiffs can at least confirm that local legislation like the D.C. Gas Ban is a relatively new phenomenon. Not until recently have extreme measures like outright gas-appliance bans been arising in certain localities.[6] Perhaps that is the simple explanation for the fact that "scores of decisions" do not yet exist. Whatever the reason, the mere fact that a violation of federal law is unprecedented is no reason to condone it. If anything, it would more urgently warrant this Court's deliberate and considered judgment—both for the benefit of Plaintiffs and others who currently live with this threat to their livelihoods. *See* Compl., ECF 1, ¶¶ 11-17.

*Fourth*, the District points to a handful of federal laws, including EPCA, that encourage renewable-energy and net-zero initiatives and so, according to the District, must be inconsistent with Plaintiffs' interpretation of EPCA. *See* Def. Mot., ECF 30, at 23-24. But there is no inconsistency there. At the outset, the District fails to mention that many of these initiatives are completely voluntary. *See, e.g.*, 42 U.S.C. § 6851(b) (stating that the "purpose of this subchapter [is] to encourage and facilitate the implementation of energy conservation measures"); *id.* § 6831(a)(2) (describing the measures as "[f]ederal voluntary performance standards"). States and

---

[6] In fact, the City of Berkeley's gas ban that the Ninth Circuit invalidated was the first of its kind in the nation. *See* Kevin Stark, *Berkeley, Calif.*, *repeals its first-in-the-nation ban on natural gas in new homes*, Nat. Public Radio (Mar. 19, 2024), https://www.npr.org/2024/03/29/1241576489/berkeley-calif-repeals-its-first-in-the-nation-ban-on-natural-gas-in-new-homes.

22

localities need not participate in any of them.[7]  So this is not a case where two conflicting federal mandates are putting states and localities in an impossible situation.

Moreover, implementing a net-zero emissions building code or renewable-energy measures does not necessarily mean a ban on gas appliances.  *Contra* Def. Mot., ECF 30, at 22 ("EPCA and related statutes support state building codes that transition buildings away from fossil fuels and towards net-zero-energy.").  The District does not consider, for example, that emissions from the gas appliances could be offset by credits used to fund renewable energy projects (such as solar or wind energy) or projects that capture existing greenhouse gas emissions.  Instead, it makes that realization only much later in its Motion and ultimately concedes that net-zero-energy buildings can still use gas appliances.  *See id.* at 44 ("Were the fossil fuel prohibition severed, the Board could implement a net-zero energy standard without it because net-zero-energy buildings can still use fossil fuels.").  So it does not take a lot of imagination to think of ways in which a state or locality participating in any of the District's listed federal programs can do so without taking the hardline stance that no building may use gas appliances.  That is not to say such efforts could not also be preempted by EPCA, but rather only to point out that this argument finds no purchase whatsoever in the gas ban context of this challenge.

*Fifth*, the District seems to go so far as to suggest that Plaintiffs' reading of EPCA creates a *constitutional* problem.  According to the District, DOE's regulatory authority extends only to

---

[7] New federal buildings, to be sure, must be built based on certain energy conservation objectives, *see* 42 U.S.C. § 6834, but they can still seek exemptions, *id.* § 6834(a)(3)(D)(II).  At any rate, federal standards like these obviously pose none of the preemption issues that state and local standards do.  With respect to its own buildings, the federal government is free to depart from EPCA however it wishes. *See Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*, 642 F.2d 527, 535 n.73 (D.C. Cir. 1980) ([T]he Property Clause . . . provides a specific and independent constitutional basis for congressional action respecting federal property." (citing U.S. Const. art. IV, § 3, cl. 2)).

