**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES, et al.,

     *Plaintiffs*,

v.

DISTRICT OF COLUMBIA,

     *Defendant*.

Case No. 24-cv-02942 (ACR)

## <u>MEMORANDUM OPINION AND ORDER</u>

The Energy Policy and Conservation Act of 1975 (EPCA) prohibits state and local regulations "concerning the energy efficiency [or] energy use" of certain products, including gas appliances. *See* 42 U.S.C. § 6297(c). The Clean Energy D.C. Building Code Amendment Act of 2022 (Clean Buildings Act) requires that by 2027, certain newly constructed or improved buildings in Washington, D.C., operate as zero-energy—essentially, they must produce as much energy as they consume. To achieve this, it bans the use of gas appliances in those buildings.

The question: does the former preempt the latter? Plaintiffs—an assortment of trade associations, companies, and unions—say yes. The ban, they argue, de facto sets gas appliances' energy efficiency or use standard to zero, which conflicts with EPCA's preemption provision. The District of Columbia responds that the ban does not address such standards at all. Yes, it mandates that gas appliances cannot be used in certain buildings. But it says nothing about the performance standards the appliances must meet when used elsewhere.

1

The District has the better interpretation.  The Court therefore GRANTS the District's

Cross-Motion for Summary Judgment, Dkt. 30, and DENIES Plaintiffs' Motion for Summary

Judgment, Declaratory Relief, and Permanent Injunction, Dkt. 26.

### I.    BACKGROUND

#### A.  The Oil Embargo of 1973[1]

While it is difficult to pinpoint the origin story of any litigation, we might as well start

ours on October 17, 1973.  That day, President Richard M. Nixon expressed concern that the

Arab–Israeli War might cause gas prices to rise.  Given our country's dependence on foreign oil

then, he feared this would cause economic upheaval at home.[2]  And he was right to worry.  On

that same day, halfway across the world, Arab oil ministers decided to impose a total oil embargo

on the United States and other countries aiding Israel.[3]  As intended, this ban "sent shock

radiating through the social fabric of . . . industrial nations."[4]  In the United States, gas prices

skyrocketed, supplies plummeted, unemployment increased, and the economy teetered.[5]

Oil was not the President's only problem.  Throughout 1973, the Watergate scandal was

splashed daily in newspaper headlines across the Nation.[6]  And it seemed that "the President was

---

[1] For those interested in a "panoramic history of the world's most important resource: oil," including the 1973 oil crisis, the Court commends Daniel Yergin, *The Prize: The Epic Quest for Oil, Money & Power* (1990).

[2] *Id.* at 588–91.

[3] *Id.*

[4] *Id*. at 597.  Coincidentally, as the Court publishes this Memorandum Opinion, the world economy is facing potentially its largest oil shock.  Due to a conflict in the Middle East.  *See* Emmett Lindner, *Echoes of the '70s in What's Now the Largest Oil Shock Ever*, N.Y. Times (Mar. 13, 2026).

[5] H.R. Rep. No. 94-340, at 20–22 (1975).

[6] Yergin at 601.  For more on that scandal and recommended readings, see *Storch v. Hegseth*, 804 F. Supp. 3d 216, 219–21 & n.1 (D.D.C. 2025).

always searching for some political 'spectacular' involving oil and the Middle East to try to divert the country from its obsession with Watergate."[7]  Because of the embargo, Watergate, or both, on November 7, 1973, President Nixon announced Project Independence: "in the spirit of Apollo, with the determination of the Manhattan Project, . . . by the end of this decade we will have developed the potential to meet our own energy needs without depending on any foreign energy source."[8]  And afterward, his administration continued to announce various energy actions.

But neither the announcements nor the energy actions succeeded.  President Nixon was forced to resign in August 1974.  And our dependence on products that used petroleum *increased* from 33 percent in September 1973 to 36 percent in December 1974.[9]

**B.  The Energy Policy and Conservation Act of 1975**

The oil embargo ended on March 18, 1974.  But the crisis had awakened the United States to the "serious long-term economic and national security problems" of continued dependence on foreign oil.  *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985).  So in January 1975, President Gerald R. Ford called for "the strongest and most far-reaching energy conservation program we have ever had."  *Id*.  Congress answered him by passing EPCA that same year.  *See* EPCA, Pub. L. No. 94-163, 89 Stat. 871 (1975).  Relevant here, EPCA aimed to "reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs."  *Herrington*, 768 F.2d at 1364 (citing S. Rep. No. 94–516, at 116–17 (1975)).

---

[7] Yergin at 601.

[8] *Id*. at 599.