"energy conservation standards," and Plaintiffs' view of EPCA would "stretch[] EPCA's preemptive scope beyond DOE's authority [and] would [thus] create a constitutional problem that the Court must avoid." Def. Mot., ECF 30, at 16 (citing *United States v. Hansen*, 599 U.S. 762, 781 (2023)). None of that is correct. The District tellingly does not even identify what "constitutional principles" are at play here. *Id.* The Supremacy Clause provides the basis for Plaintiffs' preemption action, to be sure, *see* U.S. Const. art. VI, cl. 2, but the purported problem of an agency exceeding its statutory authority is a statutory matter, not a constitutional one. The District's cited support, *Hansen*, offers it no aid, for that was a criminal case involving a First Amendment overbreadth challenge that has no obvious application here. 599 U.S. at 766. So the District cannot try to prop up its analysis with the canon of constitutional avoidance. Instead, it must defend its position on the plain terms of EPCA, just as Plaintiffs have done.

*Sixth*, and finally, the District claims that Plaintiffs are trying to create a right to use gas appliances and that their "conception of EPCA" is "misguided" because there is no "rights-creating language" in the statute. Def. Mot., ECF 30, at 36 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002), and *Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001)). This is wrong for at least two reasons. The first and more fundamental reason is that Plaintiffs' interpretation does not create such a "right." The manufacture and sale of gas appliances are lawful exercises of commerce. The question is whether states and localities can obstruct that commerce consistent with EPCA, not whether consumers have some sort of unqualified right to purchase gas appliances. The Ninth Circuit dispatched this rights-based argument for similar reasons. *See Berkeley*, 89 F.4th at 1106 (noting that it "does not follow" from its decision that "the City must affirmatively make natural gas available everywhere" because its "very narrow" holding "doesn't touch on whether the City has any obligation to maintain or expand the availability of a utility's delivery of gas to meters").

24

This Court can do the same.  The second and more technical reason is that the cases the District cites, such as *Gonzaga* and *Sandoval*, are about the existence of congressionally created causes of action, not "rights."  Those are "analytically distinct" concepts.  *Gomez-Perez v. Potter*, 553 U.S. 474, 483 (2008).  It is undisputed that Plaintiffs have a cause of action to sue the District.  So the District's citations to and quotations from cases like *Gonzaga* and *Sandoval* are irrelevant.

**III.    None of *amici*'s arguments can save the D.C. Gas Ban.**

*Amici* Sierra Club, Chesapeake Climate Action Network ("CCAN"), and Public Health Law Center ("PHLC") offer various counterarguments.  None is persuasive.

A.    Sierra Club and CCAN argue that Plaintiffs' reading of EPCA would intrude upon the "valid exercise of the District of Columbia's police power, which authorizes the District to promulgate regulations that protect its residents' public health and safety."  Br. of *Amici* Sierra Club & CCAN, ECF 35-1, at 17-18.  Plaintiffs take no issue with the general notion that the District can exercise police powers, *see Firemen's Ins. Co. of Washington, D.C. v. Washington*, 483 F.2d 1323, 1327-28 (D.C. Cir. 1973), but arguing that EPCA intrudes upon them generally, and the District's power to advance public health specifically, does no more than beg the question regarding EPCA's preemptive scope.  "Despite the importance of the public health objective," the Supreme Court has reasoned, "we cannot agree with Maine that federal law creates an exception on that basis, exempting state laws that it would otherwise pre-empt."  *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008); *see also Holland v. Burlington Indus., Inc.*, 772 F.2d 1140, 1148 n.6 (4th Cir. 1985) (rejecting a state official's "argument for a Tenth Amendment exception from ERISA's preemption . . . or an exception based on the state's police power"), *abrogated on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  In other words, there is no police-power or public-health exception to federal preemption, so Sierra Club and CCAN's invocation of them does little to advance the issues presented here.