[9] H.R. Rep. No. 94-340, at 20.

At enactment, EPCA required the Department of Energy "to mandate energy efficiency labeling of major residential appliances and to prescribe voluntary industry appliance efficiency improvements." S. Rep. No. 100-6, at 3 (1987); *see* EPCA §§ 324–326. It also "authorized, but did not require, DOE to establish mandatory efficiency standards if necessary." S. Rep. No. 100-6, at 3.

But DOE was slow on the uptake. It did not set standards expeditiously or, in some cases, at all. *See* H.R. Rep. No. 95-496, at 43–46 (1977). So three years later, Congress amended EPCA to mandate minimum energy efficiency standards for appliances that consume substantial energy, such as kitchen ranges, ovens, refrigerators, and dishwashers. *See* National Energy Conservation Policy Act (NECPA), Pub. L. No. 95-619, § 422, 92 Stat. 3206, 3259–62 (1978); *Herrington*, 768 F.2d at 1362 & n.1. Congress sought product designs that "achieve the maximum improvement in energy efficiency which the [DOE] Secretary determines is technologically feasible and economically justified." S. Rep. No. 100-6, at 3. It added, however, a waiver provision that DOE began granting as a matter of course. *See infra* pp. 9–10.

In 1987, again attempting to ensure uniformity, Congress amended EPCA to clamp down on the waivers and bolster EPCA's preemption provision. S. Rep. No. 100-6, at 4–5; National Appliance Energy Conservation Act of 1987 (NAECA), Pub. L. No. 100-12 § 5, 101 Stat. 103, 107–17 (codified as amended at 42 U.S.C. § 6295). If an energy conservation standard exists for a covered product,[10] EPCA preemption now provides that "no State regulation concerning the

---

[10] The statute identifies specific covered products and provides that the Secretary "may classify" certain other consumer products as covered products if the Secretary makes certain findings. *See* 42 U.S.C. § 6292(a), (b)(1).

energy efficiency [or] energy use . . . of such covered product shall be effective with respect to such product."  42 U.S.C. § 6297(c).[11]

In the decades since, DOE has promulgated energy conservation standards for various gas appliances, including stoves,[12] ovens, water heaters, and dryers.  *See* 42 U.S.C. § 6295(a); 10 C.F.R. § 430.32.

### C. The Clean Energy D.C. Building Code Amendment Act of 2022

Fast-forward about half a century.  In 2021, six D.C. Councilmembers introduced the Clean Buildings Act "to arrest climate change" in response to "record-breaking extreme weather, higher tides caused by rising sea levels, heavy rains and flooding, and a sharp increase in the number of dangerously hot days."[13]  The Clean Buildings Act codifies a component of the 2018 Clean Energy D.C. Plan, the District's strategy to achieving carbon neutrality by 2050.[14]

In 2022, the D.C. Council passed the Clean Buildings Act.  *See* D.C. Act 24-528 (July 27, 2022).  The Act requires that by 2027 certain newly constructed or improved buildings operate as zero-energy.  That is, they must produce as much energy as they consume.  An arguably laudable goal, though one that imposes numerous conditions on commercial buildings and residential buildings over three stories.  D.C. Code § 6-1453.01(a)(2); 12A D.C. Mun. Regs. § 101.10.5; D.C. Energy Conservation Code R202.

---

[11] This preemption provision is subject to several exception and waiver provisions, *id.* § 6297(c)–(f), which the Court discusses *infra* pp. 15–19.

[12] *Stove*, coincidentally, is the title of Lana Del Rey's forthcoming album.  *See* Lindsay Zoladz, *6 (More) Albums I'm Looking Forward to in 2026*, N.Y. Times (Feb. 24, 2026).  Alas, though, it is unlikely to address EPCA or preemption.

[13] Letter from Mary M. Cheh, Councilmember, Ward 3, Council of the District of Columbia, to Nyasha Smith, Secretary, Council of the District of Columbia, at 1 (Oct. 1, 2021).

[14] *Id*.