25

Sierra Club and CCAN similarly worry that Plaintiffs' reading of EPCA would "hamstring the District's ability to protect residents from harmful pollution" and would conflict with other federal laws that "have carefully preserved states' and localities' traditional authority to address outdoor air pollution." Br. of *Amici* Sierra Club & CCAN, ECF 35-1, at 18-19. It is unclear what substantiates *amici*'s concern here. Plaintiffs do not dispute the District's power to regulate harmful air pollution, subject, of course, to the preemptive effect of other federal laws, such as the Clean Air Act. *See* 42 U.S.C. § 7543(a). Indeed, the District has a "comprehensive air pollution control program," D.C. Code § 8-101.05, none of which Plaintiffs have challenged or appears to be implicated by this suit. What matters here is the *means* by which the District seeks to reduce greenhouse gas emissions. And this particular means—the employment of a backdoor energy conservation standard that bans covered gas appliances—is not permissible under EPCA.

B.    *Amicus* PHLC argues that (1) nothing in EPCA's history has anything to say regarding the nature and consequences of gas-appliance bans and (2) the D.C. Gas Ban qualifies for EPCA's buildings-codes exception to preemption. *See generally* Br. of *Amicus Curiae* PHLC, ECF 37-1. There are a few mistakes to unpack there. Plaintiffs will take each in turn.

As to the first point, much of the legislative record that PHLC cites and quotes—which generally stands for the proposition that lawmakers sought to avoid fracturing and balkanizing the national market for appliance manufacturers—actually undermines the argument it is trying to make. *See id.* at 8-13. As Plaintiffs have already spelled out at greater length elsewhere, *see supra*, § I.A.2; Pls. Mot., ECF 26, at 28, gas bans like the District's, if allowed to proliferate, would undoubtedly and unnecessarily complicate the appliance-manufacturing market and thereby thwart EPCA's goal of national uniformity in that sphere. According to PHLC, however, "fossil fuel prohibitions" like the D.C. Gas Ban do not implicate any of these patchwork concerns "[b]ecause

26

they are binary" and "cannot become more stringent."  Br. of *Amicus Curiae* PHLC, ECF 37-1, at 11.  PHLC argues, in other words, that so long as an "energy use" regulation takes the most extreme form (*i.e.*, an outright ban), EPCA has nothing to say about it.

PHLC's too-big-to-fail argument finds no support in EPCA's text, history, or purpose.  Nor does it find any support in the realities of appliance manufacturing.  It is one thing to presuppose that "electric appliances already exist to replace fossil fuel appliances," *id.* at 10, but it is quite another to suggest that gas-appliance bans would not "break existing product lines," *id.* at 9.  How, after all, could gas appliance product lines function in a locality that has banned gas combustion?  Surely that qualifies as "break[ing] existing product lines."

In the latter part of its brief, PLHC argues that the D.C. Gas Ban skirts EPCA preemption because it qualifies for the building-code exception.  *See* 42 U.S.C. § 6297(f).  Two features of this argument are notable.  The first is that the District does not claim this exception, which places this argument on tenuous footing at best.  *See Huerta v. Ducote*, 792 F.3d 144, 151 (D.C. Cir. 2015) ("[O]rdinarily, this court will not entertain an *amicus*'s argument if not presented by a party.").   The second is that, for this argument to even be relevant, there must be some implicit concession that EPCA otherwise preempts the D.C. Gas Ban.  An exception, after all, would be irrelevant if the rule did not already apply.  PHLC fails to pick up on this cognitive dissonance in its brief, arguing on the one hand that EPCA does not preempt the D.C. Gas Ban but then arguing on the other that an exception to preemption applies.  *See, e.g.*, Br. of *Amicus Curiae* PHLC, ECF 37-1, at 1-2 (summary of argument).  That may be why the District does not make this argument itself.

In any event, the conceptual tension aside, PHLC's building-code argument has no merit.  In advancing this contention, PHLC first takes issue with Plaintiffs' point that because the D.C.