The Act directs the D.C. Mayor, by December 31, 2026, to "issue final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard." D.C. Code § 6-1453.01(b)(1).[15]  To meet a "[n]et-zero-energy standard," a building must (1) "conserve[] an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z"; and (2) "obtain[] energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z" and meet additional "restrictions." *Id.* § 6-1453.01(a)(3)(A)–(B).  If the Mayor does not timely issue the required regulations, however, a fallback provision kicks in: "no building permit application submitted after" 2026 "shall be approved unless the building design complies with the most recent version of Appendix Z." *Id.* § 6-1453.01(b)(2).[16]

Appendix Z of the D.C. Energy Conservation Code provides for "the design of a net-zero energy building" through, among other criteria, prohibition of "[o]n-site combustion of fossil fuels . . . for the provision of thermal energy to the building." Dkt. 29-7 at 4, 6.[17]  In lay terms, it

---

[15] The Net Zero Modification and Preservation Emergency Amendment Act of 2026, D.C. Act 26-275 (Mar. 6, 2026), temporarily alters the text of the statute until June 4, 2026.  The amendment replaces "substantial improvements" with "Level 3 alterations," for example, and clarifies the definition of "[n]et-zero-energy standard." *Id.* § 3(a)(3), (b).  These temporary changes do not affect the Court's analysis.

[16] The Act excepts from this provision "the on-site combustion of fossil fuels for backup power generation in buildings that are essential to protecting public health and safety." D.C. Code § 6-1453.01(b)(2).

[17] The D.C. Construction Codes Coordinating Board approved a new version of Appendix Z in 2023, which provides that "[a]ll buildings shall be all-electric buildings." Dkt. 29-8 at 6; Dkt. 29-6; Dkt. 38-1 ¶ 8.  As of the filing of this Memorandum Opinion, that version has not yet gone into effect, because it has not yet undergone notice-and-comment rulemaking and gained the approval of the D.C. Council.  D.C. Mun. Regs. tit. I, §§ 600–603; D.C. Code § 6-1409; *see* Dkt. 29 at 6–7.  The Court's analysis does not depend on which version of Appendix Z is in effect, because both effectively prohibit the use of natural-gas appliances in covered buildings.

bans the use of natural-gas appliances in applicable buildings. So, for example, rather than installing gas stoves in apartments, builders must install electric stoves.

### D. Procedural Background

Plaintiffs, "a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems," here sued the District to enjoin the Clean Buildings Act. Dkt. 1 ¶ 6. They assert that if allowed to go into effect, the Act "will inflict serious harm on Plaintiffs in the form of lost customers, sales, and revenue; loss of employment; increased expenses, including as a result of higher gas prices; and the inability of restaurants to cook with their preferred form of energy." Dkt. 26 at 15–16.

Plaintiff National Association of Home Builders of the United States is an organization that represents approximately 140,000 U.S. residential building construction industry members. Dkt. 1 ¶ 11. Plaintiff Restaurant Law Center is a public-policy organization whose membership includes all members in good standing with the National Restaurant Association and State Restaurant Associations. *Id*. ¶ 12. Plaintiff National Apartment Association is a federation of 141 affiliated apartment associations. *Id*. ¶ 13. Plaintiff Maryland Building Industry Association represents home builders, remodelers, developers, and affiliate professional and service providers in D.C. and Maryland. *Id*. ¶ 14. Plaintiff Washington Gas Light Company is a regulated public utility that provides natural gas services to 1.2 million customers in D.C., Maryland, and Virginia. *Id*. ¶ 15. Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council is an affiliate of the Laborers International Union of North America, AFL-CIO. *Id*. ¶ 16. Finally, Plaintiff Teamster Local 96 is a union whose members work for Plaintiff Washington Gas Light Company. *Id*. ¶ 17.

Collectively, Plaintiffs contend that EPCA preempts the Clean Buildings Act. They moved for summary judgment and requested a declaration and a permanent injunction. Dkt. 26 at 35. The District disagrees that the Act is unlawful and therefore cross-moved for summary judgment. Dkt. 29. The Court heard argument on these Motions on September 25, 2025.[18]

## II.    LEGAL STANDARD

Because the parties present a purely legal question of statutory interpretation and "there is no genuine dispute as to any material fact," summary judgment is appropriate. Fed. R. Civ. P. 56(a). And because Plaintiffs challenge the Clean Buildings Act facially, *see* Dkt. 1 ¶ 20, the Court may award summary judgment in their favor only if "no set of circumstances exists under which the [District's regulation] would be valid." *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 213 (D.C. Cir. 2010).

## III.    ANALYSIS

The Constitution's Supremacy Clause makes federal law "supreme." U.S. Const. art. VI, cl. 2. And so Congress may decide that federal law should "preempt," rather than "operate alongside state law." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018). The question here is whether EPCA "announces its displacement" of the Clean Buildings Act "through [its] express preemption provision." *Id*. (cleaned up).

---

[18] Application of EPCA's preemption provision to regulations like the Clean Buildings Act has generated a split among federal courts. *Compare Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) (local regulation preempted), *with Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (local regulation not preempted), *and Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025) (same), *and Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) (same). The Southern District of New York and Northern District of New York decisions are on appeal before the Second Circuit. *See* Dkt. 85, *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 25-977 (2d Cir. Jan. 30, 2026); Dkt. 71, *Mulhern Gas Co. v. Mosley*, No. 25-2041 (2d Cir. Jan. 30, 2026).