Gas Ban concerns both new construction *and* substantial improvements to existing buildings, *see* D.C. Code §§ 6-1453.01(b)(1), (b)(2), it does not qualify for the building-code exemption, *see* 42 U.S.C § 6297(f) (applying only to "a State or local building code for new construction"). According to PHLC, § 6297(f) does not say "*only* for new construction," and "therefore [it is] unreasonable to read the phrase 'for new construction' to exclude regulations simply because they also apply to major improvements to a building." Br. of *Amicus Curiae* PHLC, ECF 37-1, at 14-15. While this argument may have some initial intuitive appeal, it is easy to see where it falls apart. Under PHLC's logic, a state or locality could easily smuggle in energy-use and energy-efficiency regulations on existing buildings so long as some part of those regulations *also* applied to new construction. *How much* of the "body of regulations" must be "'for' a particular subject" to make it "one that 'concerns' the subject" PHLC does not say. *Id.* at 14. Could a body of regulations with only 1% dedicated to "new construction" qualify for the building-code exception? What about a third, or half? PHLC's approach quickly devolves into a line-drawing conundrum with no discernible answer. Worse yet, it creates the most perverse of incentives. Localities like the District could avoid EPCA preemption by clever legislative drafting, dedicating some nominal portion of a statute or body of regulations to "new construction" and thereby exploiting the narrow carveout Congress created. No plausible interpretation of EPCA would invite that kind of gamesmanship.

But even assuming PHLC's unsound interpretation were correct, PHLC is still wrong that the D.C. Gas Ban otherwise meets the stringent requirements of the building-code exception. Plaintiffs have explained this point in detail, *see* Pls. Mot., ECF 26, at 21-24, and will not repeat themselves here. But it bears emphasizing that PHLC's interpretation would fly in the face of EPCA's text, history, and purpose. Indeed, under PHLC's bans-are-permissible approach, the

28

District could just ban all the covered products that have high, but still EPCA-compliant, energy-use figures (or low energy-efficiency figures) and thus force builders to use products that exceed EPCA standards.  That cannot be right.  Even the District concedes that EPCA preempts such "backdoor energy conservation standards."  *See supra* § I.A.1.  PHLC's interpretation, in short, is untenable and would quickly engender all the patchwork issues it purports to avoid.

IV.    **The D.C. Gas Ban is facially invalid, and its prohibition on gas combustion cannot be severed.**

The District lastly insists that the prohibition on gas combustion can be severed from the rest of the D.C. Gas Ban and that Plaintiffs' facial challenge to it fails.  Neither is correct.

A.    **The prohibition on gas combustion cannot be severed from the D.C. Gas Ban.**

1.    In an attempt to salvage parts of the D.C. Gas Ban from EPCA preemption, the District leans heavily on the presumption-of-severability provision in D.C. Code § 45.201(a) and implores the Court to sever the "offending provisions" and leave the unoffending provisions intact.  Def. Mot., ECF 30, at 44.  As for the presumption-of-severability provision, the Supreme Court has made clear that "the ultimate determination of severability will rarely turn on the presence or absence of such a clause."  *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968).  And courts have properly found § 45.201(a)'s presumption overcome when the occasion calls for it.  *See, e.g.*, *Espresso, Inc. v. District of Columbia*, 884 F. Supp. 7, 12 (D.D.C. 1995) ("Notwithstanding the District's general severability provision, and the presumption of severability, the regulation cannot be severed for a number of reasons.").  This is another such occasion.

The District offers only one reason for the Court to sever the gas-combustion provision: "Were the fossil-fuel prohibition severed, the Board could implement a net-zero-energy standard without it because net-zero-energy buildings can still use fossil fuels."  Def. Mot., ECF 30, at 44.  The District is correct that, in the abstract, a net-zero-energy standard can be implemented even