The traditional tools of statutory interpretation, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024), favor the District.  Plaintiffs' preferred reading strains the statutory text, context, and history beyond what they can bear.  The District's reading, on the other hand, fits comfortably within EPCA's statutory history, plain language, and structure.  Energy efficiency or use in EPCA refers to a fixed measure of an appliance's performance capacity.[19]  It does not concern whether the appliance can be used in a particular context.  The Clean Buildings Act only regulates the latter.

## A.  EPCA's Statutory History

Congress amended and refined EPCA over time to increase federal control over product design and strengthen its preemption provision.  This statutory history, which "form[s] part of the context of the statute," Antonin Scalia & Bryan A. Garner, *Reading Law* 256 (2012) (Scalia & Garner), informs the Court's central task of interpreting the text of the preemption provision.[20]  So the Court backs up to explain EPCA's evolution.

The federal government did not act alone in addressing the energy crisis.  Throughout the 1970s, "some States began enacting appliance efficiency standards on their own."  S. Rep. No. 100-6, at 4.  And, while NECPA contained a limited preemption provision, it allowed a state to petition DOE for a waiver.  *Id*.  Moreover, the agency adopted "a general policy" of granting

---

[19] The Court will follow the parties' lead in discussing EPCA's provisions concerning consumer products.  However, its analysis applies equally to industrial equipment for which parallel language applies.  *See* 42 U.S.C. § 6316(a) (incorporating by reference 42 U.S.C. § 6297 for certain industrial equipment); *id*. ch. 77, subch. III, pt. A-1.

[20] Statutory history includes "the statutes repealed or amended by the statute under consideration."  Scalia & Garner at 256.  It "(unlike with legislative history) can properly be presumed to have been before all the members of the legislature when they voted."  *Id.*  "So a change in the language of a prior statute presumably connotes a change in meaning."  *Id*.  For a critique of this approach, however, see Anita S. Krishnakumar, *Statutory History*, 108 Va. L. Rev. 263 (2022).

them. *Id*. The exception became the rule, and, predictably, a "growing patchwork of differing State regulations" emerged. *Id*. Equally predictably, this created conflicting standards to which manufacturers had to cater. *Id*. One state could require that a gas stove not consume greater than 1,200 kBtu per year, while another could up the limit to 1,770 kBtu per year. Soon, manufacturers confronted the Hobbesian choice of designing appliances to meet the strictest state standard or designing appliances differently for different states.

To address this performance standard free-for-all and promote uniformity, Congress amended EPCA in 1987 to tighten the waiver provision and include a new preemption provision. S. Rep. No. 100-6 at 2, 9; NAECA § 7. The main goal was to allow "industry [to] avoid the burdens of a patchwork of conflicting and unpredictable State regulations." S. Rep. No. 100-6 at 12–13. This goal is key. It was not to ensure the use of all covered appliances in all buildings. *Cf*. Dkt. 26 at 25–28; Dkt. 38 at 13–15. And so the preemption provision's language focuses laser-like on "energy efficiency [or] energy use" of "covered product[s]." 42 U.S.C. § 6297(c).

The Court considers this text in depth next.

## B. Statutory Definitions of "Energy Efficiency" and "Energy Use"

### 1. "Energy Efficiency" and "Energy Use" Standards Govern Product Design

The text of EPCA's preemption provision reads:

> [E]ffective on the effective date of an energy conservation standard [that DOE] established . . . for any covered product, no State regulation concerning the energy efficiency [or] energy use . . . of such covered product shall be effective with respect to such product.

42 U.S.C. § 6297(c). To interpret this language, the Court looks first to the relevant statutory definitions. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021).

To start, EPCA preempts regulations only where there is a DOE-established "energy conservation standard" for a covered product. 42 U.S.C. § 6297(c). It defines "energy

10

conservation standard" as a "performance standard" that measures either the "minimum level of *energy efficiency* or a maximum quantity of *energy use*" of an appliance. *Id*. § 6291(6)(A) (emphases added).[21]  And so, by design, "energy conservation standard" is synonymous with "energy efficiency" and "energy use." *Id*.; *see Rawat v. Comm'r of Internal Revenue*, 108 F.4th 891, 896 (D.C. Cir. 2024).