29

with the use of fossil fuels, *see supra* at 23, but the problem is that the D.C. Gas Ban does not define "net-zero-energy standard" that way.  Instead, the prohibition on gas combustion forms an integral part of that term's statutory definition.  *See* D.C. Code § 6-1453.01(a)(3)(B)(iii) (defining "net-zero-energy standard" to include the banning of "[o]n-site fuel combustion . . . for the provision of thermal energy to the building").  It would be one thing to cross out a provision and rewrite the definition of one term among many others in a statute.  But "net-zero-energy-standard" is not just any term; it is the centerpiece of all Chapter 14B, and indeed features in its title: "Net-zero-energy Building Code Requirements."  So the severance that the District proposes would not be some modest judicial undertaking.  It would effectively "rewrite [the] statute and give it an effect altogether different from that sought by the measure viewed as a whole."  *R.R. Ret. Bd. v. Alton R. Co.*, 295 U.S. 330, 362 (1935); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("[W]e restrain ourselves from rewriting state law to conform it to constitutional requirements[.]" (alterations omitted)).  A judicially re-crafted version of a term that is "so interwoven" in the statute, *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924), could not possibly "function in a manner consistent with the intent" of the drafters, *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).  This Court ought not to accept the District's invitation to assume the legislative function and re-draft the D.C. Gas Ban.  It must stand or fall on its own terms.

       2.      In any event, even if the prohibition on gas combustion could be severed, that would not preserve the remaining portions of the D.C. Gas Ban because they still would be preempted even without that outright prohibition.  That is because the D.C. Gas Ban also requires compliance with Appendix Z.  *See* Pls. Mot., ECF 26, at 17.  As Plaintiffs have explained, Appendix Z penalizes EPCA-covered gas appliances by, *inter alia*, capping the amount of non-renewable energy a building can use.  *See id.* at 17-18.  That too qualifies as a regulation "concerning" the

"energy use" and "energy efficiency" of gas appliances.  42 U.S.C. § 6291(4), 6311(4).  So the D.C. Gas Ban could not survive a preemption analysis even in its rump form.

The District protests against that conclusion in three ways.  On the merits, it euphemistically describes Appendix Z's mandates as merely "guid[ing] buildings in reducing their energy consumption."  Def. Mot., ECF 30, at 43.  Whatever the District is getting at there, that "guid[ance]" comes in the form of a mandatory directive that caps the amount of non-renewable energy that a building can use.  *See* Pls. Mot., ECF 26, at 17-18.  With that potential confusion remedied, the rest of the preemption analysis follows essentially the same path as for the outright prohibition on gas appliances and results in the preemption of this part of the D.C. Gas Ban as well.

The District also mounts two non-merits attacks. First, it claims that Plaintiffs did not preserve this argument in their Complaint.  *Id.* at 42.  But Plaintiffs made clear in their Complaint that their challenge was to the entirety of the D.C. Gas Ban.  *See, e.g.*, Pls. Compl., ECF 1, ¶ 1 (stating that Plaintiffs "seek declaratory and injunctive relief under federal law against enforcement of the Clean Energy DC Building Code Act of 2022 . . . codified at D.C. Code § 6-1453.01."); *id.* ¶ 84 (praying for "a permanent injunction enjoining Defendant from enforcing or attempting to enforce D.C. Law 24-177").  And while Plaintiffs did not detail the specifics of this particular supporting argument in the Complaint, that kind of pre-briefing is not required under the federal pleading standard.  *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 904 n.9 (D.C. Cir. 2020) ("[A] plaintif[] is not required to include in its complaint every argument that might support its general claims."); *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) ("[C]omplaints need not plead law or match facts to every element of a legal theory." (internal quotation marks omitted)).

31

Second, the District challenges Plaintiffs' standing to bring this claim.  Def. Mot., ECF 30, at 42-43.  But this part of the D.C. Gas Ban injures Plaintiffs for essentially the same reasons as its prohibition on gas combustion injures them.  And, notably, the District does not challenge Plaintiffs' standing to challenge that part of the D.C. Gas Ban.  By making it more difficult and more expensive to use gas appliances, Appendix Z results in the same kinds of harm—high gas prices, fewer customers, lower profits, etc.  *See, e.g.*, Pls. Compl., ECF 1, ¶¶ 11-17 (detailing Plaintiffs' harms and citing declarations); Pls. Mot., ECF 26, at 8 (same).