EPCA defines "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product." 42 U.S.C. § 6291(5).  "Energy use" in turn is "the quantity of energy directly consumed by a consumer product at point of use." *Id*. § 6291(4).  So energy efficiency is a ratio of an appliance's useful output to its energy use, while energy use is total consumption.  As defined, each term—energy conservation standard, energy efficiency, and energy use—refers to and protects federal primacy over product design.  And each metric is determined in accordance with test procedures performed under 42 U.S.C. § 6293. *See id*. § 6291(4)–(6).

Let's consider gas cooking tops, *i.e.,* gas stoves, to show how these performance standards work in practice.  Gas cooking tops manufactured after April 9, 2012, cannot come equipped with a constant burning pilot light.  *See* 10 C.F.R. § 430.32(j)(1)(i).  For those manufactured on or after January 31, 2028, their "[m]aximum integrated annual energy consumption" must be 1,770 kBtu/year.  *Id*. § 430.32(j)(1)(iii)(C).  And to ensure a gas cooking top meets these requirements, a manufacturer must test it under specified "[t]esting [c]onditions." *See generally* 10 C.F.R. ch. II subch. D, pt. 430, subpt. B.  DOE instructs, for example, that the test gas cooking top must meet certain installation, gas supply, and instrument-configuration

---

[21] That the statute itself establishes this equivalency punctures Plaintiffs' assertion that the Court should resist "conflat[ing] the terms 'regulation[s] concerning . . . energy use' and 'energy conservation standard.'"  Dkt. 38 at 18.

requirements, among other specifications.  *See id*. ch. II, subch. D, pt. 430, subpt. B, app. I1 § 2. The test aims to "simulat[e] actual use."  *Herrington*, 768 F.2d at 1404.

Putting all the pieces together, and widening our lens again, EPCA preempts regulations that govern the design, manufacture, and production of an appliance—*i.e.*, colloquially, how it "perform[s]."  *See* 42 U.S.C. § 6291(6)(A).  And a state or local regulation only conflicts with a federal energy efficiency or use standard where it affects the appliance's performance under "simulat[ed]" test conditions, not in other settings.  *Herrington*, 768 F.2d at 1404.

This all matters because Plaintiffs' interpretation of EPCA is instead based on a hypothetical measurement of the appliance's energy consumption *not* under testing conditions, but at the "point of use"—a phrase they take from the statutory definition of "energy use" and define in a particular way.  Which takes us next to answering, what is a point of use?

### 2.  That "Energy Use" Is Measured at an Appliance's "Point of Use" Does Not Alter the Analysis

Avoiding that the text refers to product design and testing conditions, Plaintiffs instead latch on to a different aspect of EPCA's definition of "energy use."  The statute provides that "energy use" means the "quantity of energy" a product consumes at its "point of use."  42 U.S.C. § 6291(4).  And the dictionary definition of "point of use," Plaintiffs note, is "the place where or time when a product or service is used."  Dkt. 26 at 18 (quoting *Point of Use*, Cambridge English Dictionary Online (2025)).  So, they say, the statute preempts any regulation of the "quantity of energy" that a gas appliance consumes where it is used.  *Id*. at 17–18.  And if a regulation entirely precludes the use of gas appliances, then their "energy use" at the "point of use" is zero—which is a standard different from the federal energy conservation standard and thus preempted.  *Id*.

In making this argument, Plaintiffs rely on *California Restaurant Association*, a Ninth Circuit opinion holding that EPCA preempts a similar regulation enacted by the City of Berkeley. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). And the Court considers this decision in detail, as it is currently the lone circuit decision on point. *See supra* note 18. The panel began by referencing the Oxford English Dictionary to define "point of use" (similarly to Plaintiffs) as the "place where something is used." *Id.* at 1101 (quoting *Point of Use*, Oxford English Dictionary Online (2022)). It used this definition to rewrite EPCA to "preempt[] regulations, including 'building code requirements,' § 6287(f), that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." *Id.*

"Right off the bat," the panel next stated, "we know that EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations, like restaurants." *Id.* at 1101–02. And the Berkeley building code in question "necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1102. "So, by its plain language, EPCA preempts Berkeley's regulation . . . because it prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used." *Id.*

The Court does not dismiss the panel's reasoning, which three circuit court judges signed and which the Ninth Circuit voted not to take up en banc. That said, in the Court's view, if this was the at-bat, the batter struck out. To start, EPCA addresses *technical* subjects. And so, naturally, "point of use" in EPCA "has a well-established technical meaning." *Cal. Rest. Ass'n*, 89 F.4th at 1123 (on denial of rehearing en banc) (Friedland, J., dissenting). The Ninth Circuit majority ignored that when a statute "'address[es] a technical subject, a specialized meaning

13

is expected'" to work better than a phrase's ordinary meaning. *Van Buren*, 593 U.S. at 388 n.7 (cleaned up) (quoting Scalia & Garner at 73). The Oxford English Dictionary definition the panel consulted thus sheds no light.