### B.    This Court can tailor its injunction to comport with principles of equity and the scope of Plaintiffs' facial challenge.

Perhaps because its severability arguments depend upon a judicial rewrite of the D.C. Gas Ban, the District attempts to reframe its remedial argument in terms of the Court's equity power and argues that "basic principles of equity prevent enjoining the entire Clean Buildings Act."  Def. Mot., ECF 30, at 44.  The District also adds that Plaintiffs' facial challenge must fail because there are conceivable valid applications of the gas ban.  *Id.* at 40-41.  The District is wrong on both counts.

Plaintiffs, to be sure, take no issue with the general equitable principles that the District recites, such as that "an injunction must be narrowly tailored to remedy the specific harm shown."  *Id*.  That and the various others appear to be black-letter law.  The issue with the District's argument instead is that it rests on a basic category error.  Courts do not "enjoin challenged laws themselves," but instead the "named defendants" that enforce them.  *Whole Women's Health v. Jackson*, 595 U.S. 30, 44 (2021) (internal quotation marks omitted).  So that means, contrary to the District's framing, that Plaintiffs are not asking the Court to "enjoin the entire Clean Buildings Act" or to "strike down the entire Clean Buildings Act."  Def. Mot., ECF 30, at 44-45.  Such a request would indeed invite an overbroad injunction, and arguably even a nonsensical one.  *See*

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 943 (2018) ("[I]t is . . . a mistake to equate the judicially imposed non-enforcement of a statute with a veto-like power to 'strike down' legislation."). Plaintiffs instead request that the Court decline to rewrite the statute and enjoin the officials who enforce it. Such a request is a typical and narrowly tailored remedy issued by federal courts of equity, *e.g.*, *Ex parte Young*, 209 U.S. 123, 159-60 (1908); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983), and a much more modest one than what the District proposes.

The District shows similar confusion with respect to the nature of Plaintiffs' facial challenge against the D.C. Gas Ban. *See* Def. Mot., ECF 30, at 40-41. According to the District, "Plaintiffs' facial challenge fails because they cannot and do not show that the fossil fuel prohibition is preempted in *all* applications." *Id.* at 40. The District misunderstands the scope of Plaintiffs' facial challenge and, as a result, misstates Plaintiffs' burden. Facial challenges do not necessarily attack *all* conceivable applications of all its various provisions. A "claim is 'facial' [if] it is not limited to plaintiffs' particular case, but challenges application of the law more broadly." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Such a claim "reach[es] beyond the particular circumstances of these plaintiffs," but the "standards for a facial challenge [apply only] to the extent of that reach." *Id.* In other words, "facial standards are applied . . . only to the universe of applications contemplated by plaintiffs' claim, not to all conceivable applications contemplated by the challenged provision." *United States v. Sup. Ct. of New Mexico*, 839 F.3d 888, 914 (10th Cir. 2016). Here, the "universe of applications contemplated by plaintiffs' claim" are circumstances where the D.C. Gas Ban affects EPCA-covered gas appliances. So Plaintiffs need only meet the facial standards to that extent, not for "all conceivable applications" of the D.C.

Gas Ban. And as Plaintiffs' merits analysis demonstrates, there is no set of circumstances in which the D.C. Gas Ban can validly apply to an EPCA-covered product.