Rather than refer to a lay-use dictionary, the dissent from the denial of rehearing en banc exhaustively canvassed a range of industry, regulatory, and legislative sources. *See Cal. Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting). That survey shows that Congress included the phrase "point of use" to "convey that the 'energy use' of an appliance under EPCA does not include indirect energy consumption upstream in the supply chain," such as "energy consumed in extracting that natural gas, removing its impurities, and transporting it to the location of the stove." *Id*. at 1123 (Friedland, J., dissenting). So "point of use," properly defined in the EPCA context, has nothing to do with an appliance's use at the place it is used.

Second, the panel's analysis contends that banning the use of appliances effectively sets the appliance's consumption to zero. *Id*. at 1102. But recall that DOE assesses energy efficiency and use according to *simulated-use test procedures*. If a test had shown our hypothetical gas stove's energy use to be 1,770 kBtu (according to the maximum integrated annual energy consumption metric the DOE prescribes), its energy use would be 1,770 kBtu wherever used. And even if not used at all. "[A] gas stove of a particular model that sits uninstalled and unused has the same 'energy use' under EPCA as one that is installed and running." *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J., dissenting).

Third, even accepting the lay-use dictionary definition for "point of use" does not require accepting the inference that EPCA demands that the appliance must be permitted in *all* places. Consider a hypothetical federal law that defines the point of use as restaurants, sets a national tortilla chips-to-salsa ratio of 2 grams for every 3 grams, and preempts states from regulating that

14

ratio.  No one would say that because Congress set a chips-to-salsa ratio, it intended to ensure

that every restaurant has a right to sell chips and salsa.  And a state regulation prohibiting French

restaurants from serving chips and salsa would not be preempted because it would operate in an

entirely different regulatory space, preserving French cuisine—one that happens also to affect

chips and salsa availability.  But replace "chips and salsa" with "covered products" and "ratio"

with "energy efficiency," and the situation is the same this litigation presents.

The District has the better reading of "point of use."

## C. Statutory Context

### 1. The Court's Interpretation Creates a Coherent Statutory Scheme

The statutory definitions do not end the Court's analysis.  It must also interpret EPCA

with an eye toward "harmony among [its] provisions."  Scalia & Garner at 180.

Here, the statutory scheme confirms that Congress intended the preemption provision to

cover only state and local regulations that alter a product's design.  Consider that the statute

contemplates that the Secretary may require "each manufacturer of a covered product to submit

information or reports to the Secretary with respect to energy efficiency [or] energy use."  42

U.S.C. § 6296(d)(1).  That is, manufacturers report a static energy efficiency or use figure as a

property of a particular product.  This data does not vacillate depending on where a product is

used.  EPCA also contains labeling requirements pertaining to "energy use" of certain products.

*Id*. § 6294(a)(2)(I), (a)(3).  Those labels, too, must necessarily report a static figure.  And

manufacturers and distributors may not "make any representation . . . with respect to the energy

use or efficiency . . . of a covered product to which a test procedure is applicable . . . unless such

product has been tested in accordance with [the relevant] test procedure and such representation

15

fairly discloses the results of such testing." *Id*. § 6293(c)(1).  Again, these representations concern a static figure.

In addition, DOE may in some cases waive preemption for states.  *See id*. § 6297(d). This waiver provision, too, reflects congressional concern for how a state or local law might affect an appliance's design and production.[22]  For example, DOE must consider "the extent to which the State regulation would cause a burden to manufacturers to *redesign and produce* the covered product type (or class)."  *Id*. § 6297(d)(3)(C) (emphasis added).  The DOE cannot grant a waiver if a state or local regulation would remove certain "*performance characteristics* (including reliability), features, sizes, capacities, and volumes" from the market.  *Id*. § 6297(d)(4) (emphasis added).  And if DOE waives federal preemption of a state regulation governing a covered product's energy efficiency or use, DOE may still delay the state regulation's effective date if it finds such delay "necessary due to the substantial burdens of *retooling, redesign, or distribution need* to comply with the State regulation."  *Id*. § 6297(d)(5) (emphasis added).

### 2.  Plaintiffs' Contrary Interpretation Disrupts the Statutory Scheme

Plaintiffs take a different view.  They assert that (1) the word "concerning" in the preemption provision, 42 U.S.C. § 6297(c); (2) the explicit exclusion of certain building codes from preemption, *id*. § 6297(f); (3) the statute's waiver provision, *id*. § 6297(d); and (4) the appearance of "energy use" in other portions of EPCA enlarge EPCA's preemptive scope.  They do not.