In any event, any overbreadth of Plaintiffs' facial challenge can be remedied by appropriately limiting the relief granted. After all, "the distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Here, Plaintiffs agree that EPCA preempts the D.C. Gas Ban only regarding its effect on covered products and does not prevent the District from enforcing it where it impacts only non-covered products. *See Berkeley*, 89 F.4th at 1104 ("[I]f a building code concerns the 'energy use' of covered and non-covered products alike, EPCA's preemptive effect is limited to the covered products."). As a practical matter, it is difficult to imagine circumstances where that would be the case, since even if no covered products are planned for a particular new building project, the D.C. Gas Ban would apply to prevent their present and future use in that building. But to the extent this is a concern, the Court could tailor its injunction much like the Ninth Circuit did in *Berkeley* and specify that the District is enjoined from enforcing the D.C. Gas Ban only in those circumstances where it would have an effect on EPCA-covered products. *Id.*[8]

---

[8] In what appears to be a change in course, the District asserts that Plaintiffs have not established any harm based on the allegations in their complaint and accompanying declarations. *See* Def. Mot., ECF 30, at 45. Whatever the reason for the District's about-face, this argument fails on the merits. Plaintiffs' complaint and declarations are more than sufficient to establish injury and irreparable harm. Plaintiffs face imminent harm that is affecting them now. *See Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 385 (2024) (to establish standing, "the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff"); *Blanchette v. Conn. Gen. Ins. Corps*, 419 U.S. 102, 143 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions take effect."). Their injuries will only worsen once the Mayor enacts the new regulations or when Appendix Z takes effect. Plaintiff National Association for Home Builders,

## CONCLUSION

For these reasons, the Court should deny the District's cross-motion for summary judgment, grant Plaintiffs summary judgment, enter a permanent injunction enjoining the District from enforcing or attempting to enforce the D.C. Gas Ban, and enter a declaratory judgment that the D.C. Gas Ban is void and unenforceable because it is preempted by EPCA.

---

for example, has a member that sells gas appliances and therefore "will face significant sales losses" when the District bans those appliances. ECF 26-5, Perry McGuire Decl., ¶ 5. It is also beyond reasonable dispute that the D.C. Gas Ban, if permitted to take effect, will reduce the number of customers using natural gas service, which will in turn reduce Plaintiff WGL's customer base. *See* Pls. Compl., ECF 1-5, ¶ 6 (Donald "Blue" Jenkins Decl.). These harms and others are real, pleaded, and substantiated. *See* Pls. Mot., ECF 26, at 16; Pls. Compl. ¶¶ 11-17 (citing declarations from members detailing these harms); ECF 26-5, Perry McGuire Decl., ¶ 5; ECF 26-6, Angelo Amador Decl., ¶¶ 7-9; ECF 26-7, Nicole Upano Decl., ¶¶ 6-7; ECF 26-8, Lori Graf Decl., ¶¶ 6-8; ECF 26-9, Donald "Blue" Jenkins Decl., ¶¶ 6-8, 10; ECF 26-10, Ryan Boyer Decl., ¶¶ 6-7; ECF 26-11, Wilder Reed Decl., ¶ 6.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *J. Mark Little*
J. MARK LITTLE [admitted pro hac vice]
910 Louisiana Street
Houston, TX 77002
Phone: (713) 229-1489
Email: mark.little@bakerbotts.com

SCOTT NOVAK [1736274]
700 K St NW
Washington, D.C. 20001
Phone: (202) 639-1316
Email: scott.novak@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

RESTAURANT LAW CENTER

/s/ *Angelo Amador*
ANGELO AMADOR [480031]
2055 L St NW
Washington, D.C. 20036
Phone: (202) 331-5913
Email: AAmador@restaurant.org

*Counsel for Restaurant Law Center*

36

LIUNA, MID-ATLANTIC REGION

/s/ *Brian Petruska*
BRIAN PETRUSKA [498321]
1875 Explorer Dr, Ste. 920
Reston, VA 20190
Phone: (703) 860-4194
Email: bpetruska@maliuna.org

*Counsel for Philadelphia-Baltimore-Washington*
*Laborers' District Council*

MOONEY, GREEN, SAIDON, MURPHY &
WELCH, P.C.


/s/ *Lauren McDermott*
LAUREN MCDERMOTT [1008301]
1920 L St NW
Washington, D.C. 20036
Phone: (202) 783-0010
Email: lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

37