---

[22] As the Court discusses *infra* pp. 18–19, a waiver provision attached to a more general provision (here, the preemption provision) cannot, by itself, control the interpretation of the more general provision.  Here, however, the Court uses the language of the waiver provision alongside other contextual cues to confirm a reading of the statutory definitions of "energy efficiency" and "energy use" it has already established.

First, "concerning."  True, that term "generally has a broadening effect."  *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 716–17 (2018).  But that does not tell the Court *how* broadly to read the preemption provision.  "[A]s many a curbstone philosopher has observed, everything is related to everything else."  *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring).  And words like "concerning" are especially sensitive to surrounding context.  *See United States v. Miller*, 604 U.S. 518, 533 (2025).  Courts must therefore take "particular" care, when "construing [words and] phrases that govern conceptual relationships," to read these terms "in their context and with a view to their place in the overall statutory scheme."  *Id*.

The District contends that "concerning" limits preemption to building codes that smuggle in design-related restrictions.  *See* Dkt. 29 at 47–49.  For example, a building code could provide that all gas appliances consume only a certain amount of energy while switched on in certain buildings.  The inclusion of the term "concerning" likely closes such a loophole.[23]  On the other hand, stretching "concerning" to cover *any* state or local prohibition of appliance use would preclude a host of critical regulations—such as fire codes that prevent placement of gas appliances where they could increase the risk of poisoning from harmful pollutants or more easily ignite.  *See Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *6 (S.D.N.Y. Mar. 18, 2025).  Plaintiffs read "concerning" with "uncritical literalism" that risks "mak[ing] pre-emption turn on infinite connections."  *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (cleaned up).

---

[23] The legislative history confirms this view.  Congress added § 6297(f) to "prevent[] State building codes from being used as a means of setting mandatory State appliance standards in excess of the Federal standards."  H.R. Rep. No. 100-11, at 26 (1987).

17

Second, the exception for certain building codes.  EPCA excludes from federal preemption "State or local building code[s]" that meet certain criteria.  42 U.S.C. § 6297(f).  The parties agree that § 6297(f) is inapplicable here because the Clean Buildings Act does not meet those criteria.  *See* Dkt. 26 at 28–31; Dkt. 29 at 50–51.  But § 6297(f) remains relevant, Plaintiffs assert, because it allows the Court to infer that by exempting certain building codes, Congress meant to apply the preemption provision to all other building codes.  *See* Dkt. 26 at 19–20.

That argument is a too-long stretch.  "[E]xceptions to preemption," like § 6297(f), "while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the [preemptive] rule."  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013); *see also Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 127 (2016) (explaining the no-elephants-in-mouseholes interpretive canon).  That is because statutes often provide multiple routes for escaping a particular proscription.  *See Dan's City Used Cars*, 569 U.S. at 264.  Here, the Clean Buildings Act is not preempted because that Act does not "concern[] . . . energy efficiency [or] energy use" under the main preemption provision.  42 U.S.C. § 6297(c).  But even building codes that *do* concern energy efficiency or use could still be excepted from preemption if they meet one of the tests that § 6297(f) prescribes.

Third, the waiver provision.  DOE may grant state and local governments waivers that permit their regulations of a product's energy efficiency or use to go into effect under certain conditions.  *See id*. § 6297(d).  But EPCA prohibits waiver if the "state regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis."  *Id*. § 6297(d)(3).  Plaintiffs claim that if DOE cannot waive preemption of laws that affect an appliance's "sale" or "servicing," *id*. § 6297(d)(3), the

18

preemption provision must cover all laws affecting an appliance's post-manufacturing life cycle. Dkt. 26 at 20–21 (quoting 42 U.S.C. § 6297(d)(3)) (citing *Cal. Rest. Ass'n*, 89 F.4th at 1104).

But like an exception provision, a waiver provision cannot by itself establish the scope of a preemption provision. *See Dan's City Used Cars*, 569 U.S. at 264. And Plaintiffs' read too much into the words "sale" and "servicing." That "the federal government must consider the complete lifecycle of an appliance—from manufacturing to servicing—in reviewing a waiver petition," *California Rest. Ass'n*, 89 F.4th at 1104, does not mean that the corresponding preemption provision covers *all* laws governing an appliance's entire life cycle in all contexts.

Fourth, "energy use" in other portions of EPCA. Notwithstanding the definition of "energy use" that the statute explicitly supplies, *see supra* pp. 10–15, Plaintiffs assert that other sections of EPCA refer to "energy use" as the quantity of energy a household consumes. *See* Dkt. 26 at 23. But those other sections do not refer to the "performance standard," 42 U.S.C. § 6291(6)(A), associated with "a covered product," *id*. § 6297(c), as the preemption provision and its associated statutory definitions do. Instead, they reference "*average annual per-household* energy use," *id*. § 6292(b)(1) (emphasis added), and similarly "*average per household* energy use," *id*. § 6295(*l*)(1) (emphasis added), of products. Different sections of EPCA, different types of energy use referenced.

If anything, the different usages support the District's take: the preemption provision's omission of any reference to total household consumption suggests that it covers regulations of product design, *not* actual energy consumption in a particular location. Between § 6297(c) on the one hand and § 6292(b)(1) and § 6295(*l*)(1) on the other, the phrase "energy use" "take[s] on distinct characters from association with distinct statutory objects." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (cleaned up).

19

In sum, EPCA preempts only laws that impose additional performance standards for appliances on top of federally established ones.  This is the only reading that preserves "a symmetrical and coherent regulatory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).[24]

### D. Federalism

Finally, the Court addresses federalism concerns.  The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015).  Lead Plaintiff National Association of Home Builders agrees.  It has endorsed this principle before the D.C. Circuit—as to building codes, no less.  In 2020, it explained that "[s]tate and local governments, which are closer to the needs and realities of their economies and constituents, have primary authority to adopt and enforce building energy codes."  *See* Br. Amicus Curiae Nat'l Ass'n of Home Builders in Supp. of Resp'ts at 18, *Am. Lung Ass'n v. EPA*, No. 19-1173 (D.C. Cir. June 23, 2020).  Well said.

Still, here, the parties present dueling theories regarding the applicability of a presumption against preemption in areas that states and municipalities traditionally regulate.  *See* Dkt. 26 at 17; Dkt. 29 at 25–27.  The Court does not fault them for raising this issue, as the relevant Supreme Court jurisprudence is evolving.  The Supreme Court has previously instructed

---

[24] On summary judgment, Plaintiffs for the first time raise the question of whether EPCA also preempts certain provisions of Appendix Z.  *Compare* Dkt. 26 at 24–26, *with* Dkt. 1 at 22–23. The Court agrees with the District that Plaintiffs have forfeited this challenge.  *See Trudel v. SunTrust Bank*, 924 F.3d 1281, 1286 (D.C. Cir. 2019); Dkt. 29 at 59.  Even if they have not, and assuming without deciding that they have standing on a ripe claim, *cf.* Dkt. 29 at 59–60, Plaintiffs' argument is unpersuasive.  Appendix Z (in either its current or proposed form, *see supra* note 17) provides for reduced energy consumption in certain buildings without setting any product-design standard.  So EPCA does not preempt Appendix Z for the same reasons it does not preempt the Clean Buildings Act.

that "[i]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (cleaned up). More recently, however, the Supreme Court refused to "invoke any presumption against pre-emption" where (as here) the "statute contains an express pre-emption clause." *Franklin Cal. Tax-free Tr.*, 579 U.S. at 125 (cleaned up). Some judges have noted difficulty in reconciling these approaches, because *Franklin California Tax-free Trust* did not "mention—much less expressly overrule—the decades of cases where the presumption had . . . been applied." *See Cal. Rest. Ass'n*, 89 F.4th at 1107–08 (O'Scannlain, J., concurring); *see Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (discussing a circuit split).

Fortunately, the presumption, applicable or not, is a wash here. Whatever else the Supreme Court cases state, both emphasize that the text of the statute must bear the weight of the chosen interpretation. *See Medtronic,* 518 U.S. at 485; *Franklin California Tax-free Tr.*, 579 U.S. at 125. Here, the text is clear. EPCA establishes certain national programs for conservation. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324 (D.C. Cir. 1986). Plaintiffs provide no persuasive evidence that Congress meant, through the same statute, to trample on the District's ability to pursue its own environmental goals where they do not contradict federal standards. With or without federalism principles to aid its analysis, the Court's conclusions remain the same.

## IV.    CONCLUSION AND ORDER

In sum, the Clean Buildings Act is not facially invalid under EPCA.  Accordingly, the Court:

**GRANTS** Defendant's Cross-Motion for Summary Judgment, Dkt. 30;

**DENIES** Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction, Dkt. 26; and

**DIRECTS** the Clerk of Court to close this case.

**SO ORDERED.**

This is a final appealable Order.  *See* Fed. R. App. P. 4(a).

Date: March 26, 2026

_____
ANA C. REYES
United States District Judge